# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RAYMOND AND DIANE FARMER, et al., | ) | Case No. 10-40269 |
| | ) | |
| | ) | |
| Debtors. | ) | |

## OBJECTION OF PALMETTO BANK, N.A. TO DISCLOSURE STATEMENT OF RAYMOND AND DIANE FARMER, et al.

Palmetto Bank, N.A. ("Palmetto"), hereby objects, pursuant to 11 U.S.C. §§ 105 and 1125 and Bankruptcy Rule 3017, to the proposed Disclosure Statement of Raymond and Diane Farmer, et al. ("Disclosure Statement"). The Disclosure Statement should not be approved because:

- the Plan and Disclosure Statement fail to comply with the Court's prior order dated May 28, 2010 which required that "there be separate voting on any Chapter 11 plan of reorganization";

- the Disclosure Statement does not contain adequate information;

- the Plan is not confirmable;

- the Plan does not clearly specify treatment for the unsecured deficiency claims of lenders;

- the Plan was not proposed in good faith;

- the Plan is not fair and equitable; and

- the Plan is not feasible.

# BACKGROUND

## A.  Pre-Petition Facts

1.     Joshua Farmer and his father Raymond Farmer (collectively, the "Farmers") formed various limited liability companies in North and South Carolina for the purpose of acquiring and operating multi-family apartment complexes and other real estate ventures.   In particular, the Farmers each owned one-half of the membership interests in the following limited liability companies (among others): (a) Wildewood Apartments of Spartanburg, LLC, a South Carolina limited liability company, (b) Meadow Green Apartments, LLC, a South Carolina limited liability company, (c) East Ridge Apartments, LLC, a South Carolina limited liability company (collectively the "Palmetto Single Asset Borrowers"), (d) Two Mile Properties, LLC, a North Carolina limited liability company (collectively with the Palmetto Single Asset Borrowers, the "Palmetto Borrowers"), (e) Timbercreek Apartments, LLC, a South Carolina limited liability company, (f) Groves Apartments, LLC a South Carolina limited liability company, (g) Georgetown Village Apartments, LLC, a South Carolina limited liability company, and (h) Gaffney Apartments, LLC, a South Carolina limited liability company (and collectively with the Palmetto Borrowers, the "Entities").

2.     Prior to March 30, 2010, each of the Entities owned certain real property and improvements, which are used as apartment complexes and other rental property (the "Properties").  With the exception of Two Mile Properties, LLC and Gaffney Apartments, LLC, each of the Entities owned only "a single piece of real estate"  *Transcript of April 16, 2010 Hearing* ("Cash Collateral Transcript") at 61:1-6.  Each of the Entities "derived substantially all of their revenues from rents" on their respective property.  *Debtors' Emergency Cash Collateral Motion* [Docket no. 4] at 2, 4.  The properties owned by the entities other than Two Mile

Properties, LLC and Gaffney Apartments, LLC constituted "single asset real estate" as that term is defined by 11 U.S.C. § 101(51B).

3.      Each of the Properties is encumbered by one or more mortgages to various lenders who had made loans to the Entities. The lenders are secured by, among other things, assignments of leases and rents on the Properties.

4.      In particular, the Palmetto Borrowers are indebted to Palmetto Bank with respect to the following loans:

| Date | Outstanding Principal Balance | Property | Debtor |
|---|---|---|---|
| June 24, 2008 | $9,850,000 | Wildewood Apartments | Wildewood Apartments of Spartanburg, LLC |
| September 29, 2006 | $5,100,000 | Meadow Green Apartments | Meadow Green Apartments, LLC |
| September 29, 2006 | $6,048,750 | East Ridge Apartments | East Ridge Apartments, LLC |
| July 21, 2006 | $2,340,000 | Addison Townhomes | Two Mile Properties, LLC |
| August 23, 2006 | $575,000 | Office and warehouse / miscellaneous | Two Mile Properties, LLC |

5.      The loans to the Palmetto Borrowers are secured by, among other things, mortgages / deeds of trust and assignments of rents in favor of Palmetto Bank. In addition, the Farmers and Two Mile Properties, LLC executed Commercial Guaranties of all obligations owed by the Palmetto Borrowers.[1]

6.      The Entities defaulted on their loans by failing to make payments to the lenders as they were due. *Cash Collateral Transcript* at 28:1 ("We've been in payment default on most all these loans since January 2009").

---

[1] Palmetto's loans to Two Mile Properties, LLC were also guaranteed by Andrea Farmer and Diane Farmer.

7.      The Entities had no equity in the Properties in March 2010 and each of the Entities was insolvent. *Cash Collateral Transcript* at 34:1-2 ("[T]here was not equity in these properties when they were conveyed."); *id*. at 53:18-20.

8.      Joshua Farmer (a practicing bankruptcy attorney) and Raymond Farmer concocted a scheme to attempt to gain the benefits of a bankruptcy reorganization while evading the requirements of the Bankruptcy Code which apply to single asset real estate entities.   In furtherance of their scheme, on or about March 30, 2010, they executed the following documents:

(a)      a Consent Resolution authorizing each of the respective Entities to transfer to the Farmers "all of the Company's assets, subject to all liens and encumbrances";

(b)      a Bill of Sale ("Bill of Sale") purporting to transfer all of the Entities interest in "furniture, fixtures, equipment and other tangible personal property that is now affixed to and/or located at the Real Property . . . and used in connection with the management, operation or repair of the Real Property" (the "Personal Property").   The Bill of Sale reflects purported consideration of "the sum of Ten Dollars ($10.00) and the assumption of all liens and encumbrances on the Personal Property"; and

(c)      quit-claim deeds purporting to transfer the real property owned by the Entities to the Farmers (the "Quit Claim Deeds", and collectively with the Consent Resolutions and the Bills of Sale, the "March 30 Transaction Documents") for the purported consideration of "Ten ($10.00) Dollars and the assumption of [the mortgages on the property]". *Cash Collateral Transcript* at 24:20 – 25:13.

9.      Between April 1 and April 5, 2010, each of the Entities filed either Articles of

Dissolution (in North Carolina) or Articles of Termination (in South Carolina).[2]  *Id.*

10.     Josh Farmer testified about various reasons for this "restructuring."  First, he

testified that all of the assets were transferred because "[w]e felt that we couldn't afford to file 12

different cases" and "it would be too expensive to have individual Chapter 11 cases for each of

these separate LLCs."  *Id.* at 25:16-23; 60:9-23.  Second, he testified that all the assets were

transferred to the Farmers to avoid the absolute priority rule which applies to corporate Chapter

11 debtors.

> Q.  And one of the reasons for doing this roll-up was to avoid the
> absolute priority rule which would have applied to the LLC cases.
> Isn't that correct.
> A.  That is a fact, yes.

*Id.* at 70:15-19.

11.     On March 31, 2010 (*after* having executed the March 30 Transaction Documents,

but without telling Palmetto regarding the transfers), the Palmetto Borrowers executed "Change in

Terms Agreements" with respect to each of the Palmetto loans.   The Palmetto Borrowers

warranted that "the terms of the original obligation or obligations, including all agreements

evidenced or securing the obligation(s), remained unchanged and in full force and effect."  This

representation was false at the time it was made because the various mortgages contained

warranties that the grantor held good and marketable title to the underlying property, and this

warranty conflicted with the Farmers' execution of the Quit-Claim Deeds.

12.     The Debtors filed their respective Chapter 11 cases on April 5, 2010.

---

[2] Two Mile Properties, LLC first changed its name to Old Two Mile Properties, LLC, and then filed a notice of
dissolution of Old Two Mile Properties.  The Debtors filed articles of organization for a newly created entity named
Two Mile Properties, LLC on April 5, 2010.

### B.  Post-Petition Facts

13.    On April 28, 2010, as part of a hearing on the Debtors' cash collateral motion, the Court *sua sponte* informed the parties that it would hear argument as to whether the Bankruptcy Code provisions relating to single asset real estate corporate entities would apply in these cases.

14.    On April 29, 2010, Palmetto filed a Motion For Determination that the Debtors are Subject to Various Provisions of the Bankruptcy Code Relating to Single Asset Real Estate and Those Applicable to Corporate Entities (the "SARE Motion").   Among other things, Palmetto requested in the SARE Motion a determination by the Court that the Debtors' attempted avoidance of the Bankruptcy Code provisions relating to separate corporations and single asset real estate entities would not be permitted.

15.    The Court conducted a hearing on the SARE Motion on May 12, 2010 and entered an oral ruling granting the Motion.   The Court's oral ruling was followed by a May 28, 2010 Order that mandated that each of the Entities have separate accounting, separate administration and separate voting on any Chapter 11 plan of reorganization.   The Court clearly stated its intent to administer the case in a manner that would be "the same as if each of the Entities and the Debtors had filed separate bankruptcy petitions." *Order Resolving Motion of Palmetto Bank for a Determination that the Debtors are Subject to Various Provisions of the Bankruptcy Code Relating to Single Asset Real Estate and Those Applicable to Corporate Entities,* [Docket No. 104] at ¶ 14 (the "SARE Order").

16.    On June 11, 2010 the Debtors filed separate schedules for each of the Entities.

17.    Around September 2010, the Debtors were in jeopardy of losing the Addison Townhomes because the property was sold at a South Carolina tax sale in the fall of 2009 and the one year redemption period for this sale ended on October 5, 2010.  The Debtors did not have the

required funds to redeem the property. Therefore, to protect the various interests in Addison Townhomes, the Debtors requested that Palmetto agree to advance the tax funds. Prior to the October 5, 2010 deadline, Palmetto redeemed the property by paying the $68,475.36 in taxes owed, but required that Palmetto would receive a priority claim for the taxes. The Debtors and Palmetto agreed that interest on the priority tax claim would accrue at the non-default contract rate set out in the loan documents, five percent (5%). A true and correct copy of an email showing this agreement is attached hereto as Exhibit A.

18.     Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its property as debtor in possession.

19.     On November 15, 2010, the Debtor filed the proposed First Amended Disclosure Statement and the Chapter 11 Plan of Reorganization ("Plan").

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 1125. This is a core proceeding pursuant to 28 U.S.C. § 157.

## ARGUMENT

### I.     STANDARD OF REVIEW

21.     In order for a disclosure statement to be approved, the proposed plan must contain adequate information and be confirmable as a matter of law. "If a chapter 11 plan is nonconfirmable on its face as a matter of law, then the court cannot approve the disclosure statement." *Collier on Bankruptcy* § 1125.03[5] n. 37 (collecting cases). "Adequate information" means information sufficient for a hypothetical investor to make an informed decision about the plan. 11 U.S.C. § 1125(a)(1). What is "adequate" is considered on a case by case basis and is left to the sound discretion of the Court. *In re Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir.), *cert. denied* 488 U.S. 926, 109 S.Ct. 311, 30 L.Ed.2d 330 (1988).

22.    A plan which is nonconfirmable does not, by definition, contain adequate

information as required by § 1125.

> Section 1125(b) of the Code gives the Court the authority to decline approval of a disclosure statement if it does not give "adequate information" to the entities that will have to vote on the plan. If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation. **Not only would allowing a nonconfirmable plan to accompany a disclosure statement, and be summarized therein, constitute inadequate information, it would be misleading and it would be a needless expense to the estate.**

*In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (emphasis supplied). *See also In re Criimi*

*Mae, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000). Accordingly, in order to gain approval of

the Disclosure Statement and show that it contains adequate information, the Debtors must

demonstrate that the proposed Plan is confirmable as a matter of law.

23.    As noted by the Debtors in the Disclosure Statement, a plan must meet several

requirements in order to be confirmed. *See Disclosure Statement* [Docket No. 265] at 19-25.

These requirements include:

(i)     the Plan classifies claims in a permissible manner;

(ii)    the Plan is in the "best interests" of all creditors;

(iii)   the Plan is feasible;

(iv)    the Plan is accepted by the requisite number of creditors or by at least one

non-insider, impaired accepting class for purposes of "cram-down" under

§ 1129(a)(10);

(v)     the Plan complies with technical requirements of the Code;

(vi)    the Debtor has proposed the Plan in good faith;

      (vii)    payments made in connection with the plan are subject to Court approval,

and

      (viii)   the Plan is fair and equitable (if not all creditors have accepted the Plan).

The Debtors' Plan fails to meet these requirements and is nonconfirmable on its face.

## II.    THE PLAN AND DISCLOSURE STATEMENT BLATANTLY DISREGARD THE SARE ORDER.

    24.    First and foremost, the Plan and Disclosure Statement are improper on their face

because they completely disregard the Court's prior SARE Order. In the SARE Order, the Court

made it clear that the assets and liabilities of the Debtors would be treated "as if the Pre-Petition

Transfers had not occurred and the Entities' assets and liabilities were being administered in

separate bankruptcy cases." *SARE Order* at ¶ 12. This separate treatment by the Court was

necessary in order to "prevent a perceived abuse or avoidance of the bankruptcy system." *Id.* at ¶

13. The Court even specifically required that there would be "separate accounting, separate

administration and separate voting on any Chapter 11 plan of reorganization." *Id.* at ¶ 14.

    25.    Despite these clear requirements by the Court, the Debtors filed both an original

and now the Amended Plan and Disclosure Statement which fail to deal with the assets and

liabilities of the Entities as if they were separate cases or separately administered. The Court's

clear directive requires at a minimum that (a) there be a *separate* plan for each Entity; and (b)

there be *separate* classification and voting of claims on an Entity level.

    26.    Rather than comply with the Court's directive, the Debtors' Disclosure Statement

lumps *all* of the Entities' assets and liabilities together for purposes of plan treatment and plan

voting. The Debtors' Plan proposes sixty-five (65) separate classes, all of which are listed as

impaired. The Debtors propose in the Disclosure Statement that all of the sixty-five (65) classes

will vote together under one plan, and the Debtor will attempt to cramdown the plan on all classes

based solely upon the vote of any single impaired class. *See* Disclosure Statement at 9 ("The

Bankruptcy Court may confirm the Plan over the objection of a non-accepting Class if one impaired Class votes to accept the plan.").

27.    It is difficult to understand the manner in which the Debtors have moved forward in this case. The SARE Order is crystal clear, and yet, the Debtors have acted in a manner which flatly ignores its requirements. The Debtors were clearly aware of the SARE Order as they reference it several times in the Disclosure Statement. In fact, on page 14 of the Disclosure Statement, the Debtors acknowledge that they are bound by the SARE Order by stating the following:

> In the SARE Order, the Bankruptcy Court required the Debtors to administer their assets and liabilities and the assets and liabilities of the Former Entities as if they were being separately administered. In order to effectuate such administration of assets and liabilities, the Plan divides the Claims against the Debtors and Former Entities into separate categories.

However, the statement is glaringly incomplete as it omits the "separate voting" requirement contained in the SARE Order.

28.    The practical implications involved in this issue are readily apparent. A lender who makes a loan to a single asset real estate entity bargains for the separate treatment and power which it will have if the entity files a bankruptcy petition. In a single asset real estate entity, there are typically only a few classes of creditors, and secured lenders have much greater protection against having an undesirable plan of reorganization crammed down upon them. In fact, "[t]he purpose of section 362(d)(3) is to address perceived abuses in single asset real estate cases, in which debtors have attempted to delay mortgage foreclosures even when there is little chance that they can reorganize successfully." *Colliers on Bankruptcy* ¶ 362.07[5]. Typically, a secured lender whose collateral has decreased in value will be able to control the applicable classes and prevent cramdown by blocking any impaired class of claims from accepting the plan. Thus, the

secured lender can bargain for acceptable treatment from the debtor or take the collateral property back.

29.    That is clearly the situation for Palmetto with regard to each of the Palmetto Single Asset Borrowers.  For each of those Entities, there are only the following classes of claims: (a) secured tax claims; (b) Palmetto's secured claim; (c) junior lender claims; and (d) general unsecured claims.  The Debtors contend that Palmetto is undersecured.  Thus, the unsecured "deficiency" portion of Palmetto's claim is properly included in the class of general unsecured claims.  *See generally In re Bryson Properties, XVIII*, 961 F.2d 496 (4th Cir. 1992).  Likewise, because Palmetto is *under*secured, each of the junior lenders behind Palmetto is simply a general unsecured creditor.  *Id.*  When the claims of junior lenders are included with general unsecured claims (including the alleged deficiency portion of Palmetto's claim), Palmetto has significantly in excess of 1/3 of the dollar amount of the class of general unsecured claims, and that class cannot be used to cramdown a plan on Palmetto over its objection.  11 U.S.C. § 1126(c) (requiring two-thirds in dollar amount and one-half in number of claims in a class to vote in favor of a plan for acceptance).  Attached hereto as <u>Exhibit B</u> is a graph which clearly demonstrates based upon the Debtor's own figures how Palmetto would control the general unsecured classes of the Palmetto Single Asset Borrowers.  Thus, only the secured tax claims are left as a separate class, and Palmetto is always left with the option of paying off those tax claims prior to a vote on the plan as those taxes constitute a first priority lien on Palmetto's collateral.

30.    The Debtors' strategy is particularly egregious because it attempts to accomplish that which the Bankruptcy Code and caselaw would not otherwise permit.  As noted in the facts, the Entities separately owned all of the properties until March 30, 2010 and had done so throughout their existence.  They had always acted separately in their accounting, corporate

formalities, etc.  The *only* reason for the transfers was to attempt to substantively consolidate the

Entities and to avoid the absolute priority rule.  The Debtors knew that substantive consolidation

would not be possible for them on a post-petition basis because they could not meet the

heightened judicial standard of proving that:

> (i) prepetition they disregarded separateness so significantly their
> creditors relied on the breakdown of entity borders and treated
> them as one legal entity, or (ii) postpetition their assets and
> liabilities are so scrambled that separating them is prohibitive and
> hurts all creditors.

*In re Owens Corning*, 419 F.3d 195, 211 (3rd Cir. 2005).  Accordingly, they transferred all the

assets a mere six (6) days prior to filing their bankruptcy petitions in order to attempt to avoid the

Bankruptcy Code restrictions and requirements.  Such actions cannot be tolerated or permitted by

debtors as an advance tactic on the eve of bankruptcy.  In the words of one bankruptcy court

dealing with a similar attempt to avoid the requirements of the law:

> Allowing [a person] to escape the strictures of [the Bankruptcy
> Code] . . . through the strategem of transferring [] title to [the
> debtor] (in violation of the due-on-transfer clause), and having her
> file a bankruptcy case, in which [a provision of the Bankruptcy
> Code] would not apply to her, would be an abuse of the bankruptcy
> system.  That would be the equivalent of a court's extending mercy
> to an orphan who acquired such status by killing his parents.
> Congress obviously did not intend [the Bankruptcy Code] to be
> readily circumvented through a conveyance [of title].

*In re Allen*, 300 B.R. 105, 116 (Bankr. D.C. 2003), *aff'd* 334 B.R. 746 (D.D.C. 2005) (holding

that inter-family transfer designed to avoid the requirements of 11 U.S.C. § 1322(b)(2) was

abusive).

     31.    What is clear is that the Debtors are skilled and knowledgeable individuals who

have retained skilled and knowledgeable bankruptcy counsel.  They were aware that they could

not cramdown a plan of reorganization if they complied with the Court's SARE Order

requirement for separate voting. Yet, rather than pursue ways in which a consensual plan could be achieved, the Debtors instead ignored the SARE Order and filed the current plan and disclosure statement. This disregard for prior orders of the Court cannot be permitted, and the Disclosure Statement cannot be approved for this reason alone.

### III.    THE PLAN IS NONCONFIRMABLE BECAUSE IT MAY IMPROPERLY DESIGNATE UNIMPAIRED CLASSES AS IMPAIRED.

32.    The Disclosure Statement does not provide adequate information to determine whether the classes for Allowed Secured Tax Claims for each of the Entities are actually impaired or whether the Priority Tax Claims are in fact unimpaired. *Disclosure Statement,* [Docket 265] at 12.

33.    The Disclosure Statement proposes that each class of non-priority Secured Tax Claims will be paid "at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of the Allowed Class 15 [or applicable number] Claim and the Reorganized Debtors, or (c) in annual Cash payments commencing twelve (12) months after the Effective Date, in an aggregate amount equal to such Allowed Secured Tax Claim as required by Section 1129(a)(9)(D) of the Bankruptcy Code, within five (5) years of the Petition Date." *Disclosure Statement* [Docket No. 265] at 21.

34.    This treatment violates 11 U.S.C. § 1125(a)(1) because it does not provide information sufficient for a hypothetical investor to make an informed decision about the plan. The three potential options for the Reorganized Debtors to treat the Secured Tax Claims are so disparate that it is impossible to determine how these classes will be treated under the proposed Plan and even whether these classes are in fact impaired under 11 U.S.C. § 1124.

35.     Should the Reorganized Debtors choose option "a" and pay the Secured Tax Claims "in full, in Cash, on the Effective Date or as soon as practicable thereafter," then the Secured Tax Claims classes would not be impaired classes as defined in 11 U.S.C. § 1124 and would not be entitled to vote.  *See In re Cho*, 164 B.R. 730, 734 n. 3 (Bankr. E.D. Va. 1994) (class which will be paid 100% of claims is "unimpaired and not entitled to vote"); *see also* Historical and Statutory Notes 11 U.S.C. § 1124 ("[A] claim or interest is unimpaired if the plan provides for their payment in cash.").

36.     The Plan and Disclosure Statement is similarly nonconfirmable because it fails to provide for the treatment of the Addison Homes tax claim which is now owned by Palmetto as a result of its post-petition payment of the Addison taxes.  To the extent the Debtor proposes that Palmetto receive the treatment of other secured tax claims against Two Mile Properties (as provided in Classes 44, 45 and 46), there is inadequate information for Palmetto to make an informed decision because the difference between receiving cash in full on the Effective Date or plan payments over five (5) years is significant and material.  Moreover, the Debtor has not demonstrated that it would even have sufficient cash to pay all pre-petition taxes in full on the Effective Date, which raises the issue of feasability of the plan.

**IV.    THE PLAN IS NONCONFIRMABLE BECAUSE IT IMPROPERLY CLASSIFIES CLAIMS IN VIOLATION OF § 1122.**

37.     At best, the Disclosure Statement and Plan are unclear with regard to how Palmetto's deficiency claims will be treated, and whether its claims (as well as the claims of all unsecured junior lenders) will be jointly classified along with other general unsecured creditors.  While a plan proponent has some discretion in classifying similar claims in separate classes, this discretion is not unlimited and must be exercised for a legitimate purpose.  *See In re Bryson*

*Properties*, 961 F.2d 496, 501 (4th Cir. 1992). Debtors are prohibited from separately classifying

claims in order to gerrymander the vote by creating an impaired class which will accept the plan.

> There must be some limit on the debtor's power to classify
> creditors . . . The potential for abuse would be significant
> otherwise . . . If the plan unfairly creates too many or too few
> classes, if the classifications are designed to manipulate class
> voting, or if the classification scheme violates basic priority rights,
> the plan cannot be confirmed.

*Id.* at 502.   The separate classification system is only permissible if done "for reasons

independent of the debtor's motivation to secure the vote of an impaired, assenting class of

claims." *Id.* (citation omitted). Failure to comply with § 1122 classification requirements makes

a Plan nonconfirmable under § 1129(a)(1).

38.   A classification system which classifies similar claims separately but gives them

the same treatment under the plan "is, at a minimum, highly suspect." *In re Bryson Properties*,

961 F.2d at 502. The claims of the second lien holders for Wildewood Apartments, East Ridge

Apartments and Meadow Green Apartments should not be designated as separate classes, but

instead should be classified with the other General Unsecured Creditors. The Debtors' schedules

list the claims of the second lien holders as completely unsecured. *See Wildewood Apartments of*

*Spartanburg, LLC Schedules and SOFA* [Docket 125] at 6; *Meadow Green Apartments, LLC*

*Schedules and SOFA* [Docket 122] at 6; *East Ridge Apartments, LLC Schedules and SOFA*

[Docket 118] at 6. Additionally, the Disclosure Statement states that for the Palmetto collateral

owned by each of the Entities, the "fair market value is less than the amount of the secured tax

claims" and the secured claims of Palmetto. *Disclosure Statement* [Docket No. 265] at 21, 22.   If

only a portion of Palmetto's total scheduled claims is secured by the collateral, it is patently

inconsistent to state that the second lien holders are secured based on the current value of the

collateral. There is no legitimate reason to create separate classes for the second lien holders when their positions are identical to the holders of General Unsecured claims.

39.     If the Debtors intended to create separate classes for the second lien holders who are completely unsecured, and not include the unsecured portion of Palmettos' scheduled claims in the General Unsecured Claims classes, this treatment is nothing other than an impermissible attempt to gerrymander the vote. If this was not the Debtors intent, then the Disclosure Statement is unclear on its face and should be amended to clarify the Debtors' position before being sent to creditors for voting.

## V.     THE PLAN IS NONCONFIRMABLE UNDER § 1129(A)(3) BECAUSE IT WAS NOT PROPOSED IN GOOD FAITH.

40.     A Chapter 11 plan cannot be confirmed unless the Court finds that it was proposed in good faith. § 1129(a)(3). Here, the Plan and Disclosure Statement were filed in disregard of the requirements of the SARE Order and were not filed in good faith. Similarly, if a plan proponent has impermissibly classified claims in an attempt to gain an impaired voting class, the plan is not proposed in good faith and may not be confirmed. "[T]he act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith." *In re Hotel Associates of Tucson*, 165 B.R. 470, 475 (9th Cir. B.A.P. 1994) (single asset real estate hotel case).

## VI.    THE PLAN IS NONCONFIRMABLE UNDER § 1129(B) BECAUSE IT IS NOT FAIR AND EQUITABLE TO ALL CLASSES.

41.     The Plan provides that Joshua and Andrea Farmer and Raymond and Diane Farmer will fund the Plan by committing the value of their projected disposable income to be received by each Debtor for a period of five (5) years, in exchange for a one hundred percent equity ownership interest in the reorganized debtor. This proposed treatment is not fair and equitable to the Debtors' creditors and must be rejected.

42.    The proposed treatment under the Plan fails because it violates the absolute priority rule which applies in all corporate Chapter 11 bankruptcies. The absolute priority rule of § 1129(b) provides that a plan is "fair and equitable" only if claims junior to unsecured claims (such as equity interests) do not receive or retain any interest in the debtor. It is undisputed that the Plan proposes allowing the Farmers to retain an equity ownership despite the fact that unsecured claimants will only be paid a percentage of the allowed value of their claim. This is a clear violation of the absolute priority rule.

43.    In the SARE Order, the Court reserved ruling on whether the absolute priority rule will apply in this case. There is no reason why the absolute priority rule should not be applicable to the property owned by corporate entities prior to the transfers done on the eve of the bankruptcy filing.

## VII.    THE PLAN IS NONCONFIRMABLE UNDER § 1129(A)(11) BECAUSE IT IS NOT FEASIBLE.

44.    Section 1129(a)(11) requires that a proposed plan be feasible, and not likely to be followed by liquidation or further reorganization. The Debtors do not address the feasibility of the Plan other than stating that they are "confident that there will be sufficient funds on hand to satisfy the minimum distributions required under § 1129(a)(9) of the Bankruptcy Code. *Disclosure Statement* [Docket No. 265] at 19. If the Plan is amended to comply with the Court's SARE Order, the Plan can not be confirmed over the objections of Palmetto and is therefore not feasible. Without convincing evidence to the contrary, Palmetto should not be forced to bear the risks of the Debtors' management of the Entities.

WHEREFORE, for all of the reasons stated herein and to be presented at the hearing on this matter, the Court should deny approval of the Disclosure Statement.

This the 8th day of December, 2010.

/s/William L. Esser IV
William L. Esser IV, Esq. (NC Bar No. 29201)
Ashley A. Edwards, Esq. (NC Bar No. 40695)
Parker Poe Adams & Bernstein, LLP
401 South Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
Facsimile: (704) 334-4706
willesser@parkerpoe.com
ashleyedwards@parkerpoe.com
*Attorneys for The Palmetto Bank*

## CERTIFICATE OF SERVICE

This is to certify that the undersigned counsel has served the OBJECTION OF PALMETTO BANK, N.A. DISCLOSURE STATEMENT OF RAYMOND AND DIANE FARMER, et al. on all of the parties to this cause through the Court's CM/ECF system in accordance with Local Rule 5005-1 as follows:

| | |
|---|---|
| Andrew T. Houston, Esq.<br>Hamilton Moon Stephens Steele & Martin<br>201 South College Street, Suite 2020<br>Charlotte, North Carolina 28244 | Travis W. Moon, Esq.<br>Hamilton Moon Stephens Steele & Martin<br>201 South College Street, Suite 2020<br>Charlotte, North Carolina 28244 |
| James Heath Pulliam, Esq.<br>Kilpatrick Stockton, LLP<br>214 North Tryon Street, Suite 2500<br>Charlotte, North Carolina 28202 | Bradley E. Pearce, Esq.<br>Katten Muchin Rosenman LLP<br>550 South Tryon Street, Suite 2900<br>Charlotte, North Carolina 28202 |
| Louis G. Spencer, Esq.<br>McNair Law Firm, P.A.<br>301 South Tryon Street, Suite 1615<br>Charlotte, North Carolina 28202 | Joe M. Lozano Jr., Esq.<br>Brice, Vander Linden & Wernick, P.C.<br>9441 LBJ Freeway, Suite 350<br>Dallas, Texas 75243 |
| Hillary Brodgers Crabtree, Esq.<br>Moore & Van Allen, PLLC<br>100 North Tryon Street, Floor 47<br>Charlotte, North Carolina 28502-4003 | U.S. Bankruptcy Administrator<br>402 West Trade Street, Suite 200<br>Charlotte, North Carolina 28202 |

This the 8th day of December, 2010.

/s/William L. Esser IV
William L. Esser IV, Esq.  (NC Bar No. 29201)
Ashley A. Edwards, Esq. (NC Bar No. 40695)
Parker Poe Adams & Bernstein, LLP
401 South Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
Facsimile: (704) 334-4706
willesser@parkerpoe.com
ashleyedwards@parkerpoe.com
*Attorneys for The Palmetto Bank*

## Esser, Will

| | |
|---|---|
| **From:** | Houston, Andrew T. [ahouston@lawhms.com] |
| **Sent:** | Thursday, September 30, 2010 3:19 PM |
| **To:** | Esser, Will |
| **Subject:** | RE: Addison Townhomes tax |

Thanks for handling this matter.  Your email accurately reflects the parties understanding regarding plan treatment for this claim.

-----Original Message-----
From: Esser, Will [mailto:willesser@parkerpoe.com]
Sent: Wednesday, September 29, 2010 5:29 PM
To: Houston, Andrew T.
Subject: RE: Addison Townhomes tax

Andy,

Palmetto has paid the taxes on Addison per our agreement.  A copy of the receipt is attached for your records.  As agreed, the amount paid by Palmetto ($68,475.36) will accrue interest at the non-default contract rate set out in the loan documents (i.e. 5%) from today's date forward, and will be treated as a priority claim under any plan submitted by the Debtors. Let me know if there is anything else you need on this, or if I have not accurately stated our agreement.  Thanks.

Will

_____

Will Esser
Partner

Three Wachovia Center | 401 South Tryon Street | Suite 3000 | Charlotte, NC 28202
Phone: 704.335.9507 | Fax: 704.335.9722 | http://www.parkerpoe.com


From: Houston, Andrew T. [mailto:ahouston@lawhms.com]
Sent: Tuesday, September 28, 2010 11:03 AM
To: Esser, Will
Subject: RE: Addison Townhomes tax

Yes, this is acceptable.  I thought I responded to you on this already.
Sorry about that.

-----Original Message-----
From: Esser, Will [mailto:willesser@parkerpoe.com]
Sent: Tuesday, September 28, 2010 10:56 AM
To: Houston, Andrew T.
Subject: RE: Addison Townhomes tax

Andy,

Did you get confirmation on this?  I would like to orally announce to the court tomorrow what we are doing on this.

Will

1

**EXHIBIT**

_A_

---

Will Esser
Partner

Three Wachovia Center | 401 South Tryon Street | Suite 3000 | Charlotte, NC 28202
Phone: 704.335.9507 |  Fax: 704.335.9722 |  http://www.parkerpoe.com


From: Houston, Andrew T. [mailto:ahouston@lawhms.com]
Sent: Thursday, September 23, 2010 2:03 PM
To: Esser, Will
Subject: RE: Addison Townhomes tax

Let me check with Josh, but I suspect that will work.

-----Original Message-----
From: Esser, Will [mailto:willesser@parkerpoe.com]
Sent: Thursday, September 23, 2010 1:52 PM
To: Houston, Andrew T.
Subject: RE: Addison Townhomes tax

Ok.  How about we just agree that the tax claim will accrue interest at
the same rate as the loan?  That seems like a reasonable middle ground
way to handle.

Will


---

Will Esser
Partner

Three Wachovia Center | 401 South Tryon Street | Suite 3000 | Charlotte,
NC 28202
Phone: 704.335.9507 |  Fax: 704.335.9722 |  http://www.parkerpoe.com


From: Houston, Andrew T. [mailto:ahouston@lawhms.com]
Sent: Thursday, September 23, 2010 11:07 AM
To: Esser, Will
Subject: RE: Addison Townhomes tax

Will,

This email will confirm our understanding that Palmetto will redeem the
property and that the Debtors will agree that Palmetto will receive a
priority claim for the taxes paid by Palmetto as set forth in sections
507(a)(8) and 1129(a)(9)(C) or (D).  To clarify one point, however, the
Debtors do not literally consent to Palmetto "stepping into the shoes"
of the taxing authority because of the excessive fees and penalties
which are charged to the delinquent taxpayer (I belive the value of the
claim doubles every 6 months).  As to the procedure for court approval,
I'll look into that on my end and see what appears to be the most
efficient way to have this approved.  Thanks, and let me know if you
have any questions.

Andy

-----Original Message-----
From: Esser, Will [mailto:willesser@parkerpoe.com]
Sent: Thursday, September 23, 2010 10:24 AM
To: Houston, Andrew T.
Subject: RE: Addison Townhomes tax

Andy,

Got your message.  Palmetto will agree to pay taxes based on debtor's
agreement that Palmetto steps into priority claim for taxes and is
entitled to priority treatment under Code with respect to these taxes.
Confirm that this is our agreement and I'll get Palmetto to pay the
taxes and get a receipt.  We can work this out with the Court in
whatever fashion you think best.  Maybe a notice of transfer of claim
would be the easiest.

Will


_____

Will Esser
Partner

Three Wachovia Center | 401 South Tryon Street | Suite 3000 | Charlotte,
NC 28202
Phone: 704.335.9507 | Fax: 704.335.9722 | http://www.parkerpoe.com


From: Houston, Andrew T. [mailto:ahouston@lawhms.com]
Sent: Tuesday, September 21, 2010 11:37 PM
To: Esser, Will
Cc: jrambo@palmettobank.com; jfarmer@farmerlegal.com
Subject: Re: Addison Townhomes tax

Will,

I understand that this is a serious issue which is why I brought this to
your attention last week. I have looked at some cases regarding the
automatic stay and the redemption issue but it appears that the rulings
are somewhat inconsistent and I don't believe that the Fourth Circuit
has spoken. I can send you pdf copies tomorrow if you'd like to review.
As far as addressing the issue, it seems like we have the same interests
on this issue.  I just spoke to Mr. Farmer and they don't have extra
money to make the payment. That said, if Palmetto consents, the Debtors
could probably make the payments from Meadow Green, East Ridge, Addison
and the office/warehouse (possibly others) in lieu of making the 10/1
adequate protection payment. Alternatively, Palmetto could redeem the
property as, it is my understanding,  it did with the other properties.
This  would increase its secured claim related to Addison (since the
taxes would have priority over the palmetto secured claim in any event).
Let's plan to discuss this first thing in the am.

Andy

----- Original Message -----
From: Esser, Will <willesser@parkerpoe.com>
To: Houston, Andrew T.
Cc: Jimmy Rambo <jrambo@palmettobank.com>
Sent: Tue Sep 21 22:58:15 2010
Subject: Addison Townhomes tax

Andy,


See attached. This is a significant issue. The Addison Townhomes was
sold at tax sale last year. The redemption period ends on OCTOBER 5,
2010. Unless $68,475.36 is paid by then, the property could be lost.
It's possible that the bankruptcy stay would keep the redemption period
from ending, but I have not looked into that issue yet. Please let me
know how the Farmers intend to pay these taxes prior to October 5.


Will


_____


Will Esser
Partner

<http://www.parkerpoe.com/images/new-logo130.jpg>

Three Wachovia Center | 401 South Tryon Street | Suite 3000 | Charlotte,
NC 28202
Phone: 704.335.9507 | Fax: 704.335.9722 | www.parkerpoe.com | vcard
<http://www.parkerpoe.com/vcard.php?PeopleID=98> | map
<http://maps.google.com/maps?q=401 South Tryon
Street%2CCharlotte%2CNC%2C28202%2CUnited States>


IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed
by the IRS, we inform you that any U.S. federal tax advice contained in
this communication (or in any attachment) is not intended or written to
be used, and cannot be used, for the purpose of (i) avoiding penalties
under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed in
this communication (or in any attachment).

PRIVILEGED AND CONFIDENTIAL: This electronic message and any attachments
are confidential property of the sender. The information is intended
only for the use of the person to whom it was addressed. Any other
interception, copying, accessing, or disclosure of this message is
prohibited. The sender takes no responsibility for any unauthorized
reliance on this message. If you have received this message in error,
please immediately notify the sender and purge the message you received.
Do not forward this message without permission. [ppab_v1.0]

EXHIBIT B

## Exhibit B

| Property | Palmetto's Claim Amounts | Debtors' Alleged Values[1] | Palmetto's Alleged Unsecured Claims | Total Unsecured Claims in Class | One-third of the Total Unsecured Claims in Class |
|---|---|---|---|---|---|
| Wildewood Apartments | $11,653,175.00 | $6,050,000.00 | $5,603,175.00 | $7,412,424.54[2] | $2,470,807.90 |
| Meadow Green Apartments | $4,747,931.00 | $2,050,000.00 | $2,697,931.00 | $2,809,949.57[3] | $936,649.73 |
| East Ridge Apartments | $6,117,777.00 | $3,750,000.00 | $2,957,777.00 | $4,467,432.00[4] | $1,489,143.80 |

[1] The amounts reflected in the chart are based on the property values listed in the Debtors' Disclosure Statement. Palmetto reserves all rights with regard to the values of the properties.

[2] The amount is composed of Palmetto's Alleged Unsecured Claim, Harbour Finance Limited's Unsecured Claim and the General Unsecured Claims listed in the schedules for Wildewood Apartments.

[3] The amount is composed of Palmetto's Alleged Unsecured Claim, Reynolds' Unsecured Claim and the General Unsecured Claims listed in the schedules for Meadow Green Apartments.

[4] The amount is composed of Palmetto's Alleged Unsecured Claim, Harbour Finance Limited's Unsecured Claim and the General Unsecured Claims listed in the schedules for East Ridge Apartments.