IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(CHARLOTTE DIVISION)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Joshua and Andrea Farmer** | ) | Chapter 11 |
| | ) | Case No. 10-40270 |
| Debtors. | ) | |
| In re: | ) | |
| | ) | |
| **Raymond and Diane Farmer** | ) | Chapter 11 |
| | ) | Case No. 10-40269 |
| Debtors. | ) | |
| | | District Court Case No. |

**BRIEF OF THE DEBTORS IN SUPPORT OF APPELLATE JURISDICTION
UNDER 28 U.S.C. § 158(a)(1) OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO
APPEAL PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8003**

### Factual and Procedural History

The Debtors in these individual chapter 11 cases are Joshua and Andrea Farmer and Raymond and Diane Farmer.  Joshua Farmer is the son of Raymond and Diane Farmer.  Joshua Farmer and Andrea Farmer are both practicing attorneys, and partners in the law firm of Tomblin, Farmer & Morris, PLLC.  Raymond Farmer is one of the principals of Carlson-Farmer, Inc., a North Carolina corporation ("Carlson Farmer").  Carlson-Farmer is a construction company located in Rutherfordton, North Carolina.  Diane Farmer has taught elementary school for over twenty years.

Prior to March 31, 2010, Joshua Farmer and Raymond Farmer (the "Farmers") each owned one-half of the membership interests in the following limited liability companies: (i) Wildewood Apartments of Spartanburg, LLC, a South Carolina limited liability company; (ii) Meadow Green Apartments, LLC, a South Carolina limited liability company; (iii) East Ridge Apartments, LLC, a South Carolina limited liability company; (iv) Timbercreek Apartments,

LLC, a South Carolina limited liability company; (v) Groves Apartments, LLC, a South Carolina limited liability company; (vi) Georgetown Village Apartments, LLC, a South Carolina limited liability company; (vii) Gaffney Apartments, LLC, a South Carolina limited liability company; and (viii) Two Mile Properties, LLC, a North Carolina limited liability company (each an "Entity," and collectively, the "Entities"). Each Entity owned certain real property and improvements, which were and are operated as apartment complexes and other rental properties (the "Properties"). The Entities derived substantially all of their revenues from rents related to the Properties.

The Farmers also each owned one-half of the membership interests in a separate, North Carolina limited liability company, Two Mile Enterprises, LLC, which managed the various Properties pursuant to contracts with the Entities.

On or about March 30, 2010, each Entity executed the following documents:

(a)    Minutes of the Meeting of the Members, whereby it was resolved that "all assets of the company, including all real and personal property and all tangible and intangible assets, be transferred to [Raymond Farmer and Joshua Farmer] in a ratio equal to each member's proportional membership interest in the company in consideration of the member's assuming liabilities of the company per the company's accounting records";

(b)    a Consent Resolution authorizing each Entity to transfer to the Farmers "all of the Company's assets, subject to all liens and encumbrances";

(c)    a Bill of Sale, transferring to the Farmers all of the Entities interest in "furniture, fixtures, equipment and other tangible personal property that is now affixed to and/or located at the Real Property . . . and used in connection with the management, operation or repair of the Real Property"; and

(d)    a quit-claim deed or non-warranty deed transferring the real property owned by the Entities to the Farmers.

Between April 1 and April 5, 2010, each Entity also filed either Articles of Dissolution (in North Carolina) or Articles of Termination (in South Carolina). As a result of these transfers,

each of the Properties is now directly owned by Joshua Farmer and Raymond Farmer jointly, subject to the liens and encumbrances of each Entity's creditors.

On April 5, 2010 (the "Petition Date"), the Debtors filed two voluntary joint petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina. The Honorable George R. Hodges has presided over these individual chapter 11 cases since their inception. The chapter 11 cases were administratively consolidated by an order entered on May 10, 2010.

At the outset of these bankruptcy cases, the Bankruptcy Court heard substantial testimony from Joshua Farmer at an interim hearing on the Debtors' motions to authorize the use of cash collateral on April 16, 2010. During this hearing, the unrebutted testimony of Mr. Farmer established that he informed The Palmetto Bank's special assets officer in February 2010 that he was planning to restructure his affairs by collapsing the former entities, transferring the assets to himself and his father, and filing for relief under chapter 11 of the Bankruptcy Code. Attached hereto as **Exhibit A** is a copy of the relevant portion of the April 16 hearing transcript. At the conclusion of the April 16 hearing, the Bankruptcy Court authorized the use of cash collateral on an interim basis and scheduled a final hearing on April 28, 2010.

At the conclusion of the final cash collateral hearing on April 28, 2010, Judge Hodges stated that he wondered whether the parties in interest "ought to be going by the single asset rules" although Judge Hodges further stated that "as presently filed, this is technically not a single asset case."[1] The Bankruptcy Court elaborated that it could address whether the single asset real estate rules should apply in these bankruptcy cases on its own motion, or allow the

---

[1] Under section 362(d)(3) of the Bankruptcy Code, a single asset debtor is required to commence making interest payments to its secured creditors at the nondefault contract rate of interest on the value of the collateral or file a plan of reorganization within ninety days of the petition date.

parties to address the issue at a later hearing. After hearing from the respective parties, the Bankruptcy Court agreed to hear arguments on this issue on May 12, 2010.

On April 29, 2010, The Palmetto Bank ("Palmetto") filed a motion seeking to have the single asset rules apply in this case and broadened the scope of the bankruptcy court's inquiry by requesting that all rules applicable to corporations under the Bankruptcy Code be applied in these jointly administered, *individual* chapter 11 cases (the "SARE Motion") (Docket No. 58).[2]  In a supporting Memorandum of Law, Palmetto attempted to radically expand the Court's inquiry and requested that this Court render the pre-petition transfers void despite the fact that no adversary proceeding was filed and despite providing virtually no notice (Docket No. 70).

At the May 12 hearing, Palmetto did not call a single witness to testify, nor did it introduce any evidence in support of its SARE Motion.  Rather, counsel for Palmetto argued three points in support of the SARE Motion. First, Palmetto argued that the pre-petition transfers are void under South Carolina fraudulent transfer law.  Next, Palmetto argued that the absolute priority rule should apply in these *individual* chapter 11 cases.  Finally, Palmetto argued that the single asset real estate rules (*i.e.*, section 362(d)(3) of the Bankruptcy Code) should apply to the Debtors' former limited liability companies, which would have qualified as "single asset" entities absent the pre-petition consolidation of their assets and liabilities.  Attached hereto as **Exhibit B** is a complete copy of the May 12, 2010 hearing transcript.[3]

At no point during the May 12 hearing did Palmetto (or any other creditor) argue: (i) that the bankruptcy court should require the Debtors to have one impaired class of creditors of each former Entity accept a proposed plan in order to confirm a "cramdown" plan over the objection of a class of creditors (*i.e.*, the Debtors would need at least ten separate impaired classes to

---

[2] Unless otherwise identified, all references made to the "Docket" relate to the lead bankruptcy case of In re: Farmer, Case No. 10-40269.
[3] Palmetto's arguments are set forth at pages 4-8 of the attached Exhibit B.

confirm a plan), or (ii) that the Debtors had to file separate plans for <u>each</u> of the former Entities <u>and</u> the individual debtors.

In fact, with respect to the latter, counsel for Palmetto actually argued that the assets of the former Entities should be treated in separate "buckets" in one plan:

> Mr. Esser: Now, we don't want to insist that the debtors have to file separate cases and bear the various administrative expenses but, if the court were to rule that all of these single assets would be put into separate buckets and **the plan** is going to have to treat them with separate buckets, then I think that would be an appropriate resolution to dealing with this.

(Ex. B, p. 19, Lines 13-19)(emphasis added).

The Bankruptcy Court narrowed the issues raised by Palmetto stating: "…the main thing we need to address today is application of the single asset rules," (Ex. B, p. 16, Lines 15-16), and ultimately required "that the single-asset rules apply as to the six properties" (Ex. B, p. 20, Lines 11-12). The Bankruptcy Court specifically rejected Palmetto's argument that the fraudulent transfer issue was properly before the Court and stated: "…if Palmetto or anyone else wants to pursue the fraudulent transfer issue, I think we need to do that by adversary proceeding and we will deal with that as it comes up" (Ex. B, p. 21, Lines 2-5). Speaking to that issue during the hearing, counsel for Palmetto stated: "…[b]ut ultimately, Your Honor, if you believe an adversary proceeding is necessary on the fraudulent transfer issue, Palmetto will **immediately** file one…" (Ex. B, p. 6, Lines 21-23) (emphasis added). No such adversary proceeding was ever filed by Palmetto or any other creditor. Nor has any creditor filed a motion to dismiss the bankruptcy as a "bad faith" filing.

The Bankruptcy Court also reserved ruling on the application of the absolute priority rule, stating that this issue would be addressed "…in conjunction with a plan or confirmation of the plan" (Ex. B, p. 16, Lines 3-5). The Bankruptcy Court ultimately stated as follows:

> The Court: So I will say today that [the single asset rules] will apply as to the-I guess the 362 parts, but I think we will also have to have separate accountings and probably separate voting and the other kind of things. We can deal with that as a final matter down the road…

(Ex. B, p. 20, Lines 20-23. Finally, the Bankruptcy Court required the Debtors to file separate schedules and stated: "…in terms of laying out schedules, it would probably be a good idea to have just an amended set of schedules that shows what goes where with each entity" (Ex. B, p. 22, Lines 14-16).

On May 28, 2010, the Court entered the SARE Order. Attached hereto as **Exhibit C** is a true and correct copy of the bankruptcy court's SARE Order entered on May 28, 2010. In pertinent part, the SARE Order provides:

- The Court finds that on these facts it is appropriate to treat the Debtors' assets and liabilities as if the Pre-Petition Transfers had not occurred and the Entities' assets and liabilities were being administered in separate bankruptcy cases (Ex. C, SARE Order, ¶ 12);

- The Court's intention is to administer the present cases in such a way that it would be the same as if each of the Entities and the Debtors had filed separate bankruptcy petitions. This separate administration will include not only separate application of the provisions of Section 362 of the Code with respect to each Entity and its assets and liabilities before the Pre-Petition Transfers, but will also require separate accounting, separate administration and separate voting on any Chapter 11 plan of reorganization (Ex. C, SARE Order, ¶ 14);

- To aid in the administration of these cases as a whole, the Debtors should file separate schedules and statements of financial affairs for each Entity (Ex. C, SARE Order, ¶ 15);

- The rules applicable to single asset real estate cases shall apply to the assets held by the Single Asset Entities prior to the date of the Pre-Petition Transfers and the administration of these proceedings shall be governed by the applicable provisions of the Bankruptcy Code as applied to the various assets and liabilities as if the Pre-Petition Transfers had not occurred and the Entities' assets and liabilities were being administered in separate bankruptcy cases; provided however, that the Court will not rule at this time as to whether the absolute priority rule will apply in these cases (Ex. C., SARE Order, Decretal ¶ A);

- The Court will not rule at this time on Palmetto and Inland's argument that the Pre-Petition Transfers to the Debtors are void fraudulent transfers. A determination

concerning the Debtors' interest (if any) in the various transferred properties shall be resolved in the context of an adversary proceeding under Bankruptcy Rule 7001 (Ex. C, SARE Order, Decretal ¶ B);

- The Debtors are directed to file amended schedules and statements of financial affairs for themselves and for each of the Entities on or before June 11, 2010. The amended schedules and statements of financial affairs shall separately list the assets and liabilities for each of the Entities as if the Pre-Petition Transfers had not occurred (Ex. C, SARE Order, Decretal ¶ C);

- Nothing herein shall be deemed to address the effectiveness of the Pre-Petition Transfers or the validity of any lien or claim of a creditor. The rights of all parties with regard to these issues are specifically preserved (Ex. C, SARE Order, Decretal ¶ D).

In compliance with the Bankruptcy Court's SARE Order, the Debtors filed separate schedules for each of the former Entities and the individual debtors on June 11, 2010 (Docket Nos. 118-27). Similarly, the Debtors filed a Joint Plan of Reorganization and Joint Disclosure Statement on July 6, 2010 (Docket Nos. 137-38). The hearing on the initial disclosure statement was scheduled for August 11, 2010. The Debtors filed a motion to continue the hearing on the initial Disclosure Statement on August 3, 2010, and sought leave to amend (Docket No. 173).

The Bankruptcy Court granted leave to amend and the Debtors filed the Amended Disclosure Statement of November 15, 2010 (the "Disclosure Statement")(Docket No. 265). Contemporaneously therewith, the Debtors filed the First Amended Joint Plan of Reorganization of Raymond and Diane Farmer and Joshua and Andrea Farmer, Pursuant to Section 1121(a) of the Bankruptcy Code (the "Plan") (Docket No. 264). The Plan was attached as Exhibit A to the Disclosure Statement. On November 16, 2010, the Bankruptcy Court issued an Order and Notice for Hearing on Disclosure Statement scheduling the hearing on December 15, 2010 (Docket No. 266).

On December 8, 2010, Palmetto filed an Objection to the Disclosure Statement (the "Palmetto Objection")(Docket No. 285). The same day, the First National Bank of the South

("FNBS") filed a similar objection to the Amended Disclosure Statement (Docket No. 290). On

December 9, 2010, U.S. Bank, N.A. ("US Bank") filed a similar objection to the Disclosure

Statement (Docket No. 291). 1230 Overbrook Holdings, LLC ("1230 Overbrook") and CBA-

Mezzanine Capital Finance, LLC ("CBA," and together with 1230 Overbrook and US Bank, the

"Securitization Creditors"), also filed an objection to the Disclosure Statement on December 9,

2010. The primary objection raised by Palmetto, FNBS, and the Securitization Creditors is that

the Debtors' Disclosure Statement failed to comply with the SARE Order. Specifically, those

creditors shared an interpretation of the SARE Order that required the Debtors: (a) to file

separate plans for each Entity; and (b) to have multiple impaired classes accept the Plan in order

for the Debtors to confirm a cramdown plan over their respective objections.

On December 13, 2010, the Debtors filed the Response of the Debtors to the Objection of

the Palmetto Bank to Disclosure Statement of Raymond and Diane Farmer, *et al.* (the

"Response")(Docket No. 293). In the Debtors' Response, the Debtors argued initially that the

Disclosure Statement provided adequate information to its creditors. In addition, the Debtors

refuted the interpretation of the SARE Order put forth by Palmetto, FNBS, and the Securitization

Creditors because such interpretation was not supported by the record in the case and, more

fundamentally, because that interpretation meant that the Bankruptcy Court specifically rewrote

sections 1129(a)(10) and 1129(c) of the Bankruptcy Code, by virtue of its equitable powers

under section 105(a) of the Bankruptcy Code.

After a hearing on the Disclosure Statement held on December 15, 2010, the bankruptcy

court accepted the position asserted by Palmetto, FNBS, and the Securitization Creditors.

Attached hereto as **Exhibit D** is a true and correct copy of the transcript from the December 15,

2010 hearing. While the Bankruptcy Court seemingly acknowledged that it could not accept the

complaining creditors position by stating that "Congress may not have intended ten separate
confirmation orders"(Ex. D; p. 36, Lines 2-3), it nevertheless endorsed that incongruous result in
its ruling:

> Mr. Esser: That—so essentially, you end up with—it may be in one document, but
> you end up with ten confirmation hearings?

> The Court: Exactly.

(Ex. D, p. 38, Lines 2-5).

The Bankruptcy Court entered its Order Denying Approval of the Debtors' First
Amended Joint Disclosure Statement on January 6, 2011 (the "Disclosure Statement
Order")(Docket No. 322).    Attached hereto as Exhibit E is a copy of the Disclosure
Statement Order.    The Disclosure Statement Order provides in pertinent part the
following:

- Among other things, the Disclosure Statement fails to comply with the SARE
  Order because it allows for the possibility that a class of creditors holding claims
  against one Entity could be used as an impaired accepting class to cramdown a
  plan over the objection of classes of creditors holding claims against an entirely
  separate Entity.  This fails to comply with the SARE Order requirement that each
  Entity's assets and liabilities would be treated as if it were in a separate
  bankruptcy case, with separate accounting, separate administration and separate
  voting for each of the Entities (Ex. E, ¶3);

- In the SARE Order, the Court left open the question of whether the "absolute
  priority" rule of 11 U.S.C. § 1129(b) would apply with regard to the assets of each
  of the Entities.  The Court now resolves that question by holding that the
  "absolute priority" rule shall apply to each of the Entities in the same manner as if
  none of the Pre-Petition Transfers had occurred (Ex. E, ¶4);

- On or before January 26, 2011, the Debtors shall submit new Disclosure
  Statement(s) and proposed Plan(s) for each of the Entities in conformity with the
  SARE Order and this Order.  Any such plan(s) shall provide for separate
  treatment and separate voting for each of the Entities as if the Pre-Petition
  Transfers had not occurred.  In addition, each plan(s) shall comply with the
  requirements of the absolute priority rule of 11 U.S.C. § 1129(b) as if the Pre-
  Petition Transfers had not occurred.  The plan(s) related to each Entity shall be
  treated separate and apart from the plan(s) for any other Entity in the same way as

if the Pre-Petition Transfers had not occurred and the Entities' assets and liabilities were being administered in separate bankruptcy cases (Ex. E, Decretal ¶B).

The Debtors filed a Notice of Appeal with the bankruptcy court on January 20, 2011, indicating their intention to appeal the SARE Order and the Disclosure Statement Order (Docket No. 328).[4]  This brief is submitted in support of the Notice of Appeal.

## ARGUMENT

### I.     *The Disclosure Statement Order Can be Appealed As of Right Because it is Final Order Under 28 USC 158(a).*

The United States District Court for the Western District of North Carolina has jurisdiction to hear appeals "…from final judgments, orders and decrees…" entered by the Bankruptcy Court.  28 U.S.C. §158(a)(1).

While section 158(a)(1) addresses "final orders," the concept of finality in bankruptcy cases raises a set of unique considerations and requires the district court to consider "finality in a more pragmatic and less technical way in bankruptcy cases than in other situations." *Committee of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 241 (4th Cir. 1987)(citation omitted).  These unique considerations were outlined by the Third Circuit as follows:

> The rationale for viewing finality under a less rigorous standard in the bankruptcy area is clear. Bankruptcy cases frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory.

*In re Amatex Corp.*, 755 F.2d 1034, 1039 (3d Cir. 1985).  Accordingly, "orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger

---

[4] Since the Disclosure Statement incorporated the SARE Order by reference as part of the bankruptcy court's findings, the Debtors have appealed both orders.  Unless referred to separately, the term "Disclosure Statement Order" as used herein is also intended to include the SARE Order.

case." *Gold v. Guberman (In re Computer Learning Ctrs., Inc.)*, 407 F.3d 656, 660 (4th Cir. 2005); *see also In re Saco Local Dev. Corp.*, 711 F.2d 441, 444 (1st Cir. 1983) (Breyer, J.).

Although an order denying approval of the disclosure statement is typically an interlocutory order, *See, e.g., In re Wallace & Gale Co.*, 72 F.3d 21, 25 (4th Cir. 1995), at least one district court has ruled that the decision of the bankruptcy court addressing the adequacy of a disclosure statement is a final appealable order. *In re Snyder*, 56 B.R. 1007, 1010 (N.D. Ind. 1986)(stating "…the only consistent conclusion to be drawn from the implications of § 1125(d) is that an order approving a disclosure statement is appealable by a party in interest"). Here, the Debtors submit that the Disclosure Statement Order is a final order because it did not truly address the adequacy of the information provided to creditors. Instead, it was used as a vehicle to determine substantive property rights and to unravel the pre-petition transfer of assets.

Before a plan proponent can solicit acceptance or rejection of a chapter 11 plan of reorganization, a written disclosure statement must be approved by the bankruptcy court as containing "adequate information." 11 U.S.C. §1125(b). Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind…that would enable a such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. §1125(a)(1). Although there is no precise formulation of the specific information that should be included in a disclosure statement, one bankruptcy court has listed multiple categories of information that should be considered for inclusion in a disclosure statement. *In re Ferretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991). Among other things, the disclosure statement should include: (i) a description of the available assets and their values; (ii) the anticipated future of the debtor and financial projections; (iii) information regarding claims against the estate; (iv) a liquidation analysis showing what a creditor would receive in a chapter 7 case; (v) information

regarding the future management of the debtor and compensation; and (vi) a summary of the plan of reorganization. *Id.*

In this case, the Debtors submit that the Disclosure Statement Order was not truly an interlocutory order determining that the Disclosure Statement failed to provide adequate information to creditors. In fact, even a cursory review of the December 15, 2010 hearing transcript (Ex. D, pp. 35-40) and the Disclosure Statement Order (Ex. E) make clear that the bankruptcy court never addressed whether the Disclosure Statement provided adequate information to creditors because the bankruptcy court never addressed any of the categories of information set forth in the *Ferretti* decision.

Instead, the bankruptcy court clarified its previous ruling in the SARE Order and stated that the Disclosure Statement could not be approved because it failed to comply with the SARE Order's "separate voting" requirement (Exhibit E, Disclosure Statement Order, ¶3). In other words, the Court refused to approve the Disclosure Statement because it failed to provide that the Debtors would have to receive no less that ten impaired classes of creditors accept the plan in order to cramdown a plan of reorganization over the objection of a class of creditors.

More fundamentally, however, the Disclosure Statement Order and the SARE Order stand for the proposition that the bankruptcy court unraveled the pre-petition substantive consolidation of assets and apparently resurrected the Entities that were properly dissolved pursuant to state law. In the SARE Order, the bankruptcy court explicitly stated that it was not ruling on the validity or effectiveness of the pre-petition substantive consolidation of assets by stating "[n]othing contained herein shall be deemed to address the effectiveness of the Pre-Petition Transfers…the rights of all parties with regard to these issues are specifically preserved" (SARE Order, Decretal ¶D). The bankruptcy court further stated that any dispute as to the

validity of the pre-petition transfers "…shall be resolved in the context of an adversary

proceeding under Bankruptcy Rule 7001" (Ex. C, SARE Order, Decretal ¶B).

Notwithstanding decretal paragraphs B and D of the SARE Order, the bankruptcy court

did in fact address the effectiveness and validity of the pre-petition substantive consolidation

without an adversary proceeding by stating:

- The Court finds that on these facts it is appropriate to treat the Debtors' assets and liabilities **as if the Pre-Petition Transfers had not occurred and the Entities' assets and liabilities were being administered in separate bankruptcy cases** (Ex. C, SARE Order, ¶ 12);

- The Court's intention is to administer the present cases in such a way that it would be the same **as if each of the Entities and the Debtors had filed separate bankruptcy petitions**.  This separate administration will include not only separate application of the provisions of Section 362 of the Code with respect to each Entity and its assets and liabilities before the Pre-Petition Transfers, but will also require separate accounting, separate administration and separate voting on any Chapter 11 plan of reorganization (Ex. C, SARE Order, ¶ 14);

- The rules applicable to single asset real estate cases shall apply to the assets held by the Single Asset Entities prior to the date of the Pre-Petition Transfers and the administration of these proceedings shall be governed by the applicable provisions of the Bankruptcy Code as applied to the various assets and liabilities **as if the Pre-Petition Transfers had not occurred and the Entities' assets and liabilities were being administered in separate bankruptcy cases**; provided however, that the Court will not rule at this time as to whether the absolute priority rule will apply in these cases (Ex. C, SARE Order, Decretal ¶ A);

- Rather, it was the Court's intention in entering the SARE Order to ensure that the parties had the same substantive and procedural rights **as if the Pre-Petition Transfers had never occurred** and each of the Entities had filed a separate bankruptcy case (Ex. E, Disclosure Statement Order, ¶2);

- The Court now resolves that question by holding that **the "absolute priority" rule shall apply to each of the Entities in the same manner as if none of the Pre-Petition Transfers had occurred** (Ex. E, Disclosure Statement Order, ¶4);

When these provisions are read together with the bankruptcy court's requirements that

the Debtors must file multiple plan(s) and have multiple impaired classes accept the plan(s) (Ex.

E, Disclosure Statement Order, Decretal ¶B), there is only one unmistakable conclusion. That the bankruptcy court unraveled the pre-petition substantive consolidation, without the filing of an adversary proceeding as it stated it would require, without the Constitutionally mandated requirements of notice and a hearing, and despite the fact that Palmetto failed to introduce any evidence whatsoever in support of its SARE Motion. In sum, the Debtors submit that the bankruptcy court's Disclosure Statement Order effectuated a substantive *de*consolidation of assets and that this Court should look to opinions addressing substantive consolidation orders in determining whether the Disclosure Statement Order is "final" under section 158(a)(1).

In *Alexander v. Compton,* the United States Court of Appeals for the Ninth Circuit addressed the issue of whether an order of substantive consolidation was a final order under section 158(a). In that case, the Bankruptcy Court entered an order substantively consolidating the assets and liabilities of two entities with those of the individual formerly controlling both entities. *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 760 (9th Cir. 2000). Various investors filed notices of appeal to the District Court but the District Court concluded that the substantive consolidation order was not a final order and remanded the case to the Bankruptcy Court. *Id*. at 760.

On appeal, however, the Ninth Circuit reversed the District Court and held that "substantive consolidation orders are final and appealable under § 158(a)… [because it] seriously affects the substantive rights of the involved parties." *Id. at 762*. In reaching its ruling, the *Alexander* Court pointed out that an order addressing substantive consolidation "is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights." *Id*. Indeed, the Ninth Circuit reasoned that the Bankruptcy Court's order "'finally determined' the 'discrete issue' of whether [the entities] should be substantively consolidated with [the

individual's] estate, a decision that 'resolved and seriously affected substantive rights' of the

parties." *Id*. The Court further elaborated that a consolidation order is of the sort that "'can

cause irreparable harm if the losing party must wait until the bankruptcy court proceedings

terminate before appealing.'" *Id*. The court thus concluded that the consolidation order was a

final order under section 158(a). *Id*.

Much like the consolidation order in *Alexander*, the Disclosure Statement Order is final

and appealable because it seriously affects the substantive rights of the Debtors. In the first

instance, the Disclosure Statement Order is immediately appealable because it finally addressed

the discrete issue of whether the bankruptcy court would unravel the pre-petition substantive

consolidation of assets. Since the bankruptcy court effectively unraveled the transfers, then the

Debtors should have an absolute right to appeal the bankruptcy court's determination.

In addition, the bankruptcy court finally determined the discrete issues of whether the

absolute priority rule applies in individual chapter 11 cases and further compelled the Debtors to

submit multiple plans of reorganizations. Each of these determinations are "final" in the

jurisdictional sense because they will cause "irreparable harm" to the Debtors if they "must wait

until the bankruptcy court proceedings terminate before appealing." *Alexander*, 229 F.3d at 762.

Accordingly, the Debtors have an absolute right to appeal the Disclosure Statement Order under

28 U.S.C. § 158(a)(1).

**II.    *Alternatively, this Court has Jurisdiction to Hear this Appeal Because the Disclosure
Statement Order may be Reviewed Under the "Collateral Order Doctrine."***

The Disclosure Statement Order may be reviewed under the 'collateral order doctrine'

originally enunciated by the Supreme Court in *Cohen v. Beneficial Industrial Loan Corp.,* 337

U.S. 541 (1949). The Fourth Circuit has described the collateral order doctrine as follows:

> Th[e] doctrine treats certain interlocutory orders as *final* for purposes of appeal, on the grounds that such "collateral orders" present self-contained issues that are independently ripe for immediate appellate review, despite the pendency of further proceedings in the district court. In other words, "collateral orders" *are* final orders .

*Jones v. Braxton*, 392 F.3d 683, 686 (4th Cir. 2004) (citation omitted). To be reviewable under the collateral order doctrine, an order "must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *See, e.g., Grundy Nat'l Bank v. Looney (In re Looney)*, 823 F.2d 788, 791 (4th Cir. 1987). This brief addresses each of these elements in turn.

In the first instance, the Disclosure Statement Order conclusively determined multiple disputed questions. A leading treatise on federal practice has described the requirement of conclusive determination as follows:

> [A] disposition ordinarily should be held final for purposes of collateral order appeal when the district judge believes that it has been finally resolved for purposes of whatever proceedings remain to defeat a conventionally final judgment. Thus the bare fact that Civil Rule 54(b) establishes the power to reconsider any order at any time before formal entry of judgment does not defeat collateral order finality. ***It is enough that no further consideration is contemplated***.

Wright, Miller & Cooper, *Fed. Prac. & Proc.: Jurisdiction 2d* § 3911.1 (emphasis added) (citations omitted).

In this case, the Disclosure Statement Order conclusively determined that the absolute priority rule would apply in these individual chapter 11 cases because the bankruptcy court was clear that no further consideration of that issue was contemplated (Ex. E, ¶4; "The Court now resolves that question by holding that the "absolute priority" rule shall apply."). Likewise, the Disclosure Statement Order reflects conclusive determinations that: (i) the pre-petition

substantive consolidation had been unraveled (Ex. E, ¶3), and (ii) that the Debtors are required to file multiple plans of reorganization and have multiple impaired classes of claims vote in favor of the plan in order to confirm a plan over the objection of a creditor (Ex. E, Decretal ¶B).

These issues are important in this case because they impact substantial rights of the Debtors.  In the case of the absolute priority rule, the Disclosure Statement Order requires that the Debtors pay all of their creditors in full in order to retain any of their property.  This result, however, is at odds with the requirement is section 1129(a)(15) of the Bankruptcy Code, which requires an individual debtor to commit the value of their "projected disposable income" to fund a plan of reorganization if a creditor objects.

Moreover, the bankruptcy court's requirements of multiple plans and multiple "cramdown" classes is contrary to the express terms of section 1129(a)(10) and 1129(c).  Under section 1129(a)(10) of the Bankruptcy Code, the Debtor only needs one impaired class of creditors to accept the plan in order to confirm a plan of reorganization.  Further, the Bankruptcy Court may only confirm one plan under section 1129(c) of the Bankruptcy Code.  The Disclosure Statement Order has effectively rewritten these sections of the Bankruptcy Code and made it virtually impossible for the Debtors in this case to confirm a plan of reorganization over the objection of one creditor.

Next, the Disclosure Statement Order is practically unreviewable as a final matter because it compels the Debtors to tender a plan that the Debtors do not want confirmed.  Specifically, the bankruptcy court has made it clear that it will not even consider a plan filed by the Debtors unless it complies with the additional hurdles the bankruptcy court set in the Disclosure Statement Order.  Since the Debtors submit that these additional hurdles are not supported by existing law, then it is impossible for the Debtors to have the opportunity to ever

get to a confirmation hearing in these cases. The Disclosure Statement Order is thus unreviewable.

Further, this appeal involves a "serious and unsettled" question of law. Although the Fourth Circuit has held that the presence of a "serious and unsettled question" on appeal is not a necessary element of the collateral order doctrine, *Under Seal v. Under Seal*, 326 F.3d 479, 484 (4th Cir. 2003), the presence of such an issue here—the question of the applicability of the "absolute priority" rule in individual Chapter 11 cases—further supports the application of the collateral order doctrine to the Disclosure Statement Order.

Indeed, the Fourth Circuit has not addressed this issue and the jurisdictions are split as to whether the absolute priority rule applies in individual chapter 11 cases. *In re Shat*, 424 B.R. 854 (Bankr. D. Nev. 2010)(holding that the absolute priority rule does not apply to individual chapter 11 cases); *In re Roedemeier*, 374 B.R. 264 (Bankr. D. Kan. 2007)(same); *In re Tegeder*, 369 B.R. 477 (Bankr. D. Neb. 2007)(same). *Compare with In re Mullins*, 435 B.R. 352 (Bankr. W.D. Va. 2010)(holding that the absolute priority rule applies to pre-petition assets); *In re Gbaedo*, 431 B.R. 222 (Bankr. N.D. Cal. 2010)(same). The Court thus has jurisdiction to hear this appeal under the collateral order doctrine.

### III.   *Alternatively, this Court Should Grant the Debtors Leave to Appeal Pursuant to Rule 8003 of the Federal Rules of Bankruptcy Procedure.*

#### A.  *Statement of the Questions Presented by the Appeal.*

1.  Whether the bankruptcy court erred as a matter of law by applying the absolute priority rule in an individual chapter 11 case?

2.  Whether the bankruptcy court exceeded its authority under section 105(a) of the Bankruptcy Code by requiring the Debtors to file multiple plans of reorganization.

3.  Whether the bankruptcy court exceeded its authority under section 105(a) of the Bankruptcy Code by requiring the Debtors to have multiple impaired classes of creditors accept a plan of reorganization in order to cramdown a plan of reorganization over the objection of a dissenting creditor.

4.  Whether the bankruptcy court erred as a matter of law by unraveling the pre-petition transfers without any party in interest filing an adversary proceeding.

5.  Whether the Debtors were deprived of due process of law because the pre-petition transfers were unraveled by the bankruptcy court without notice and a hearing, or any evidentiary record before the court.

### B.  Standards Governing a Motion for Leave to Appeal Under Rule 8003.

As set forth above, the Disclosure Statement Order is properly before the District Court as a matter of right because it is a final order.  However, in the event that the Court should determine that it is not a final order, it may nonetheless exercise its discretion to hear the important issues presented by the appeal that are discussed above.  *See, e.g., In re Wallace & Gale Co.*, 72 F.2d 21, 25 (4th Cir. 1995) ("[T]he decision whether to grant leave to appeal from a bankruptcy court's interlocutory order is committed to the district court's discretion." (citing *In re Texas Extrusion Corp.,* 844 F.2d 1142, 1156 (5th Cir.1988)).  In a recent unpublished decision, Judge Thornburg stated the following regarding when such discretion would merit hearing an appeal from an interlocutory order:

> The statutory language of [28 U.S.C. § 158] ... provides no guidance as to how that        discretion should be exercised. Most courts have analogized to the standards set forth in 28 U.S.C. § 1292(b), the statute governing discretionary appeals of interlocutory orders in non-bankruptcy litigation: (1) whether the order involves a controlling question of law as to which there is substantial ground for difference of opinion; and (2) whether immediate appeal would materially advance the termination of the litigation.

*In re Hill, No*. 1:08CV80, 2008 WL 2331028 at *3 (W.D.N.C. June 4, 2008) (quoting *In re Hebb,* 53 B.R. 1003, 1006 (D.Md.1985)).

For the reasons stated above, the Debtors submit that the issues raised by the Disclosure Statement Order are controlling questions of law. The second part of the first prong is satisfied if "a difference of opinion exists between courts on a given controlling question of law, creating the need for an interlocutory appeal to resolve the split or clarify the law." *KPMG Peat Marwick, LLP v. Estate of Nelco, LTD., Inc.*, 250 B.R. 74, 82 (E.D. Va. 2000).

As discussed above, the Fourth Circuit has not addressed whether the absolute priority rule applies in individual chapter 11 cases and the jurisdictions that have addressed that issue are split. Further, the Debtors submit that the Disclosure Statement Order is at odds with binding Fourth Circuit precedent because the bankruptcy court used its equitable powers under section 105(a) to rewrite sections 1129(a)(10) and 1129(c) of the Bankruptcy Code. See *Official Committee of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987)(holding that the bankruptcy court could not use its equitable powers under section 105(a) to rewrite specific provisions of section 1129 of the Bankruptcy Code).

Further, an immediate appeal would materially advance the termination of the bankruptcy case. Until the issues raised by the Disclosure Statement Order are resolved on appeal, it appears likely that the Debtors will not be able to tender a plan that has a reasonable possibility of being confirmed. Thus, an immediate appeal is necessary to push the bankruptcy cases towards confirmation.

## CONCLUSION

In sum, the Debtors submit that the Disclosure Statement Order is a final order appealable as of right under either 11 U.S.C. §158(a)(1) or the "collateral order doctrine" established in *Cohen*. In the event the District Court views the appeal as interlocutory, then the Debtors submit that the Court should grant leave to appeal to clarify the controlling legal issues

and to resolve those issues with an eye towards confirming a plan of reorganization that maximizes a distribution to creditors.

Dated: Charlotte, North Carolina
        January 20, 2011

                                HAMILTON MOON STEPHENS
                                STEELE & MARTIN, PLLC

                        By:     _____/s/ Andrew T. Houston_____
                                Andrew T. Houston (NC Bar No. 36208)
                                2020 Charlotte Plaza
                                201 South College Street
                                Charlotte, North Carolina 28244-2020
                                Telephone: (704) 344-1117
                                *Counsel for the Debtors*