# EXHIBIT D

1

```
 1              UNITED STATES BANKRUPTCY COURT
             WESTERN DISTRICT OF NORTH CAROLINA
 2                    CHARLOTTE DIVISION

 3
     RAYMOND B. FARMER             :    Case No. 10-40269
 4   DIANE P. FARMER,
                                   :    Chapter 11
 5       Debtors.
                                   :    Charlotte, North Carolina
 6                                      Wednesday, December 15, 2010
                                   :    9:52 a.m.
 7
     : : : : : : : : : : : : : : : : : : : : : : : : : :
 8

 9        TRANSCRIPT OF FIFTH CONTINUED HEARING ON MOTIONS
            FOR RELIEF FROM STAY AND DEBTORS' RESPONSE;
10          HEARING ON DEBTORS' AMENDED DISCLOSURE
               STATEMENT AND OBJECTIONS THERETO
11        BEFORE THE HONORABLE GEORGE R. HODGES,
               UNITED STATES BANKRUPTCY JUDGE
12
     APPEARANCES:
13
     For the Debtors:             Hamilton Moon
14                                BY:  ANDREW T. HOUSTON, ESQ.
                                       TRAVIS W. MOON, ESQ.
15                                     RICHARD S. WRIGHT, ESQ.
                                  201 South College St., Suite 2020
16                                Charlotte, NC  28244

17   For Creditor, Palmetto       Parker Poe
     Bank:                        BY:  WILLIAM L. ESSER, IV, ESQ.
18                                     ASHLEY A. EDWARDS, ESQ.
                                  401 S. Tryon Street, Suite 3000
19                                Charlotte, NC  28202

20   Audio Operator:             JULIA R. ADAMS
                                  (704) 350-7500
21
     Transcript prepared by:     Janice Russell Transcripts
22                                1133 Tanager Trail
                                  Virginia Beach, Virginia  23451
23                                (757) 422-9089

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
```

```
 1   APPEARANCES (Continued):

 2   For Creditor, 1230 Overbrook   Kilpatrick Stockton, LLP
     Drive Holdings, LLC,           BY:  JAMES H. PULLIAM, ESQ.
 3   CBA-Mezzanine Capital          214 N. Tryon Street, Suite 2500
     Finance, LLC, and U.S. Bank    Charlotte, NC  28202
 4   National Association:

 5   For Creditor, EMC              Brock & Scott PLLC
     Mortgage Corporation:          BY:  MATT UNDERWOOD, ESQ.
 6                                  5121 Parkway Plaza Boulevard
                                    Charlotte, NC  28217
 7
     For Creditor, First           McNair Law Firm
 8   National Bank of the          BY:  LOUIS G. SPENCER, ESQ.
     South:                        301 S. Tryon Street, Suite 1615
 9                                  Charlotte, NC  28282

10   For Creditors, Toby Tomblin   KEITH B. NICHOLS, ESQ.
     and the Estate of Janet L.    301 South College St., Suite 2600
11   Tomblin                       Charlotte, NC  28202

12   For Creditor, Inland          Katten Muchin Rosenman LLP
     Mortgage Capital              BY:  BRADLEY E. PEARCE, ESQ.
13   Corporation:                  550 S. Tryon Street, Suite 2900
                                    Charlotte, NC  28202
14
     For Creditor, First South     Fletcher & Rhoton, P.A.
15   Bank:                         BY:  JOHN W. FLETCHER, III, ESQ.
                                    316 East Worthington Avenue
16                                  Charlotte, NC  28203

17   For the Bankruptcy            ANN DORNBLAZER, ESQ.
     Administrator's Office:       402 W. Trade Street, Room 200
18                                  Charlotte, NC  28202

19   For Creditors, Land Rover     Horack Talley
     Capital Group and World       BY:  KEITH B. NICHOLS, ESQ.
20   Omni Financial Corp.:         301 South College St., Suite 2600
                                    Charlotte, NC  28202
21
     For Creditor, First National  JAMES H. HENDERSON, ESQ.
22   Bank of Shelby:               1201 Harding Place
                                    Charlotte, NC  28204
23

24

25
```

INDEX

ARGUMENTS:

    On behalf of the Debtors, by Mr. Houston          5

    On behalf of Creditor, Palmetto Bank, by Mr. Esser    23

RESPONSE:     Mr. Houston                  35

THE COURT:     Finding                      35

| EXHIBITS: | | Marked | Received |
|-----------|------|--------|----------|
| D-1 | Claim Class for Wildewood | 8 | 8 |
| 2 & 3 | Summaries of loan history | 12 | 12 |
| 4 | Outline of objections | 13 | 13 |

4

1               P R O C E E D I N G S

2          THE COURT:  All right.  Now we'll go to Raymond and

3   Diane Farmer.

4          Why don't we start with the announcements over here

5   (indicating) on the debtors' side and go across that

6   (indicating) ways.

7          MR. HOUSTON:  Your Honor, Andy Houston, Tom Moon, and

8   Richard Wright are all here on behalf of the debtors this

9   morning.

10         MR. FLETCHER:  May it please the Court, I'm John

11  Fletcher representing First South Bank, one of the creditors.

12  I'm sitting over here to find a seat, but I'm present with the

13  creditors.

14         THE COURT:  Okay.

15         All right, Mr. Henderson.

16         MR. HENDERSON:  Jim Henderson on behalf of First

17  National Bank of Shelby.

18         THE COURT:  Okay.

19         MR. UNDERWOOD:  Matt Underwood on behalf of EMC

20  Mortgage Corporation.

21         MR. ESSER:  Will Esser and Ashley Edwards on behalf of

22  Palmetto Bank.

23         MR. NICHOLS:  Your Honor, Keith Nichols standing in

24  for Kristin Ogburn on behalf of Land Rover Capital Group, World

25  Omni Financial, and I'm standing in for Mark Pinkston on behalf

1  of Toby Tomblin and the Estate of Janet Tomblin.

2        MR. SPENCER:  Louis Spencer on behalf of First

3  National Bank of the South.

4        MR. PULLIAM:  Your Honor, Jim Pulliam on behalf of

5  1230 Overbrook Drive Holdings, LLC and CBA-Mezzanine Capital

6  Finance, and U.S. Bank, N.A., in its capacity as trustee.

7        MR. PEARCE:  Good morning, Your Honor.  Brad Pearce on

8  behalf of Inland.

9        THE COURT:  All right.

10        MS. DORNBLAZER:  Ann Dornblazer, Bankruptcy

11  Administrator's Office.

12        THE COURT:  Okay.  We'll proceed then.

13        MR. HOUSTON:  Your Honor, initially, I would just like

14  to announce Mr. Pulliam and I spoke beforehand.  There are two

15  stay relief motions on.  I'll let him speak to this, if I

16  misstate this.  We have agreed to move those to, to January

17  when the valuation hearings are set on his respective

18  properties.

19        THE COURT:  Okay.

20        MR. PULLIAM:  That's right.

21        THE COURT:  All right.

22        MR. HOUSTON:  Okay.

23        And moving forward, we are here on the disclosure

24  statement and to begin, I think it's important to understand.

25  This is a disclosure statement hearing.  It's not a

1   confirmation hearing.  There have been certain objections

2   filed.  I don't think it's appropriate to turn this into a

3   confirmation hearing and the standard is pretty clear in

4   reviewing a disclosure statement.  It's cited in both

5   objections and the response that we filed.  We need to provide

6   adequate information to creditors.  That's defined in 1125.  It

7   means we need to provide information that a reasonable

8   hypothetical investor would need to evaluate voting yea or nay

9   on the plan.  It's pretty clear.  I think everybody agrees on

10  that.

11          What is also clear is that there was an order entered

12  in this court very early on in this case that's become a point

13  of controversy between, essentially, three creditors and the

14  debtor and not really any of the other creditors and that was

15  the Court's single-asset order and we filed a response on

16  Monday.  And if the Court had a chance to review it, I'm not

17  going to repeat many of the factual underpinnings, as well as

18  the legal arguments contained in that brief and response.

19          THE COURT:  No, have not looked at that so you better

20  repeat them.

21          MR. HOUSTON:  Okay.

22          Starting off, the -- very early in this case there was

23  a substantial hearing on the debtors' interim motion to use

24  cash collateral.  At the conclusion of the final hearing on

25  that matter the Court suggested that it wondered if we ought to

1  be going by single-asset rules with respect to certain

2  properties that would have been single-asset properties before

3  the case and absent the pre-petition transfers.   Palmetto Bank

4  filed a motion, which requested, essentially, the same relief

5  and, and asked for some others.

6          We had a hearing on the matter.   There were certain

7  arguments that were raised and notably, Palmetto argued that

8  the transfers should be deemed void as fraudulent transfers

9  under South Carolina law, deemed -- they also argued that the

10 absolute priority rule should apply and they argued that the

11 Court should apply, in essence, 362(d)(3), the 90-day rule, for

12 the debtors to either file a plan or commence making non-

13 default contract interest payments at the value of the

14 collateral.

15         After all the parties were heard, I think the Court

16 made it very clear it was not addressing the absolute priority

17 rule, it was not addressing the issue of fraudulent transfers

18 and, in fact, stated that anyone who wanted to pursue that

19 could, could bring an adversary proceeding, which is the proper

20 vehicle to contest the transfers, and the Court entered the

21 order stating that it would require 362(d)(3) to apply, it

22 would require separate administration of the assets and

23 liabilities of both the individual debtors and the entities as

24 if the pre-petition transfers had not occurred, and that it

25 would require other administrative things such as filing

1   separate schedules, provide clarity.  It would provide -- we

2   would also provide separate accountings, separate voting,

3   separate other administrative functions, and I think the, the

4   real point of that order was to provide clarity to everyone in

5   this case:  What goes where with what; who were the creditors

6   of which entity prepetition; who were the creditors of the

7   individual debtors.

8           And I submit to you that the disclosure statement that

9   we provided does that.  I think it's very clear that it

10  defines, describes the pre-petition transfers.  It segregates

11  everything by POD, as I like to refer to, which was by the

12  individuals or by the pre-petition entities.  It also provides

13  a liquidation analysis on an, for entity and individual basis.

14  It provides information to creditors as to pending and

15  potential adversary proceedings.  It gives a very thorough

16  detail of the many motions and fights we've had in this case

17  and most importantly, it contains charts and attaches the plan

18  that summarizes the plan treatment of claims of, against the

19  individual debtors and then each former entity.

20          And if I could approach the bench, Your Honor?

21          THE COURT:  Yeah.

22          MR. HOUSTON:  Your Honor, I've handed up what we call

23  Debtors' Exhibit 1 for the purpose of this hearing and for

24  demonstrative purposes it was attached as Exhibit E to the

25  disclosure statement.  It identifies claims treatment as of,

1   creditors, as of the former Wildewood Apartments, LLC and I

2   think it -- this has various classes -- I think it, it

3   evidences a number of objections that are going to be raised.

4   And consistent with the order it identifies that it will

5   classify the secured tax claim of the taxing authority as to

6   the Wildewood Apartments.  It treats the secured claim of

7   Palmetto as to Wildewood.  It also identifies what is a second

8   mortgage on that property as a separate class and that it

9   treats the general unsecured creditors of the Wildewood

10  Apartments separately.

11          And the importance of that is, and, and consistent

12  with the, the single-asset order, is that the unsecured

13  creditors of the former Wildewood are paid out of the

14  operations of Wildewood.  There's no commingling.  There's no

15  pooling of assets, which is an objection that I've seen and we

16  believe that's consistent with this Court's order.

17          Now I think it's really important that we address two

18  issues that have been raised by three creditors and that is

19  that the single-asset order required the debtors to file ten

20  separate plans.  And second, the single-asset order, according

21  to a handful of creditors, also required the debtors to have no

22  less than ten impaired classes, accept the plan in order to

23  cram down the plan over their objection.  Those are the

24  arguments.

25          And there are two problems with that and like I said,

1   they were listed in the brief, but I'll, I'll go into some

2   detail in them.  Factually, that's not what happened.  That's

3   not what was requested.  Palmetto Bank was leading the charge

4   at this early hearing.  They never requested either of those

5   two things.  I think the record is pretty clear on that.  We

6   submitted the transcript from that hearing.  These things were

7   never argued.

8        And second, and more fundamentally, is that not only

9   were they not argued, this is not something that the Court

10  ruled, nor could it rule.  I think it was very clear what the

11  Code says in Section 1129, 1129(a)(10), is that the debtor

12  needs one impaired class of creditors to confirm a plan over

13  the objection in a cramdown situation under 1129.  That's the

14  first argument.

15       And the second is under 1129(c) the Court can only

16  confirm one plan.  It's clear and the relief that they're

17  requesting flies very much in the face of what 1129 says and

18  Fourth Circuit law is very clear on this point.  And there was

19  a case coming out of the A. H. Robins bankruptcy.  It's called

20  Mabey.  In that case -- I'll try to be brief -- but the debtors

21  filed a motion seeking to establish a trust fund for the

22  potential claimants in that case.  At the time this motion was

23  pending a plan had been filed but had not been confirmed.

24  Claims allowance, objections and so forth had not been handled

25  or heard and the district court allowed the trust fund and on

1   appeal the Fourth Circuit said that by allowing this trust fund

2   under the Court's Section 105 powers it had expressly,

3   essentially had expressly rewritten specific sections of the

4   Bankruptcy Code under 1129, those dealing with how unsecured

5   creditors are supposed to be paid and they're supposed to be

6   paid pursuant to a confirmed plan.

7            And I think that is precisely what three creditors are

8   arguing in this case and no one else.  And I think what's,

9   what's interesting is that only three people are going to argue

10  that point and there are other many similarly situated

11  creditors that aren't.  Mr. Pearce has been involved in this

12  case.  He's never represented to me that that was his take on

13  the order, nor has he negotiated that way.  Mr. Fletcher has

14  been involved in this case.  He's similarly situated.  He has

15  never taken that position with me.  Mr. Henderson is here.  He

16  is also similarly situated and he does not believe that's what

17  the Court says or what the law provides.  And what I expect to

18  hear is that the pre-petition rollup was just so fundamentally

19  unfair that it's going to, under our interpretation, allow the

20  debtors to confirm a cramdown plan, for instance, as against

21  Palmetto, with classes of claims that they had no business with

22  prepetition.  And that is just fundamentally unfair, according

23  to Palmetto and to others.

24            And if I could approach the bench, Your Honor?

25            Ms. Beard, I expect that -- I apologize for that.

1          And, Your Honor, I submit to you what we've marked as

2   Debtors' Exhibits 2 and 3 for demonstrative purposes.   Exhibit

3   2 summarizes the, essentially, the loan history between the

4   Farmers and Palmetto Bank.   If you look on the left-hand

5   column, it just identifies -- primarily we're dealing with the

6   loans on the real estate -- and it identifies them by property,

7   who the obligor was, who the guarantors were prepetition.   And

8   if you just look at the first line you, you look at, at

9   Wildewood Apartments of Spartanburg.   The obligor on that note

10  prepetition was Wildewood Apartments and the guarantors were

11  Josh and Ray Farmer and Two Mile Properties.   With respect to

12  Meadow Green, the same thing; with respect to East Ridge, the

13  same thing; and with respect to the other two properties,

14  Addison Townhomes and the office and warehouse, Two Mile was

15  the primary obligor and the Farmers were the guarantors on

16  those loans.

17          Now what the sum total of that is is identified in

18  Chart 3, which I've handed up.   It shows that these were not

19  treated as separate by Palmetto Bank.   And frankly, there were

20  cross-guaranties all over the place.   In fact, Two Mile

21  Properties was a guarantor on all of the loans to the separate

22  entities being Wildewood, Meadow Green, and East Ridge, the

23  Farmers were individual guarantors on all of these loans, and

24  the practical effect of it is that Palmetto treated this as an

25  enterprise.   They required the guaranties of, of the other

1    enterprises and, for instance, they would have been and are a

2    creditor of Two Mile Properties with respect to Wildewood,

3    Meadow Green, and East Ridge.  And the fact of the matter is

4    they could be crammed down with people they don't have a so-

5    called relationship with because they would have been creditors

6    in that specific bucket, anyway, absent the transfers.

7          And to further rebut this fairness argument, during

8    the single-asset order -- and one of the, one of the objections

9    I suspect we're going to hear is that we've held creditors

10   hostage, and I don't think that's the case.  I think the Court

11   made it very clear that if you don't want to partake in this

12   file your adversary proceeding.  I think that was clear.  It

13   was stated in the order.  It was stated during the hearing.  In

14   fact, it was threatened by certain attorneys during the hearing

15   and it never happened.

16         So the fact that they had alternatives to this, if

17   they believe they had a legitimate way out, they could have

18   brought them and didn't.  And keeping those in mind, Your

19   Honor, I would --

20         May I approach the bench one last time?

21         THE COURT:  Yes.

22         MR. HOUSTON:  Your Honor, I figured the easiest way to

23   do this in dealing with objections and so forth is to prepare a

24   chart.  We've done it in other cases and it seems like a, a

25   good way to at least organize things.  And Exhibit 4 that I've

1   submitted is an outline of certain objections and if I could

2   briefly run through these just to see how I think we should

3   handle these and announce certain amendments, I think that's

4   probably a good way to do it.

5          And I'd like to lead off with the Tomblin objection

6   that was filed by Mr. Pinkston, I believe, Monday.  And the

7   reason I think it's important to start with his is his is the

8   most consistent with the scope of what a disclosure statement

9   hearing's supposed to be in that he's requesting additional

10  information to know whether he can and should vote on the plan.

11  And from there I'd like to just sort of follow in order.

12         The Tomblin objection, the first objection raised is

13  that the definition of Effective Date is vague and ambiguous.

14  With respect to that objection, I think the, that objection

15  should be overruled and the reason being is that in the plan,

16  which is attached as an exhibit to the disclosure statement,

17  specifically Articles 1, Section 1.44, and Article 11,

18  Section 1.2, specifically defines what the term Effective Date

19  is and that is it is the business day after which the

20  confirmation order becomes final.  I mean, there's no specific

21  way for me to tell you that date is going to be -- or anyone --

22  that that date's going to be January 20th, or February 30th, or

23  -- there's not a February 30th -- but maybe March 1st, though,

24  or anything like that.

25         The second objection is that the disclosure statement

15

1    fails to estimate allowed administrative expenses.  The debtors

2    are going to amend Exhibit B to the disclosure statement to

3    reflect that objection.

4           The next objection is the disclosure statement fails

5    to provide estimates as to the amounts due to each class of

6    claims.  Likewise, we're going to amend the exhibits to the

7    disclosure statement to reflect that.

8           The disclosure statement fails to anticipate the

9    anticipated payments to Tomblin and fails to explain plan

10    treatment.  Again, we're going to amend and provide estimates

11    they requested.

12          The last two deal with additional information

13    regarding feasibility.  We're going to amend and provide

14    certain schedules showing projections for the properties of the

15    individual debtors essentially over the next year and projected

16    over the life of the plan.

17          With that in mind, I turn to a couple of objections

18    that were filed, World Omni and Land Rover, both of which were

19    objections as to the valuation of certain vehicles.  I think

20    they're actually valuation and/or confirmation issues rather

21    than disclosure issues.

22          I talked to Ms. Ogburn yesterday, I believe, and she

23    said that she would agree to deal with that in connection with

24    the valuation hearing.  I know somebody from her office is here

25    today.  He can speak to that, but that was my understanding as

1  to what the understanding was.

2        THE COURT:  You all all right with that?

3        MR. NICHOLS:  Yes, Your Honor.  With respect to World

4  Omni and Land Rover, I understand there's going to be a

5  valuation hearing; that you're going to, in fact, file that

6  motion.  So this could be done with at that time.

7        THE COURT:  Okay.  All right.

8        MR. HOUSTON:  That's right.

9        With respect to No. 4, Citibank, their objection

10 essentially was the classification of Classes 2 and 10, which

11 is on the personal residences of both sets of Farmers, violated

12 the anti-modification provision.  Initially, that's a

13 confirmation objection.

14        Second, I don't believe it actually does.  I think it

15 actually is pretty clear that they are going to, to the extent

16 they have an allowed claim with respect to those homes, that

17 those allowed claims would not be modified, arrearages would be

18 caught up, and I believe that the section of the Code is, is

19 designed to operate much like a Chapter 13 is where the debtors

20 pay their house payments going forward and they catch up

21 arrearages through the plan.  And I think that's what it does.

22        As it relates to disclosure, I think it's disclosed

23 that there was a lawsuit that's going to be, and I think, in

24 fact, it was filed yesterday with respect to those loans.  I

25 think it fully discloses that in the plan, which is attached to

1   the disclosure statement, fully addresses disputed claims and

2   it's laid out in great detail in Article 7.

3        Moving along to the Palmetto objection, the first

4   objection they raise is the plan and disclosure statement

5   blatantly disregards the single-asset order.  For the reasons I

6   said before, I think that should be overruled.

7        The next objection is the plan is non-confirmable

8   because it may improperly designate unimpaired classes as

9   impaired.  Same objection.  I, I think it should be addressed

10  at confirmation, not disclosure.  I think what Palmetto is

11  trying to do is get discovery to support some theory that it

12  has that certain claims, for instance, tax claims, have been

13  impaired when, in fact, they are -- when, in fact, they are not

14  impaired.  I think that's their position.  That is a, that is a

15  confirmation issue, not a disclosure issue.

16       There is one point to make there that was raised, is

17  that there was an agreement that the debtors with respect to

18  Addison Townhomes would pay Palmetto for paying off the tax

19  claims.  That's right.  I mean, we're -- that needs to be

20  amended in the plan.  We're going to add a provision, a claim,

21  in there, a class of claims, that says they will be treated as

22  under 1129(a)(9)(D), I believe, which, which deals with secured

23  tax claims.  That was an omission on my part.

24       The next objection they raise, the plan is non-

25  confirmable because it improperly classifies claims in

1    violation of 1122.  Essentially, a gerrymandering objection.

2    We would say the same thing.  This is a confirmation fight.

3         To address one point, though, or I guess two, is

4    Palmetto claims it doesn't have adequate information as to how

5    the unsecured deficiency portion of it will be treated and it

6    also claims that the second mortgage holders, who are out of

7    the money, are improperly classified.

8         With respect to the first, we can add a provision in

9    the disclosure statement and the plan that says unsecured

10   portion will be treated in the unsecured pool for that bucket.

11   That's not a problem, and I think that by operation of law

12   that's right.

13        With respect to the, the second mortgage holders,

14   there've been no valuation hearings.  We're not really sure

15   they're out of the money.  In terms of plan revisions, we can

16   add a provision in there that says something to the effect of,

17   to the extent the second mortgage holder, which is Harbour

18   Finance, I believe, on some of these notes, or on some of these

19   properties, to the extent they are fully undersecured, that

20   their claim will be treated in the unsecured portion of that

21   bucket and that class, whatever it might be, in that case will

22   not be considered in confirming the plan.  I think that's, I

23   think that's a reasonable way to do it.

24        The next objection raised is the plan is not

25   confirmable under 1129(a)(3) because it was not proposed in

1   good faith.   For the reasons we mentioned before, I think this

2   is a confirmation fight and I think it's also based on what we

3   believe to be Palmetto's erroneous interpretation of the

4   single-asset order.

5         The next objection, the plan is non-confirmable under

6   1129(b) because it is not fair and equitable.   Essentially, the

7   same objection.   It's a confirmation fight.   I think it's also

8   based on the erroneous assumption the absolute priority rule

9   applies in individual 11 cases, which it does not.

10         The next objection is that the plan is non-confirmable

11   under Section 1129(a)(11) because it is not feasible.   Again, I

12   think this is a confirmation objection.

13         And I'd also at this point like to announce a couple

14   of amendments that I'm going to make with respect to Palmetto

15   specifically as it relates to feasibility and otherwise.

16         And the first thing is -- and maybe it wasn't clear

17   from the order -- we're going to add a provision in the plan

18   and it can be reflected in the disclosure statement.   It's

19   essentially a drop-dead type provision, that if the debtors

20   post confirmation fail to make a payment they will agree to

21   friendly foreclosure.   They'll waive notice and so forth.   You

22   know, there might have to be some procedures in there for how

23   this actually gets before the Court, if that's disputed.   But

24   to the extent there's not a payment made timely and they

25   haven't cured it within 30 days, we'd like to add that

1  provision in there.

2        And also with respect to Palmetto, Palmetto, it's our

3  understanding, that they're marketing these notes for resale

4  and I think we're going to add a provision in the plan and

5  disclosure statement that provides them a six-month marketing

6  period that if they can sell these within six months they'll

7  have automatic relief, or the purchaser will have automatic

8  relief from the confirmation order, that they can essentially

9  foreclose or that the property will be tendered to them.  It's

10 something we can work out, but that's the concept behind it.

11        Moving along, there was an objection filed by First

12 National Bank of the South.  The first objection is the lack of

13 adequate information.  For the reasons I mentioned with

14 Tomblin, we're going to, we're going to provide that

15 information in an amendment.

16        The next objection is the disclosure statement and

17 plan violate the single-asset order.  Again, this is the same

18 argument we addressed before and I believe that should be

19 overruled.

20        The plan is not fair and equitable to all classes and

21 violates the absolute priority rule.  I think this has already

22 been addressed before, and I won't repeat myself.  I think that

23 should be overruled.

24        I would point out, though, that one of the objections

25 in there is that we're failing to allow First National Bank of

1    the South to vote on the plan or receive a distribution.   It's

2    not me.   It's Bankruptcy Rule 3003, which states they can't

3    vote or receive a distribution if they haven't filed a proof of

4    claim.   They haven't.   I understand they filed a motion seeking

5    to deem certain filings as the informal proof of claim or to

6    amend it.   There's a hearing on that and I think the disclosure

7    statement and the, and the plan can be amended pending the

8    resolution of that.

9         The final -- or there's two more objections by First

10   National Bank of the South.   The plan is not proposed in good

11   faith.   Again, this is a confirmation objection and an

12   objection based on the single-asset order.   I think they should

13   be overruled.

14        Similarly, their last objection, the plan is not

15   feasible.   Confirmation objection based on interpretation of

16   the single-asset order.   As I mentioned before, though, we will

17   provide them additional information, to the extent they can

18   determine that, to the extent they need to determine whether

19   it's feasible or not.

20        The seventh and eighth objections filed by 1230

21   Overbrook Holdings, CBA-Mezzanine Capital Finance, and U.S.

22   Bank were both filed by Mr. Pulliam, so I'll address them

23   together.   They were essentially the same objection.   The

24   disclosure statement violates the single-asset order.   For the

25   reasons we mentioned before, we will -- I think that should be

1   overruled.

2          With respect to one point, there's a point made by

3   Mr. Pulliam that there's only one distribution reserve and it

4   indicates that there's a pooling of assets.   That's not the

5   case.   I agree that the plan says that.   We'll amend it to

6   reflect that there are separate distribution reserves, separate

7   disputed claims reserves on a POD level, as I'll call it.

8          The next objection is the disclosure statement does

9   not contain adequate information.   For the reasons I discussed

10  in connection with the Tomblin objections, we're going to amend

11  to provide that information.

12         The amended plan is not confirmable on its face.   In

13  the first instance, this is a confirmation objection.

14         The second objection they raised is absolute priority

15  rule.   For the reasons we mentioned before, I don't believe

16  that actually applies.

17         And finally, as it relates to amendments, like I said

18  before, we're going to amend to give them additional

19  information.

20         So that's what I have on this and the way I'm

21  proposing to handle this is -- obviously, you want to hear from

22  everyone else first -- but I think we should take, probably, a

23  couple weeks to make this determination and reconvene -- I know

24  the holidays, it might be a little inconvenient -- reconvene

25  sometime in early January where we make these changes and at

1   that point the Court should approve the disclosure statement

2   and the disclosure statement should go out for a vote.

3          Thank you, Your Honor.

4          THE COURT:   Thank you.

5          Who wants to go next?

6          Mr. Esser.

7          MR. ESSER:   Your Honor, as Norton's on Bankruptcy Law

8   says the hearing on the disclosure statement is one of the most

9   important procedural hearings that occur in a Chapter 11

10  bankruptcy case.   And that certainly is true in this one.

11         There were essentially two primary issues to address

12  with the Court.   One that had to do with the prior SAR order,

13  the absolute priority rule, basically legal issues.   The second

14  had to do with the lack of adequate information in the

15  disclosure statement.   As we stand here today, the, the

16  debtors' counsel has said they're going to amend, I guess

17  essentially has admitted that there are a lot of lack of

18  adequate information 'cause they're going to amend.   I didn't

19  count those up, but there were probably 15 or 20 different ways

20  they're going to amend their disclosure statement to provide

21  further information.

22         Just very briefly, the one that I didn't hear them

23  address had to do with the treatment of tax claims.   And with

24  regard to each one of the tax claims involved, they have this

25  optional treatment, which they get to opt.   It's either pay it

1   in full within, either on or within 90 days of the effective

2   date with, in full in cash, or pay it out over five years.

3   Well, there's no way to determine looking at the disclosure

4   statement if that is an option for the debtor, whether or not

5   the, that class is impaired or not.

6        So we don't think that that's been addressed.  We

7   think the debtor needs to make a decision.  Either it's paying

8   it in full in cash, then it's not impaired, or it's paying it

9   over five years and it is impaired and at least that way the,

10   those classes know and everybody knows whether they get to vote

11   and what happens with them.

12        The primary thing on, Your Honor, today has to do with

13   your prior ruling under the SAR order and also, the issue of

14   the absolute priority rule.  And it's -- it'd be a little bit

15   hard for me to overemphasize how important this decision in

16   this case is.  This is -- this ruling is not going to be

17   limited to this case, the ruling of the Court with regard to

18   the SAR order and absolute priority.  This essentially, Your

19   Honor, is a test case, which creative debtors' counsel have

20   come up with to push the boundaries of the law and to see if

21   that's something they can do.

22        Now let's look back just for a minute at the facts

23   that we had.  You have a situation in which you have

24   sophisticated debtors, a bankruptcy attorney, and, and then his

25   wife is also an attorney.  They over a period of years set up

1  separate corporate entities to own property.  Most of, a

2  majority of them were set up as single purpose, single-asset

3  real estate entities.  They used all the advantages of a

4  corporate form, shielding themselves from liability and all the

5  other advantages that they get that went along with that.  They

6  kept them separate.  There is no testimony that they commingled

7  assets one to the other, that they didn't -- they had separate

8  taxes, they had separate accounting, and all of these things

9  were very clearly kept separate.  In fact, after Your Honor

10  ordered in the SAR order that they file separate schedules of

11  creditors and assets, they had no problem in doing that and

12  producing it in a very short order.

13      They get themselves into financial difficulty.  At

14  that point there is no contest that the properties lacked, that

15  the debtors lacked equity in the vast majority of the

16  properties.  We heard Mr. Farmer testify under oath about that

17  on the first day.  They got themselves in -- the lenders who

18  had loans on the various properties started to exercise their

19  default remedies.  There have been some foreclosures, a

20  receivership, etc.  There was a foreclosure sale pending.

21      What the debtors did is they looked at this bundle of

22  assets and liabilities that they had and they said, "Well,

23  shoot.  If we file separate bankruptcy cases, there's no way

24  that we can confirm a plan because of the large amount of

25  unsecured debt that the secured lenders have and the single-

1   asset rules and the fact if it's all in a silo and if we file a

2   bankruptcy we know what the test is for trying to get

3   substantive consolidation."  I quoted that.  That's the Third

4   Circuit's opinion in the Owens-Corning case.  The debtors would

5   have to prove that they're, prepetition they disregarded

6   separatedness so significantly their creditors relied on the

7   breakdown of entity borders and treated them as one legal

8   entity, or postpetition their assets and liabilities are so

9   scrambled that separating them is prohibitive and hurts all

10  creditors.

11        So the debtors looked at that and they clearly knew

12  that postpetition the moment they filed the bankruptcy petition

13  they, they had no chance of getting substantive consolidation.

14  They've never operated that way.  The lenders had relied upon

15  them being separate assets, separate single-asset real estate

16  cases.  So what you had is a situation where they said, "Well,

17  let's" -- "we want to not only substantively consolidate, but

18  we want to avoid this absolute priority rule that applies in

19  corporate cases so that we can hang on to these assets.  We can

20  achieve a purpose which Congress said is impermissible, that

21  is, that an equity holder of a corporate entity retains equity

22  when all of the creditors have not been paid 100 percent in

23  full, first."

24        So what they did is they did these pre-petition

25  transfers.  Virtually on the eve of bankruptcy they signed a

1  couple of papers and said, "Ha-ha.  We're going to put

2  everything into our name as the personal guarantors.  We don't

3  care 'cause we're already on the hook as guarantors and we'll

4  get rid of these entities and we'll move all and try to cram

5  all of the creditors down.  Now we have a few days before the

6  bankruptcy.  Not only achieve a substantive consolidation,

7  we've also managed to get away and avoid the absolute priority

8  rule."

9          Well, Your Honor, that is simply impermissible.  It's

10  an abuse of the bankruptcy process.  I think it's very clear in

11  the D.C. Circuit case that I've quoted to the Court in my

12  papers a couple of times where the D. C. Circuit upheld the

13  district court who said on the, on the eve of bankruptcy you

14  cannot avoid the bankruptcy process by simply transferring

15  entities over to another place.

16          Your Honor, if the Court were to allow that to happen

17  literally every bankrupt, debtors' bankruptcy attorney in the

18  state who gets a client in on which the principals of a company

19  have guaranteed the debt, they would say, "We're going to use

20  this strategy.  I mean, it would be almost malpractice not to.

21  Just go ahead and transfer all the assets into the guarantor's

22  name, file for the guarantor principal.  We've avoided the

23  absolute priority rule.  We've avoided any kinds of issues

24  about substantive consolidation and now we can move off into

25  the sunset."

1    Your Honor, it would absolutely open the floodgates to

2  an abuse of the bankruptcy system, but Your Honor specifically

3  addressed the very issue that we're on here today.  Seven

4  months ago in this case -- and frankly, I, I find it

5  disingenuous the argument that opposing counsel is making

6  because the Court's prior order on this is so absolutely and

7  abundantly clear.  And I'll quote a couple of the statements

8  from that order.

9    Your Honor, you'll remember that Palmetto and all the

10  other creditors came in here.  We were fired up and mad about

11  these transfers happening, right?  We wanted them set aside and

12  Palmetto even made a big argument about how they were

13  fraudulent transfers and set, to be set aside so that the

14  substantive and procedural rights of Palmetto guaranteed by

15  Congress and the Bankruptcy Code would be upheld.  And the

16  arguments were made to this Court and the Court entered an

17  order and among the things the Court held in the SAR order were

18  these:

19    "The Court finds that on these facts it is appropriate

20    to treat the debtors' assets and liabilities as if the

21    pre-petition transfers had not occurred and the

22    entities' assets and liabilities were being

23    administered in separate bankruptcy cases."

24    Your Honor, it's clear that in separate bankruptcy

25  cases you cannot take the vote of a class of creditors, which

1   does not exist in that bankruptcy case, and use it to cram down

2   a plan on a different bankruptcy case.   The Court went on to

3   say:

4          "Accordingly, to prevent a perceived abuse or

5          avoidance of the bankruptcy system, the Court finds

6          that the provisions of the Bankruptcy Code should

7          apply to the assets owned by the entities prior to

8          March 30, 2010 as if the subsequent transfers did not

9          occur."

10   You basically held that you were going to, you were

11   going to ignore those transfers.   We're going to treat these,

12   this case as if those transfers had never happened, all the

13   assets are still owned by separate entities, and we're going to

14   treat them separately.

15          "The Court's intention is to administer the present

16          cases in such a way that it would be the same as if

17          each of the entities and the debtors had filed

18          separate bankruptcy petitions."

19   The Court went on to say it would require separate

20   accounting, separate administration, and separate voting on any

21   Chapter 11 plan of reorganization and then in the decredal

22   Paragraph A the Court held:

23          "The administration of these proceedings shall be

24          governed by the applicable provisions of the

25          Bankruptcy Code as applied to the various assets and

1          liabilities as if the pre-petition transfers had not

2          occurred and the entities' assets and liabilities were

3          being administered in separate bankruptcy cases."

4     Your Honor, not only did you orally rule that from the

5 bench, but then we went -- and I can tell you that this was one

6 of the hot, most hotly contested orders that we had to present

7 to the Court and debtors' counsel did a good job of trying to

8 tone down or, or, you know, modify the language that the Court

9 had used -- but the Court -- we went and submitted competing

10 orders to the Court and this was the order that the Court,

11 after reviewing the two competing orders, came upon and I

12 printed out a copy of the e-mail where Mr. Houston presented

13 his competing order and a number of these provisions, which I

14 just read, were struck out.  He didn't want those in this

15 order.

16     So not only did Your Honor rule on it at the hearing,

17 itself, you ruled on it a second time when we presented the

18 competing orders.

19     Now Mr. Houston's made a big deal out of the fact that

20 Palmetto never went ahead and filed an adversary proceeding to

21 try to set aside the transfers as fraudulent transfers.  Well,

22 Your Honor, there was no point.  You had already granted us all

23 the relief that we wanted, which was to put us back in the same

24 procedural and substantive rights that we had before the

25 transfers occurred.  In fact, the transcript at the hearing,

1   Your Honor essentially said just that.  You said at the

2   conclusion of the hearing, you said, "Well, you can" -- "the

3   creditors can go ahead and file one."  Excuse me.  I'll just

4   find that reference, Your Honor.  Here it is:  "You know, if"

5    -- this is the Court:

6           "You know, if you want to pursue, Palmetto or anybody

7           else wants to pursue the fraudulent transfer issue, I

8           think we need to do that by adversary proceeding and

9           we'll deal with that as it comes up.  I'm not sure as

10          a practical matter that -- well, I will let you all

11          decide about that -- but it would seem to me that you

12          could -- the banks could pursue that and win that

13          issue and then just be faced with 12 new bankruptcy

14          filings.

15          So I'll let you all think about the practical aspects

16          of this.  My intention is, though, is to try to

17          administer the present case, as long as we have the

18          present case, to try to administer it in such a way

19          that it would be the same as if the cases had been

20          filed as the LLC cases."

21          So Your Honor clearly said, granted all of the relief

22   that Palmetto wanted.  As I stated on the transcript then, we

23   weren't looking for, to require the debtors to have to incur

24   further additional administrative expenses by having

25   separate -- go back, dismiss that case, have them file separate

1   cases, try to unwind the dissolutions of the LLCs, I mean, all

2   these different things.  We were fine.  It was in bankruptcy.

3   It was moving forward but what we wanted were the rights that

4   we had as if they were treated as separate LLC cases and that

5   is what Your Honor granted.

6         So clearly, there was no reason -- and Your Honor even

7   said, "I'm not sure as a practical matter why you would do

8   that.  I, I granted you the relief that you wanted so no point

9   in going ahead and filing a fraudulent transfer action."  And

10  Palmetto took Your Honor up on that.

11        Your Honor, we're now seven to eight months since that

12  ruling.  The Court's language that you used in the ruling is

13  unambiguous.  It's clear as can be and yet the debtors have

14  continued -- this is the second time they filed a plan and

15  disclosure statement.  It's the second time they have clearly

16  ignored the Court's directive to them that these are going to

17  be treated as separately administered, separate voting, etc.  I

18  raised that as an objection in my objection to the disclosure

19  statement, which I filed back in August of this year, and I've

20  talked about it with Mr. Houston several times.  What do you

21  mean that doesn't mean that?  Separate voting means separate

22  voting.  I mean, it's -- it means you take one bucket.  It's a

23  separate LLC case.  The only creditors who get to vote are the

24  creditors of that LLC, period.  You can't cram down with some

25  creditors from another bankruptcy case.

1          But that is, in fact, what the debtors are arguing to

2    the Court that they can do and that is what we have now spent

3    just enormous amounts of time, money, and everything else

4    disputing.   I think it is absolutely essential that today the

5    Court make crystal clear to the parties its ruling that these,

6    in fact, will be treated as set out in the SAR order.   They

7    will be treated as separate cases for each LLC and there will

8    not be this cross-voting cramdown, which the debtors have

9    attempted to do.

10          Your Honor, with regard to the absolute priority rule,

11    that issue is directly before the Court today.   I understand in

12    the SAR order that the Court pushed on that issue for another

13    date.   I've got a number of cases, which I can hand up if you

14    would like, all of which deal with disclosure statement

15    hearings in which the court denied approval of the disclosure

16    statement because the plan did not comply with the absolute

17    priority rule.

18          So the issue about the absolute priority rule and its

19    application is a disclosure statement hearing issue, not just a

20    plan issue.   And the reason for that is quite simple.

21    Creditors need to be informed and have adequate knowledge going

22    into a -- receive -- before they receive a ballot to know what

23    the, what the context is within which they are voting.   Now

24    typically, it's not an issue.   You can read the Bankruptcy Code

25    and it says 1129 provisions apply and the absolute priority

1   rules apply with regard to corporate LLC cases.  Because of

2   this scheme that the debtors have put together of the pre-

3   petition transfers, there is some question mark on that.

4         Your Honor, I would suggest to the Court that based

5   upon the SAR order there is no conceivable logical or rational

6   reason that the absolute priority rule does not apply.  I mean,

7   frankly, if the Court does not just, just go ahead and rule

8   that the absolute priority rule applies and all of the normal

9   LLC rules apply, etc., well, then we should go ahead and, and

10   dismiss the case so, in fact, there are 12 or 10, however, 10

11   separate LLC cases that have to be filed so that we no longer

12   have this question.  But I think that's what the Court --

13   the -- what -- the resolution the Court crafted the last time.

14   You didn't want to make them spend the additional

15   administrative expense, but you wanted to, them to follow the

16   law and to comply with the intentions of Congress and the

17   Bankruptcy Code.

18         So for all of those reasons, Your Honor, obviously,

19   the disclosure statement cannot be approved today.  We already

20   know that because they're going to go back and amend it, but I

21   think the Court needs to make absolutely clear that not only

22   the SAR order means what it says.  There will not be voting

23   across buckets or across LLCs or a cramdown across LLCs, but

24   also that the absolute priority rule applies.

25         Thank you.

1        THE COURT:  Do you want to address that, Mr. Houston?

2        MR. HOUSTON:  Just very briefly.

3        And I think it all centers around one issue, whether

4   it's the absolute priority rule, the single-asset order, the

5   interpretation that Mr. Esser has, which requires us to have at

6   least ten cramdown classes and have ten plans confirmed.  It's

7   not what I'm suggesting.  It's what Congress has not only

8   suggested but demanded, the way the court and the players in

9   the bankruptcy case confirm a plan.  It requires one impaired

10  class under 1129(a)(10).  The Court can only confirm one plan

11  under 1129(c) and the result that Mr. Esser is advocating for

12  flies clearly in the face of what Congress has dictated, not

13  what I'm suggesting.  And I think Fourth Circuit law and other

14  where, every other court that I've seen commands against that.

15       And for those reasons I think the objection should be

16  overruled.

17       Thank you.

18       THE COURT:  Well, Mr. Esser correctly stated what my

19  intention was when we set out here.  I can see now that I

20  probably should have just dismissed the case at the beginning

21  as a bad faith filing, as evidenced by the pre-bankruptcy

22  transfers and corporate shell game that resulted in what we

23  had.  I thought at the time that we could overlook that and

24  administer the case as if that hadn't happened and that's what

25  I intended to do and set out to do and I think that if we're

36

1   going to continue on with the case that's what we've got to do.

2   Congress may not have intended ten separate confirmation

3   orders.   I'm pretty sure Congress didn't intend that a

4   bankruptcy case like this probably go on, in the first place.

5          So it was something of an accommodation,

6   administrative accommodation to the debtor to let it continue.

7   It was not my intention at any time to let that administrative

8   accommodation give any substantive advantage to the debtor or

9   any disadvantage to the creditors.

10          So I think you've kind of got to go back to square one

11   and if you want to proceed in the case that we've got, do so

12   with separate pots with separate deals altogether and keeping

13   them completely separate for voting purposes.   I don't know if

14   that's possible or not.   At the beginning of the case I -- it's

15   -- I mean, I, I wasn't thinking of today.   I didn't have this

16   in mind.   If I'd thought this far ahead or known to do that, I

17   might not have done what I did, but we've come this far with

18   it.   I guess it's worth seeing if we can't, can't get it

19   through a case that could be confirmed, or at least teed up for

20   a confirmation hearing.   But I think that we've got to do so

21   with something that's substantially different than what's been

22   proposed today.   So I don't know.

23          Do y'all want to say anything about what you think we

24   ought to do and where we ought to go?

25          MR. ESSER:   Your Honor, just for confirmation

1   purposes.  You said there'll be separate pots with separate

2   voting.  Because we had -- because you've used the term

3   "separate voting" before, to make clear --

4          THE COURT:  Well, I mean, as if they were separate LLC

5   cases.  I, I think the, the case has to be treated with, like

6   that.  I think that the Rules, including the absolute priority

7   rule, have got to apply like that, or else, or else the case

8   should have been dismissed from the beginning.  So that's --

9          Mr. Wright looks puzzled.

10         MR. WRIGHT:  That's Mr. Wright's state of being.

11         THE COURT:  Oh.

12         MR. WRIGHT:  But what you're suggesting I think is

13  essentially -- I forget however many entities there are -- 10

14  or 12 subplans under the --

15         THE COURT:  I think that's --

16         MR. WRIGHT:  -- one plan, at least letting the debtor

17  make a stab at that.

18         THE COURT:  I think that's what we've got to try to

19  see if we can do.

20         MR. ESSER:  To, to clarify then, when they, when they

21  talk about subplans, each one rises or falls on its own.

22  'Cause it's set for a separate LLC.

23         THE COURT:  I would think so, yeah.

24         MR. ESSER: So, I mean, it -- I don't -- I mean, if

25  they're in the same document when you vote you vote on whatever

1   you've got a claim in, period, and that one needs to be

2   confirmed.   That -- so essentially, you end up with --  it may

3   be in one document, but you end up with ten confirmation

4   hearings?

5            THE COURT:  Exactly.

6            MR. ESSER:  Okay.

7            THE COURT:  I, I think that's right.

8            MR. ESSER:  And the ones that are --

9            THE COURT:  And there may be some that can be

10  confirmed and there may be some that can't.

11           MR. ESSER:  And the ones that are corporate entities,

12  the absolute priority rule applies.

13           THE COURT:  I believe so.

14           MR. ESSER:  On the individuals, it doesn't.

15           THE COURT  As -- as if -- as if they were separate

16  filings.

17           MR. WRIGHT:  What do we do about the guaranty claims?

18           THE COURT:  I have no idea.

19           MR. WRIGHT:  I'm glad I'm not alone.

20           THE COURT:  That's why y'all get the big bucks.

21           MR. WRIGHT:  Understood.

22           How much --

23           So I think, in essence, you know, the order for today

24  is that this amended, second amended disclosure statement is

25  not approved.   That's all that we're doing today,

1          Then --

2          THE COURT:  I think that's --

3          MR. WRIGHT:  -- we need how much time --

4          THE COURT:  Yeah.

5          MR. WRIGHT:  -- to file an amended --

6          THE COURT:  I understand that's a --

7          MR. WRIGHT:  -- plan and disclosure statement?

8          MR. HOUSTON:  I mean, I would think a month, 30 days.

9          THE COURT:  We have a hearing date on the 26th of

10  January.  That give you time?

11          MR. HOUSTON:  That's fine.

12          MR. ESSER:  I guess I can discuss with Mr. Houston,

13  debtors' counsel, after the fact.  I'm not sure if we need to

14  go forward on valuation hearings on the 5th or 6th under the

15  circumstances but --

16          MR. HOUSTON:  We can talk about that when --

17          THE COURT:  Let us know.  We'll save those dates.

18          MR. HOUSTON:  Right.

19          THE COURT:  I'm not going to do anything else those

20  days, so.  Okay?

21          Mr. Pulliam.

22          MR. PULLIAM:  Your Honor, there's one other procedural

23  issue that I've noticed in looking at the claims.

24          Many creditors are filing one claim for several

25  different properties.  For example, on Spartanburg there's a

40

1   water company that's filed a 60,000 some odd thousand dollar

2   claim for every property in Spartanburg.

3        I think, I think the debtor should, should be required

4   to send a notice and the, the deadline for filing a proof of

5   claim should be reopened up and a, a new deadline imposed so

6   these creditors can file claims for individual cases instead of

7   one claim for the entire Farmer case.

8        THE COURT:  Let's let y'all talk about that.

9        MR. HOUSTON:  Right.  I think we should probably just

10  discuss that amongst ourselves and maybe bring that up at the

11  next hearing.

12       THE COURT:  If you can figure out --

13       MR. HOUSTON:  Right.

14       THE COURT:  -- some way to do that, it'll be better

15  than anything I could come up with right here.  So we'll -- if

16  you can't, then I'll try to come up with something, okay?

17       All right.  Well, good luck.  I realize it's a, it's a

18  wrench in the gearbox, but let's see where you can go from

19  here.

20       Thank you.

21       MR. WRIGHT:  Thank you, Your Honor.

22       MR. ESSER:  Thank you, Your Honor.

23       (Proceedings concluded at 10:43 a.m.)

24

25

1                              <u>CERTIFICATE</u>

2          I, court approved transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in the above-entitled

5    matter.

6    <u>/s/ Janice Russell</u>            <u>December 21, 2010</u>

7    Janice Russell, Transcriber              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25