PROBER & RAPHAEL, A LAW CORPORATION
DEAN R. PROBER, ESQUIRE, #106207
LEE S. RAPHAEL, ESQUIRE, #180030
CASSANDRA J. RICHEY, ESQUIRE #155721
20750 Ventura Boulevard, Suite 100
P. O. Box 4365
Woodland Hills, California 91365-4365
(818) 227-0100
C.094-22616
Attorneys for Secured Creditor

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF NORTH CAROLINA (CHARLOTTE)

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Raymond B. Farmer and Diane P. Farmer; | ) | Bk. No. 10-40269 |
| Joshua B. Farmer and Andrea G. Farmer | ) | Bk. No. 10-40270 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

NOTICE OF SECURITY INTEREST IN RENTS AND PROFITS

TO DEBTORS, DEBTORS' ATTORNEY AND ALL INTERESTED PARTIES:

NOTICE IS HEREBY GIVEN pursuant to 11 U.S.C. §§ 552(b) and 546(b) of the Bankruptcy Code that BAC Home Loans Servicing, LP, its assignees and/or successors in interest, has a security interest in the rents and profits in that certain real property commonly known as **422 Pelican Flight Drive, Dewees Island, South Carolina**.

Said security interest arises from a Promissory Note and dated August 29, 2007 in the original amount of $ 206,000.00.  A copy of the Note and Mortgage is attached hereto as **Exhibit "A"** and is incorporated herein by this reference.

NOTICE IS HEREBY GIVEN that pursuant to Bankruptcy Code § 546(b), BAC Home Loans Servicing, LP, its assignees and/or successors in interest, hereby claims a perfected security interest in rents, issues and profits of the afore-described subject property.

1

NOTICE IS ALSO GIVEN that as a result of this Notice of Perfection under §546(b) concerning the rents, issues and profits from the subject Property, that all rents, issues and profits generated hereafter from the afore-described real property are deemed cash collateral as defined under 11 U.S.C. § 363(a) and are subject to the perfected security interest held by BAC Home Loans Servicing, LP, its assignees and/or successors in interest.

NOTICE IS HEREBY GIVEN that said cash collateral must be segregated and separately accounted for pursuant to Bankruptcy Code § 363(c)(4).

NOTICE IS FURTHER GIVEN that BAC Home Loans Servicing, LP, its assignees and/or successors in interest, does not consent to the use of their cash collateral and hereby demands that such funds generated from the subject real property be segregated and separately accounted for as required by law and turned over to BAC Home Loans Servicing, LP, its assignees and/or successors in interest.

Dated: February 4, 2011                     Prober & Raphael, A Law Corporation


                                            /s/ Dean R. Prober, Esq.
                                            DEAN R. PROBER, ESQUIRE, #106207

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I, Danielle Seth-Hunter, certify that I am a resident of the County aforesaid; I am over the age of 18 years and not a party to the within action; my business address is 20750 Ventura Boulevard, Suite 100, Woodland Hills, California 91364.

On February 9, 2011, I served the within NOTICE OF SECURITY INTEREST IN RENTS AND PROFITS on all interested parties in this proceeding by placing true and correct copy thereof enclosed in a sealed envelope with postage prepaid in the United States Mail at Woodland Hills, California, addressed as follows:

Raymond B. Farmer
Diane P. Farmer
305 Honeysuckle Dr.
Rutherfordton, NC 28139
Debtors

Joshua B. Farmer
Andrea B. Farmer
234 Edwards Street Extension
Rutherfordton, NC 28139
Debtors

Andrew T. Houston, Esquire
Richard S. Wright, Esquire
Travis W. Moon, Esquire
Hamilton, Moon, Stephens, Steele & Martin
201 South College Street, Suite 2020
Charlotte, NC 28244
Debtors' Attorney

O. Max Gardner, III, Esquire
P.O. Box 1000
Shelby, NC 28151-1000
Debtors' Attorney

U.S. Trustee
U.S. Bankruptcy Administrator
402 W. Trade Street, Suite 200
Charlotte, NC 28202-1669

Bradley E. Pearce, Esquire
Katten Muchin Rosenman, LLP
550 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213


I declare that I am employed in the office of a member of the Bar at whose direction this service was made.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2011 at Woodland Hills, California.


*/s/ Danielle Seth-Hunter*

4

Prepared by: MELISSA D. BENTON

**Countrywide Bank, FSB.**

DATE:       08/28/2007
BORROWER: DAVID C. CAULDER
CASE #:
LOAN #:
PROPERTY ADDRESS: 422 PELICAN FLIGHT DRIVE
                  DEWEES ISLAND, SC 29451-_____

Branch #: 0000287
13860 BALLANTYNE CORP PL #150
CHARLOTTE, NC 28277
Phone: (704)752-1340
Br Fax No.: (704)752-1691

## HOME EQUITY CREDIT LINE AGREEMENT AND
## DISCLOSURE STATEMENT

Date: 08/29/2007

This Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you,
Countrywide Bank, FSB.
The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to
Countrywide Bank, FSB.

**1. LOANS: DRAW AND REPAYMENT PERIOD.** Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period,") or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 5 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 12.B, 12.D, 13.B or 16.A below.) You will not make any loan before the fourth business day following the signing of this Agreement.

I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed. Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such Initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.

After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 13.B below, in which case my Account is due and payable in full at the time of such termination. The Repayment Period shall be 180 months.

**2. MAKING LOANS.** You will make loans under this Agreement (up to my Available Credit Limit) by (i) honoring Equity Credit Line Checks you provide to me requesting advances of at least $250; (ii) if you issue an access card ("Card"); by honoring advances I request by using the Card at any Merchant or servicer provider ("Merchant") or any participating automated teller ("ATM") networks; (iii) paying closing costs and finance charges in accordance with paragraph 8.C below; (iv) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (v) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Mortgage; or (vi) any other method or procedure you establish.

**3. SPECIAL CARD TERMS AND CONDITIONS.** I understand that you, in your sole discretion and at your sole option, may cause to be issued a Card, as an access device and an additional means by which I may obtain advances under the Account. By applying for the Account, I have requested that you issue the Card to me if my application is approved and if you, at your option and in your sole discretion, provide access to my/our Account by the Card after the Account is opened. If one or more Cards are issued to me as a means of obtaining loan advances on my Account, I agree that my use of the Card and any related loan advances will be governed by the following terms and conditions **unless I cancel my card within [30] days of receiving the Card and have not authorized the use of the Card or Card account number.** I also agree to comply with any agreement between me and the Card Issuer:

A. *Account Access.* In addition to any means by which I may access my Account as described in the Agreement, I may be permitted to obtain (up to my Available Credit Limit) loan advances by using any Card you provide, at any Merchant or service provider ("Merchant") that allows me to use the Card to pay for goods or services. If you provide

● HELOC - SC Agreement & Disclosure Statement
2C837-SC (12/05)(d)





Exhibit A

LOAN

me with a Personal Identification Number ("PIN"), I may also obtain loan advances by using the Card automated teller machine ("ATM") networks. I agree not to write my PIN on my Card(s) or disclose it to others. If I use my Card at an ATM, I understand that the owner of the ATM may charge me a fee for the transaction. I understand that in order to use my Card at an ATM, I must call 1-800-669-5864 to request a PIN. I also understand that Card loan advances (whether at a Merchant or ATM) may be subject to transactional limits that could restrict the full use of my Available Credit Limit. There are no minimum draw requirements that apply when I use the Card, except for any limits that may be imposed separately by a Merchant or ATM owner. I agree that if you decide in your sole discretion to approve any transactions above my Available Credit Limit, I will be responsible for the full amount of any such advances. I understand that if I make reservations or purchases of any kind using my Card, my Account may be immediately charged for the full amount of the reservation or purchase, regardless of whether I have received the goods or services requested at the time my Account is charged.

B. **Liability.** I agree that all borrowers who have executed the Agreement are jointly and severally liable under the terms of the Agreement for any Card transactions that are posted to the Account, whether or not a Card has been issued to all borrowers.

C. **Authorizations.** All Card transactions are processed through the applicable bankcard networks that are branded on the Card ("Bankcard Networks") according to the requirements and procedures of the Bankcard Networks. Some Card transactions may require prior authorization by you or pursuant to the requirements and procedures of the Bankcard Networks before they are approved for processing. The Bankcard Networks may refuse to process any Card transaction if it appears to be illegal or fraudulent, or if the Merchant or the transaction does not otherwise meet the requirements of the Bankcard Networks. In addition, you or the Card Issuer may deny authorization for any Card transaction if my Account has been suspended or terminated. I also agree that if you or the Card Issuer detects any suspicious or unusual use, you or the Card Issuer may suspend use of any Card.

D. **Lawful Transactions.** I agree to use my Card only for valid and lawful purposes. If I use my Card for any other purpose or transaction (herein called a "Prohibited Activity"), including, without limitation, gambling activities, I agree to promptly reimburse you, the Card issuer (if other than you) and the Bankcard Networks for all amounts or expenses paid by any such party as a result of such use. You reserve the right to block any Prohibited Activity and/or to not approve any authorization request for a Prohibited Activity. Card transactions for any Prohibited Activity made by me or for my benefit will be considered authorized by me. You will not be liable if I engage in any Prohibited Activity using the Card, and I will be responsible for the full amount of any loan advances made in connection with such Prohibited Activity. Display by an online merchant of the service mark of any Bankcard Network branded on the Card does not mean that a Card transaction over the Internet is legal where I reside.

E. **Transactions With Merchants.** I understand and agree that: (1) If a Merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", "all sales final", or similar language, I will be bound by that policy when I use my Card to pay for goods or services from that Merchant; (2) When using my Card to make travel or lodging reservations, I must obtain the Merchant's cancellation policy and follow it if I cancel the reservations. If I cancel, I must obtain the cancellation number that the Merchant is required to give me pursuant to the requirements and procedures of the Bankcard Networks. The Merchant may charge me for a cancelled transaction unless I can provide you with a correct cancellation number. (3) If I authorize a Merchant to charge repeat transactions to my Account without my presenting my Card for each charge, then I must notify the Merchant when I want to discontinue the repeat transactions or if my Account is suspended or closed. Otherwise, I will be responsible to you for the amount of all such repeat transactions. I understand that if my loan advance privileges or my use of the Card is suspended or cancelled for any reason, it is my responsibility to pay for such repeat transactions directly until loan advance privileges and/or Card use are reinstated. (4) If I disagree with any transaction on my monthly statement or have a dispute with any Merchant as a result of a Card transaction, I agree to comply with the section entitled MY BILLING RIGHTS – I SHOULD KEEP THIS NOTICE FOR FUTURE USE in my Agreement. I will promptly provide you with such information or assistance as you reasonably request.

F. **Foreign Transactions.** I agree to pay you in U.S. dollars. If I make a Card transaction in a foreign currency, the appropriate Bankcard Network will convert the transaction amount into U.S. dollars at the rates, and in accordance with its operating regulations in effect at the time the transaction is processed. Currently, the regulations of the Bankcard Networks provide that the currency conversion rate to be used is either a wholesale market rate selected by the Bankcard Networks or a government-mandated rate, each in effect one day prior to the processing date, plus an adjustment factor (currently 1%) established by the Bankcard Networks. The Bankcard Networks may change the currency conversion rate, and the formula used to establish that rate, from time to time. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date. The currency conversion rate used may be the same as, greater than or less than the amount that would be calculated by conversion through a financial institution in the country in which the transaction occurred. I understand that you do not determine the currency conversion rate or the formula to establish the rate that is used by the Bankcard Networks and that you do not receive any portion of the currency conversion rate used by the Bankcard Networks.

LOAN {

G. <u>Limitation of Liability.</u> Your liability to me, if any, for wrongful dishonor of any loan request I make using Card is limited to my actual damages. I also agree that you are not responsible if any transaction is not approved, whether by you, a Merchant, Bankcard Network, or a third party, even if I have sufficient credit available.

H. <u>Termination/Suspension of Account.</u> Upon any termination or cancellation of my Account by you or by me, or any suspension of my loan advance privileges under the Agreement, I agree that all Cards will be destroyed by me upon your instruction, or may be retrieved by you or your agent.

I. <u>Cancellation/Expiration of Cards.</u> I may be permitted to use the Card to access my account only so long as the access card program remains active and you permit me to participate in the program. If more than one person has executed the Agreement, any one of us may request that our Cards be cancelled. The request, at your option, may be made verbally or in writing. You may also cancel any Card at your sole discretion at any time, including if (1) the contracts with current or future providers of services used to operate the Card program expire or are terminated; or (2) I have not used my Card to obtain a loan advance on my Account at least once during any 12 month period; (3) my card is lost, stolen, or otherwise subject to unauthorized use; or (4) any part of the Program, including use of the Card, is prohibited by applicable law. I understand and agree that the terms governing my ability to obtain loan advances during the initial Draw Period and any renewed Draw Period are set forth in the Agreement and that those terms supercede any inconsistent expiration date(s) printed on any Cards that are issued to me to the extent that such expiration date(s) is (are) later than the expiration date of any Draw period defined in the Agreement.

J. <u>Lost or Stolen Cards.</u> **I agree to promptly notify you at 1-800-556-5678 if any Card is lost or stolen, or if I suspect unauthorized use.** You reserve the right not to honor any loan advance request made using a Card if any of my Cards has been cancelled or reported lost or stolen.

K. <u>Unauthorized Transactions.</u> I will not be liable for the unauthorized use of my Card. I agree to assist you in your investigation of any claims of unauthorized Card transactions and understand that I may be required to provide you with a written statement and/or an Affidavit of Forgery. I agree that if I permit a person to use the Card or Card account number, or if I benefit from another person's use of the Card or Card account number, such use is not unauthorized use of the Card, even if I did not intend to be responsible for such use.

L. <u>Special Rule for Card Purchases.</u> The following is in addition to the notice at the end of the Agreement entitled MY BILLING RIGHTS – I SHOULD KEEP THIS NOTICE FOR FUTURE USE:
    **Special Rule for Card Purchases.**
    If I have a problem with the quality of property or services that I purchased with my Card, and I have tried in good faith to correct the problem with the merchant, I may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) I must have made the purchase in my home state or, if not within my home state, within 100 miles of my current mailing address; and

(b) The purchase price must have been more than $50. These limitations do not apply if you or the Card Issuer own or operate the merchant, or if you or the Card Issuer mailed me the advertisement for the property or services.

## 4. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.

A. I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement, and if I do so such payments will be credited as of the day of receipt.

B. At a minimum, you will send me a periodic statement at the end of each billing cycle in which there is a debit or credit balance of more than one dollar ($1.00) or in which a finance charge has been imposed. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

C. I may pay all or any part of my "New Balance" at any time, without penalty. If I pay my entire "New Balance" shown on my periodic statement for any billing cycle by the "Payment Due Date," any periodic finance charge incurred from the first day of the next billing cycle until the posting of my payment will appear on my periodic statement for the next billing cycle.

D. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 13.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

E. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my Account.

F. During the Repayment Period, if the "Repayment" on my Account is 36 months or 120 months, my ......
Payment Due" equals 1/180th of the outstanding principal balance of my Account as of the last day of the Draw Period
plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle
together with any "Amount Past Due." If the Draw Period on my Account is 36 months, my "Minimum Payment Due"
during the Repayment Period equals 1/120th of the outstanding principal balance of my Account as of the last day of
the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the
billing cycle together with any "Amount Past Due."

**5. CREDIT LIMIT.** My Credit Limit under this Agreement is $ 206,000.00     . I promise not to request a loan
which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit
Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this
Agreement to exceed my Credit Limit. You will make loans on my Account based on the "Available Credit Limit" shown
on my most recent periodic statement. However, I agree that when I make payments on my Account by check or other
noncash method, you reserve the right to make loans based on the "Available Credit Limit" shown on the last periodic
statement issued prior to the most recent periodic statement. In addition to each "Minimum Payment Due," I must pay
immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my
Credit Limit.

**6. ANNUAL PERCENTAGE RATE.**

[ ] A. The initial Daily Periodic Rate is     N/A %. The initial **ANNUAL PERCENTAGE RATE** is
N/A %. These rates are "discounted" rates. This means that these rates are lower than the rates that
would be in effect if the formula set forth in paragraph 6.C below had been used, in which event the initial
Daily Periodic Rate would be     N/A % and the initial **ANNUAL PERCENTAGE RATE** would be     N/A %.
These discounted rates will be in effect from the date of this Agreement until N/A     . Thereafter,
the Daily Periodic Rate and the Annual Percentage Rate will be determined using the formula set forth in paragraph
6.C below.

[X] B. The initial Daily Periodic Rate is 0.05103 % and the initial **ANNUAL PERCENTAGE RATE** is
18.625 %. These rates are not discounted.

C. My Annual Percentage Rate and Daily Periodic Rate may increase or decrease (the first day after my
"discounted" rate has expired, if applicable) according to the following procedure: The ANNUAL PERCENTAGE RATE
shall be the "Index" plus a "Margin." The "Index" will be the highest Prime Rate as published in the "Money Rates"
table of The Wall Street Journal as of the first business day of the calendar month. The "Margin" is equal to the
number of percentage points disclosed in paragraph 6.D below. Each billing cycle will end on the last day of the
calendar month. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index
value is established.

Upon a change in the Index, any resulting change in my Daily Periodic Rate and Annual Percentage Rate will
take effect without prior notice to me, and will apply to new loans and to the outstanding principal balance in my
Account. The new Annual Percentage Rate and Daily Periodic Rate will apply to my then existing unpaid principal
balance and all new loans I obtain until my Annual Percentage Rate and Daily Periodic Rate change again. The Daily
Periodic Rate at any time equals the **ANNUAL PERCENTAGE RATE** divided by 365.

D. The "Margin" to be used under paragraph 6.C above to determine my **ANNUAL PERCENTAGE RATE** is
1.500 percentage points.

E. The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only interest and
not other costs. The **ANNUAL PERCENTAGE RATE** will never increase above   18.000 %
or the maximum rate permitted by law, whichever is less.

F. If the Daily Periodic Rate (and the corresponding Annual Percentage Rate) increases, I will have to pay
additional periodic finance charges and, as a result, I will have to pay larger "Minimum Payments."

**7. FINANCE CHARGES.**

I agree to pay finance charges on my Account as explained below.

A. Periodic **FINANCE CHARGE.**

(1) A loan represented by an Equity Credit Line Check will be posted to my Account on the date that such a check
is presented to you for payment. Any loan advance represented by a Card transaction will be posted to my Account as
of the date that you receive the transaction for processing. The periodic finance charge begins to accrue on my
Account from the time a loan is posted to my Account. There is no grace period during which I can repay loan
advances without incurring a periodic finance charge.

(2) You compute the periodic finance charge on my Account by applying the Daily Periodic Rate to the "Average
Daily Balance" in my Account (including current transactions). To determine the periodic finance charge for any billing
cycle, the "Average Daily Balance" is multiplied by the Daily Periodic Rate, then this product is multiplied by the
number of days in the billing cycle.

LOAN #

(3). To get the "Average Daily Balance," you take the beginning principal balance of my Account each day, add any new loans, and subtract any principal payments or credits. This gives you the Daily Balance. Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

B. Other **FINANCE CHARGES.**

(1) Broker Fee **FINANCE CHARGES.**

I agree to pay Broker Fee **FINANCE CHARGES** of $ N/A at the time I sign this Agreement.

| | |
|---|---|
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |

(2) Settlement Agent **FINANCE CHARGES.**

I agree to pay the following Settlement Agent **FINANCE CHARGES** at the time I sign this Agreement:

| | |
|---|---|
| Attorney's Fee | $ _____ 0.00 |
| Atty/Sttlmnt Agent | $ _____ 200.00 |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |

## 8. OTHER CHARGES.

A. I agree to pay each of the charges listed below, which shall constitute additional indebtedness under this agreement. Any charges assessed will be shown on my periodic statement for the billing cycle in which such charge is assessed:

(1) If I fail to make my "Minimum Payment Due" within ten (10) days of the "Payment Due Date," I agree to pay the maximum delinquency charge (or late charge) authorized by law which is the lesser of 5% of the unpaid installment or $12.50 (as adjusted pursuant to S.C. Code Section 37-1-109).

(2) I agree to pay a Return Item Fee of $15 for each check you receive in payment of my Account which is returned unpaid upon second presentment.

B. I agree to pay you or my broker the following closing costs at or before the time I sign this Agreement:

| | |
|---|---|
| Title Insurance | $ _____ 384.00 |
| Recording | $ _____ 60.00 |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| LESS Amounts Paid by Lender | $ _____ 0.00 |
| Total Paid by Borrower | $ _____ 644.00 |

C. I may elect to pay the closing costs described in paragraph 8.B above and the finance charge described in paragraph 7.B above in cash or by check at or before the time I sign this Agreement or I may elect to finance some or all of such costs and finance charges by allowing you to make a loan under my Account to pay some or all of such costs and finance charges.

## 9. REAL PROPERTY SECURITY.
To secure the payment of all loans I obtain and the performance of all promises I make in this Agreement, I and all co-owners are giving you a Mortgage (the "Mortgage") covering my dwelling located at
422 PELICAN FLIGHT DRIVE, DEWEES ISLAND, SC 29451-____

LOAN #

(the "Real Property"). The Mortgage is security for my current and future obligations under this Agreement. . . . I continue to be obligated to make payment to you under this Agreement even if the Real Property is damaged or destroyed and whether or not any insurance proceeds are available.

## 10. SECTION INTENTIONALLY OMITTED.

## 11. PROPERTY INSURANCE.
I agree to obtain and maintain property insurance against loss or damage to the Real Property, in such amounts, against such risks (including, but not limited to, flood damage insurance required by law), and according to such terms as you may require in the Mortgage or otherwise. I may obtain property insurance from any company of my choice that is acceptable to you. If the amount of the premiums for property insurance increases at any time during the term of my Account, I agree to pay any such increase(s).

## 12. YOUR RIGHTS TO TEMPORARILY SUSPEND MY LOANS OR REDUCE MY CREDIT LIMIT.

A. Subject to limitations of applicable law, you may take the actions listed in paragraph 12.B below during the period that any of the following events or conditions occur:

(1)     the value of the Real Property declines significantly below its appraised value for the purposes of my Account;

(2)     you reasonably believe that I will not be able to meet the repayment requirements under my Account due to a material change in my financial circumstances, such as the filing of a bankruptcy petition by or against me;

(3)     I am in default of any material obligation of this Agreement, such as my important obligations listed in paragraph 14 below;

(4)     government action (such as enactment of a state usury law) prevents you from imposing the Annual Percentage Rate provided for in this Agreement;

(5)     government action (such as imposition of a tax lien) impairs the priority of the lien of the Mortgage such that the value of the lien of the Mortgage is less than 120% of my Credit Limit;

(6)     the maximum Annual Percentage Rate set forth in paragraph 6.E above is reached;

(7)     the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice.

B. During the period in which a condition described in paragraph 12.A above occurs, you may refuse to make any additional loans or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed, provided I have notified you in writing, explaining in detail and documenting how the condition(s) have been cured or have changed and no new condition(s) under paragraph 12.A above or 13.A below have occurred.

C. Before reinstating my right to obtain loans, or restoring my Credit Limit, you may conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) as you deem appropriate, and you may require me to reimburse you on demand for any costs you actually incur for obtaining credit reports and appraisals. You may take these steps to verify that (i) the condition(s) that caused your suspension of my loans or reduction of my Credit Limit no longer exist, and (ii) the priority of the lien of the Mortgage is not impaired.

D. If more than one Borrower signs this Agreement and any such Borrower requests that you cease making loans, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the loans for such request to be effective. If all such persons subsequently request reinstatement of the loans, you must honor such a request unless a condition listed in paragraph 12.A above or 13.A below has occurred.

E. If an event or condition described in paragraph 12.A above occurs which is also an event or condition described in paragraph 13.A below, your rights and remedies described under paragraph 13.B below apply and supercede your rights described in this paragraph 12.

## 13. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.

A. Subject to limitations of applicable law, you may take the actions listed in paragraph 13.B below if any of the following events or conditions occur:

LOAN

(1)    I fail to meet the repayment terms of this Agreement, such as my failure to make any minimum Payment Due to you on or before the Payment Due Date;

(2)    I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Mortgage;

(3)    I sell or transfer title to the Real Property without first obtaining your written permission;

(4)    I fail to maintain insurance on the Real Property as required under this Agreement or the Mortgage;

(5)    I act or fail to act and as a result a lien senior to the lien of the Mortgage is filed against the Real Property;

(6)    I die and I am not survived by another person obligated as a Borrower under this Agreement;

(7)    All or part of the Real Property is taken through eminent domain, condemnation or similar government taking;

(8)    A prior lienholder on the Real Property begins foreclosure under its security document;

(9)    The Real Property is used for an illegal purpose which could subject the Real Property to seizure;

(10)    I fail to pay taxes on the Real Property;

(11)    The prospect of payment, performance or realization of collateral is significantly impaired; or

(12)    My action or inaction adversely affects the Real Property or your rights in the Real Property. Such action or inaction could include, for example, the following:

    (a)    A judgment is filed against me;

    (b)    I commit waste or otherwise destructively use or fail to maintain the Real Property;

    (c)    I die and I am survived by another person obligated as a Borrower under this Agreement; or

    (d)    I move out of the Real Property.

B. If an event described in paragraph 13.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

(1)    you may terminate any of my rights under my Account;

(2)    you may temporarily or permanently refuse to make any additional loans;

(3)    you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

(4)    you may foreclose the Mortgage;

(5)    you may reduce my Credit Limit; and

(6)    you may take any other action permitted by this Agreement, by law or in equity.

## 14. MY IMPORTANT OBLIGATIONS. I agree that:

A.    I will pay all of my existing and future debts to you under any existing or future agreement with you and I will pay all of my existing and future debts to my other creditors as they become due and will not allow a creditor to obtain a judgment against me.

B.    I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

C.    From time to time, if requested, I will supply you with current financial information about me.

D.    I have not made and will not make any misrepresentation in connection with my Account whether in my application, in this Agreement, or in the Mortgage.

E.    I will not permit a receiver, sequestrator, liquidator, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Real Property.

LOAN #:

F.   I will not use or allow use of the Real Property for any illegal purpose.

G.   I will not move out of the Real Property.

H.   I will not permit a lien to be filed which takes priority over the Mortgage for future advances made under this Agreement.

I.   I will not break any promise made in this Agreement or in the Mortgage such as:

    (1)   my promise not to exceed my Credit Limit; and

    (2)   my "Important Obligations" listed in the Mortgage.

**15. COSTS OF COLLECTION.** Subject to any limits of applicable law, I must pay for your reasonable and actual costs of collection, or foreclosure such as your court costs and reasonable attorney's or trustee's fees. Periodic finance charges will continue to accrue at the rates provided in this Agreement before and after I default and before and after you obtain a judgment against me.

**16. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN LOANS.**

A. Termination by Me. I may terminate my right to obtain loans by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain loans may be terminated by written notice pursuant to this paragraph 16.A signed by any one or more of such persons. I may also suspend my right to obtain loans pursuant to paragraph 12.D above.

B. Termination by You. My right to future advances under my Account will terminate at the end of the Draw Period or any renewed Draw Period if not sooner upon your exercise of your termination or suspension rights under paragraphs 12.B or 13.B above or my exercise of my suspension or termination rights under paragraphs 12.D or 16.A above.

C. Effect of Termination. Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the "Minimum Payment Due" on or before my "Payment Due Dates" until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 13.B above. I must return unused Equity Credit Line Checks to you upon termination.

**17. CHANGES TO AGREEMENT.**

A. You may change this Agreement to the extent not prohibited by federal or state law, such as the changes listed as follows:

    (1)   if the original Index is no longer available, you may change the Index and Margin;

    (2)   you may make any change I agree to in writing;

    (3)   you may make a change which is unequivocally beneficial to me, such as offering me more minimum payment options, extensions or renewals of my Account, reductions in the rate or fees, and additional means to access loans; and

    (4)   you may make insignificant changes, such as changing the address to which payments must be sent, name changes, operational changes involving the billing cycle date, the date the Minimum Payment is due, the day of the month on which Index values are measured to determine my rate, your rounding rules and the balance computation method.

B. If required by applicable law, you will mail me notice of such a change before the effective date of the change. The change will be effective as to any existing unpaid balance and as to any future transactions under this Agreement.

**18. OTHER PROVISIONS.**

A. Third Parties. This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my or any non-borrower co-owner's obligations under this Agreement. My rights under this Agreement belong only to me. I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Mortgage at any time without my consent.

LOAN #

B. <u>Additional Credit Reports and Appraisals</u>. I authorize you to conduct such searches, v.........
evaluations (such as credit reports, appraisals and lien searches) concerning me, the Real Property and the Mortgage
as you may deem necessary from time to time. I will cooperate in having the Real Property reappraised.

C. <u>Tax Deductibility</u>. I know that I should consult a tax adviser regarding the deductibility of interest and charges.

D. <u>Applicable Law</u>. I agree that this Agreement is to be governed by federal law and, to the extent not preempted
by federal law, by the laws of the state where the Real Property is located.

E. <u>Application of Payments</u>. You may apply payments and proceeds of the Real Property in such order as you
shall deem advisable or as otherwise required by applicable law.

F. <u>Failure to Perform</u>. If I violate or fail to perform any term or condition of this Agreement (or the Mortgage), you
may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of
my Account and finance charges will be figured at the rates described above. I agree to pay these costs and finance
charges on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies
under this Agreement.

G. <u>Complete Understanding of the Parties</u>. There are no oral agreements concerning this Agreement. This
Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or
unenforceable, the rest of this Agreement shall remain in effect.

H. <u>Waiver of Notice</u>. I waive presentment, demand, protest, notice of default, nonpayment, partial payments and
all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of
this Agreement, except those notices that are required by federal Regulation Z.

I. <u>Meaning of Words</u>. All words in this Agreement will be read to be of such gender and number as the context
may require. The section headings in this Agreement are for convenience and do not limit or amend any of the
Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrase "such as" is not
intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other
conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if
different from the listed conditions or events.

J. <u>Payment Marked "Payment in Full"</u>. I agree not to submit any checks to you in payment of my Account marked
"Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my
Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount
then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment
in Full" or similar notation. **Communications concerning a dispute as to amounts owing on my Account,
including any checks submitted to you as full satisfaction of my Account, must be sent to**
Countrywide Bank, FSB.
P.O. Box 5170, Simi Valley, CA 93062-5170

K. <u>Enforcement</u>. You can accept any late or partial payment or otherwise waive or delay enforcing your rights
under this Agreement and still exercise your rights at a later time.

L. <u>Notices</u>. Except for any notice required under applicable law to be given in another manner, (a) any notice to
me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class
mail, addressed to me at my last address appearing on your records or at such other address as I may designate by
written notice to you as provided in this paragraph 18.L and (b) any notice to you provided for in this Agreement shall
be given by mailing such notice to you by certified mail, return receipt requested, at
Countrywide Bank, FSB.
P.O. Box 5170, Simi Valley, CA 93062-5170
or to such other address as you may designate by written notice to me as provided in this paragraph 18.L.

M. <u>Riders/Addenda</u>. The covenants and agreements of each of the riders/addenda checked below are
incorporated into and supplement and amend the terms of this Agreement.

☐ No Cost Addendum                                  ☐ _____ Rider
☐ _____ Addendum                   ☐ _____
☒ Billing Rights Statement

LOAN

BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDERS/ADDENDA, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDERS/ADDENDA, AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDERS/ADDENDA. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME EQUITY LINE OF CREDIT", THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE" AND TWO COPIES OF THE HOME EQUITY LINE OF CREDIT NOTICE OF RIGHT TO CANCEL.

Borrower: DAVID C. CAULDER                                    8-29-07
                                                             Date

Borrower: JOSHUA B. FARMER                                   8-29-07
                                                             Date

Borrower: _____                   _____
                                                             Date

Borrower: _____                   _____
                                                             Date

DATE:        08/28/2007
BORROWER: DAVID C. CAULDER
CASE #:
LOAN #:
PROPERTY ADDRESS: 422 PELICAN FLIGHT DRIVE
                 DEWEES ISLAND, SC 29451-____

Branch #: 0000287
13860 BALLANTYNE CORP PL #150
CHARLOTTE, NC 28277
Phone: (704)752-1340
Br Fax No.: (704)752-1691

This notice of my billing rights is a Rider to and supplements my/our Home Equity Credit Line Agreement and Disclosure Statement.

## MY BILLING RIGHTS - I SHOULD KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about my rights and your responsibilities under the Fair Credit Billing Act.

### I Must Notify You In Case of Errors Or Questions About My Bill.

If I think my bill is wrong, or I need more information about a transaction on my bill, I must write you on a separate sheet at the address listed on my bill. I must write to you as soon as possible. You must hear from me no later than 60 days after you sent me the first bill on which the error or problem appeared. I can telephone you, but doing so will not preserve my rights.

In my letter, I must give you the following information:

- My name and account number.

- The dollar amount of the suspected error.

- I must describe the error and explain, if I can, why I believe there is an error. If I need more information, I must describe the item I am not sure about.

### My Rights and Your Responsibilities
### After You Receive My Written Notice

You must acknowledge my letter within 30 days, unless you have corrected the error by then. Within 90 days, you must either correct the error or explain why you believe the bill was correct.

After you receive my letter, you cannot try to collect any amount I question, or report me as delinquent. You can continue to bill me for the amount I question, including finance charges, and you can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while you are investigating, but I am still obligated to pay the parts of my bill that are not in question.

If you find that you made a mistake on my bill, I will not have to pay any finance charges related to any questioned amount. If you didn't make a mistake, I may have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, you will send me a statement of the amount I owe and the date that it is due.

If I fail to pay the amount that you think I owe, you may report me as delinquent. However, if your explanation does not satisfy me and I write to you within ten days telling you that I still refuse to pay, you must tell anyone you report me to that I have a question about my bill. And, you must tell me the name of anyone you reported me to. You must tell anyone you report me to that the matter has been settled between us when it finally is.

If you don't follow these rules, you can't collect the first $50 of the questioned amount, even if my bill was correct.

HELOC - Billing Rights Notice
20482-US (08/05)(d)

Initials: _____    Initials: _____

Prepared by: MELISSA D. BENTON

# HOME EQUITY
# CONFIRMATION AGREEMENT

AGENT:

| | |
|---|---|
| ORIGINATION DATE: | 08/07/2007 |
| AGREEMENT DATE: | 08/07/2007 |
| APPLICANT: | DAVID C. CAULDER |
| CO-APPLICANT: | JOSHUA B. FARMER |
| PROPERTY ADDRESS: | 422 PELICAN FLIGHT DRIVE |
| | DEWEES ISLAND, SC 29451-____ |

BRANCH # 0000287    13860 BALLANTYNE CORP PL #150
                    CHARLOTTE, NC 28277

| | |
|---|---|
| CONFIRMATION NO.: | 9704 |
| POINTS: | 0.000 |
| AGREEMENT TERM: | 45 Days |
| EXPIRATION DATE: | 09/21/2007 |

LOAN NUMBER:
LOAN AMOUNT:        206,000.00
LOAN TYPE:          HELOC - Piggyback/ 89.97%/Preferred/Cost

INDEX:              **WSJ Prime Rate**
OCCUPANCY:          2ND/VACATION HOME

| MARGIN | CURRENT INDEX | INT. RATE CEILING |
|---|---|---|
| 1.500 | 8.250 | 18.000 |

This Agreement covers only the above described Applicant, property, and loan program and is subject to the following terms and conditions. **YOU MUST SIGN THIS AGREEMENT AND RETURN IT TO THE LENDER WITHIN 10 DAYS OF THE DATE OF THIS AGREEMENT.**

1.  ☐ This home equity line of credit loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate will be based on the then-current value of the Index plus the Margin shown above. The loan you have applied for also has an Introductory Interest Rate, which may be lower or greater than the rate that you will be required to pay for the remaining term of the loan. Refer to the "Important Terms of Our Home Equity Line of Credit" disclosure for complete information.

    ☒ This home equity line of credit loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate after closing will be based on the then-current value of the Index plus the Margin shown above. Refer to the "Important Terms of Our Home Equity Line of Credit" disclosure for complete information.

    ☐ This home equity loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate will be based on the then-current value of the Index plus the Margin shown above. The loan you have applied for also has an Introductory Interest Rate, which may be lower or greater than the rate that you will be required to pay for the remaining term of the loan.

2.  The loan must close, the three-day rescission period (unless such a period is not applicable) must expire, and funds must be disbursed on or before the expiration date set forth above.

3.  Upon loan closing, the Lender must receive a valid first or second lien on the property, as specified in the loan application, and title must be clear, without defects unacceptable to Lender. If required, there must be title insurance in an amount and form acceptable to the Lender.

4.  The Applicant must submit to the Lender a complete loan application, including any additional supporting documentation which the Lender may request in order to enable the Lender to make an underwriting decision.

5.  If this Agreement covers a "reduced documentation" loan application, the Lender reserves the right, in its discretion, to require the Applicant to submit a complete loan application with any additional supporting documentation which the Lender may request. This may result in delays due to the time the Lender will need to verify the information contained in the complete loan application and/or supporting documentation.

6.  This is not a loan approval or loan commitment. Any program described above may not be available for Applicant. The Lender will not close the loan unless, among other things, it approves the Applicant's loan application, including employment, income, assets, credit and property, and all conditions of such approval are satisfied prior to loan closing.

7.  As of the date of loan closing, the Applicant must have hazard insurance on the property covering the replacement cost of the dwelling with an insurance carrier acceptable to the Lender. If the property is located in a special flood hazard area, flood insurance will be required. If the property includes commonly owned area, a master policy insurance certificate will be required. Insurance against additional perils, including but not limited to earthquake, may also be required.

LOAN #

8.  The Applicant must complete or cause to be completed all required construction, tests or repairs prior to loan closing, and the property must be suitable for occupancy. The Applicant must obtain all required inspections or certifications by applicable and appropriate authorities prior to loan closing. These include, but are not limited to, wood-destroying insect inspection, repair and abatement; radon test; well water or septic system acceptance; local occupancy or use permits; and repairs required by the appraiser as a valuation condition.

9.  If this Agreement covers a purchase transaction, the sale must close with each party paying costs and expenses as specified in the copy of the purchase agreement supplied to the Lender. Any changes in such purchase agreement must be approved by the Lender prior to closing.

10. The points specified above    ☐ do    ☒ do not    include all other loan fees, costs and expenses.

11. The Lender estimates that it will take approximately 45    days to process, approve, close and fund the loan. The Lender agrees to use commercially reasonable efforts to fund the loan prior to the expiration date of this Agreement. However, this Agreement is not a commitment to close and fund the loan prior to the expiration date. Delays may occur, and this Agreement may expire prior to loan closing due to a variety of circumstances. Such circumstances include, but are not limited to, unforeseeable or extraordinary events, delays in receipt or failure to receive various required information, documents or fees from either the applicant or third parties, and acts of God. The Lender agrees to exercise reasonable efforts to obtain third-party documentation. Nevertheless, the expiration date of this Agreement shall <u>not</u> be extended as a result of any such circumstances or events.

12. Regardless of whether or not loan documents have been signed, if the Lender discovers a material change in the information provided with respect to the loan, including but not limited to, the borrowers' income, employment, credit or the property, the Lender shall not be obligated to fund the loan, and the expiration date of this Agreement shall not be extended as a result of any such circumstances or events.

13. If the loan does not close and funds are not disbursed prior to the expiration date of this Agreement, the Lender and the Applicant may enter into a new Confirmation Agreement. The interest rate and points specified in such new Agreement may be higher than either of the interest rate and points specified above or the Lender's then-current market rate and points.

Any questions concerning the terms and conditions of this Agreement may be directed to
DON WITTER                                  (704) 752-1340

BY SIGNING BELOW, LENDER AND APPLICANT AGREE TO THE TERMS AND CONDITIONS OF THIS CONFIRMATION AGREEMENT.
**Countrywide Bank, FSB.**

BY _____    TITLE  LOAN SPECIALIST _____
    MELISSA BENTON

Please sign and date below; return the original and keep a copy for your records.

I (We) have read this Confirmation Agreement and agree to all the terms and conditions set forth herein.

_____  8-29-07    _____  8-29-07
Signature                         Date        Signature                         Date
DAVID C. CAULDER                               JOSHUA B. FARMER

_____  _____    _____  _____
Signature                         Date        Signature                         Date

LOAN #

8.  The Applicant must complete or cause to be completed all required construction, tests or repairs prior to loan closing, and the property must be suitable for occupancy. The Applicant must obtain all required inspections or certifications by applicable and appropriate authorities prior to loan closing. These include, but are not limited to, wood-destroying insect inspection, repair and abatement; radon test; well water or septic system acceptance; local occupancy or use permits; and repairs required by the appraiser as a valuation condition.

9.  If this Agreement covers a purchase transaction, the sale must close with each party paying costs and expenses as specified in the copy of the purchase agreement supplied to the Lender. Any changes in such purchase agreement must be approved by the Lender prior to closing.

10. The points specified above ☐ do ☒ do not include all other loan fees, costs and expenses.

11. The Lender estimates that it will take approximately 45 days to process, approve, close and fund the loan. The Lender agrees to use commercially reasonable efforts to fund the loan prior to the expiration date of this Agreement. However, this Agreement is not a commitment to close and fund the loan prior to the expiration date. Delays may occur, and this Agreement may expire prior to loan closing due to a variety of circumstances. Such circumstances include, but are not limited to, unforeseeable or extraordinary events, delays in receipt or failure to receive various required information, documents or fees from either the applicant or third parties, and acts of God. The Lender agrees to exercise reasonable efforts to obtain third-party documentation. Nevertheless, the expiration date of this Agreement shall not be extended as a result of any such circumstances or events.

12. Regardless of whether or not loan documents have been signed, if the Lender discovers a material change in the information provided with respect to the loan, including but not limited to, the borrowers' income, employment, credit or the property, the Lender shall not be obligated to fund the loan, and the expiration date of this Agreement shall not be extended as a result of any such circumstances or events.

13. If the loan does not close and funds are not disbursed prior to the expiration date of this Agreement, the Lender and the Applicant may enter into a new Confirmation Agreement. The interest rate and points specified in such new Agreement may be higher than either of the interest rate or points specified above or the Lender's then-current market rate and points.

Any questions concerning the terms and conditions of this Agreement may be directed to
DON WITTER                    (704) 752-1340

BY SIGNING BELOW, LENDER AND APPLICANT AGREE TO THE TERMS AND CONDITIONS OF THIS CONFIRMATION AGREEMENT.
**Countrywide Home Loans, Inc., itself or as agent for Countrywide Bank, FSB.**

BY _____    TITLE  LOAN SPECIALIST
    RAVA COLBY

Please sign and date below; return the original and keep a copy for your records.

I (We) have read this Confirmation Agreement and agree to all the terms and conditions set forth herein.

_____  Date    _____  Date
Signature                                   Signature
DAVID C. CAULDER                            JOSHUA B. FARMER

_____  Date    _____  Date
Signature                                   Signature


Prepared by: RAVA A. COLBY

# HOME EQUITY
## CONFIRMATION AGREEMENT

AGENT:

| | |
|---|---|
| ORIGINATION DATE: | 08/07/2007 |
| AGREEMENT DATE: | 08/07/2007 |
| APPLICANT: | DAVID C. CAULDER |
| CO-APPLICANT: | JOSHUA B. FARMER |
| PROPERTY ADDRESS: | 422 PELICAN FLIGHT DRIVE |
| | DEWEES ISLAND, SC 29451-____ |

BRANCH # 0000287     13860 BALLANTYNE CORP PL #150
CHARLOTTE  NC 28277

| | |
|---|---|
| CONFIRMATION NO.: | 9704 |
| POINTS: | 0.000 |
| AGREEMENT TERM: | 45 Days |
| EXPIRATION DATE: | 09/21/2007 |

LOAN NUMBER:
LOAN AMOUNT:      215,000.00
LOAN TYPE:        HELOC - Piggyback/ 90.00%/Preferred/Cost

INDEX:            WSJ Prime Rate
OCCUPANCY:        2ND/VACATION HOME

|         MARGIN |  CURRENT INDEX | INT. RATE CEILING |
|:---:|:---:|:---:|
| 1.500 | 8.250 | 18.000 |

This Agreement covers only the above described Applicant, property, and loan program and is subject to the following terms and conditions. **YOU MUST SIGN THIS AGREEMENT AND RETURN IT TO THE LENDER WITHIN 10 DAYS OF THE DATE OF THIS AGREEMENT.**

1.  ☐ This home equity line of credit loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate will be based on the then-current value of the Index plus the Margin shown above. The loan you have applied for also has an Introductory Interest Rate, which may be lower or greater than the rate that you will be required to pay for the remaining term of the loan. Refer to the "Important Terms of Our Home Equity Line of Credit" disclosure for complete information.

    ☒ This home equity line of credit loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate after closing will be based on the then-current value of the Index plus the Margin shown above. Refer to the "Important Terms of Our Home Equity Line of Credit" disclosure for complete information.

    ☐ This home equity loan is an adjustable rate mortgage loan, and the interest rate is subject to periodic adjustment. The interest rate will be based on the then-current value of the Index plus the Margin shown above. The loan you have applied for also has an Introductory Interest Rate, which may be lower or greater than the rate that you will be required to pay for the remaining term of the loan.

2.  The loan must close, the three-day rescission period (unless such a period is not applicable) must expire, and funds must be disbursed on or before the expiration date set forth above.

3.  Upon loan closing, the Lender must receive a valid first or second lien on the property, as specified in the loan application, and title must be clear, without defects unacceptable to Lender. If required, there must be title insurance in an amount and form acceptable to the Lender.

4.  The Applicant must submit to the Lender a complete loan application, including any additional supporting documentation which the Lender may request in order to enable the Lender to make an underwriting decision.

5.  If this Agreement covers a "reduced documentation" loan application, the Lender reserves the right, in its discretion, to require the Applicant to submit a complete loan application with any additional supporting documentation which the Lender may request. This may result in delays due to the time the Lender will need to verify the information contained in the complete loan application and/or supporting documentation.

6.  This is not a loan approval or loan commitment. Any program described above may not be available for Applicant. The Lender will not close the loan unless, among other things, it approves the Applicant's loan application, including employment, income, assets, credit and property, and all conditions of such approval are satisfied prior to loan closing.

7.  As of the date of loan closing, the Applicant must have hazard insurance on the property covering the replacement cost of the dwelling with an insurance carrier acceptable to the Lender. If the property is located in a special flood hazard area, flood insurance will be required. If the property includes commonly owned area, a master policy insurance certificate will be required. Insurance against additional perils, including but not limited to earthquake, may also be required.

LOAN #:

8. The Applicant must complete or cause to be completed all required construction, tests or repairs prior to loan closing, and the property must be suitable for occupancy. The Applicant must obtain all required inspections or certifications by applicable and appropriate authorities prior to loan closing. These include, but are not limited to, wood-destroying insect inspection, repair and abatement; radon test; well water or septic system acceptance; local occupancy or use permits; and repairs required by the appraiser as a valuation condition.

9. If this Agreement covers a purchase transaction, the sale must close with each party paying costs and expenses as specified in the copy of the purchase agreement supplied to the Lender. Any changes in such purchase agreement must be approved by the Lender prior to closing.

10. The points specified above ☐ do ☒ do not include all other loan fees, costs and expenses.

11. The Lender estimates that it will take approximately 45 days to process, approve, close and fund the loan. The Lender agrees to use commercially reasonable efforts to fund the loan prior to the expiration date of this Agreement. However, this Agreement is not a commitment to close and fund the loan prior to the expiration date. Delays may occur, and this Agreement may expire prior to loan closing due to a variety of circumstances. Such circumstances include, but are not limited to, unforeseeable or extraordinary events, delays in receipt or failure to receive various required information, documents or fees from either the applicant or third parties, and acts of God. The Lender agrees to exercise reasonable efforts to obtain third-party documentation. Nevertheless, the expiration date of this Agreement shall <u>not</u> be extended as a result of any such circumstances or events.

12. Regardless of whether or not loan documents have been signed, if the Lender discovers a material change in the information provided with respect to the loan, including but not limited to, the borrowers' income, employment, credit or the property, the Lender shall not be obligated to fund the loan, and the expiration date of this Agreement shall not be extended as a result of any such circumstances or events.

13. If the loan does not close and funds are not disbursed prior to the expiration date of this Agreement, the Lender and the Applicant may enter into a new Confirmation Agreement. The interest rate and points specified in such new Agreement may be higher than either of the interest rate and points specified above or the Lender's then-current market rate and points.

Any questions concerning the terms and conditions of this Agreement may be directed to
DON WITTER                    (704) 752-1340

BY SIGNING BELOW, LENDER AND APPLICANT AGREE TO THE TERMS AND CONDITIONS OF THIS CONFIRMATION AGREEMENT.
**Countrywide Home Loans, Inc., itself or as agent for**
**Countrywide Bank, FSB.**

BY _____     TITLE  LOAN SPECIALIST _____
RAVA COLBY

Please sign and date below; return the original and keep a copy for your records.

I (We) have read this Confirmation Agreement and agree to all the terms and conditions set forth herein.

_____ 8/9/07     _____ 8-9-07
Signature           Date              Signature           Date
DAVID C. CAULDER                      JOSHUA B. FARMER

_____ _____     _____ _____
Signature           Date              Signature           Date

610                2  001  001          BK    H637PG552

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
MELISSA D. BENTON

[Space Above This Line For Recording Data]

# MORTGAGE
## (Line of Credit)

M

THIS MORTGAGE, dated AUGUST 29, 2007          , is between
DAVID C CAULDER, AND JOSHUA B FARMER
Jayne K. Caulder and Andrea G. Farmer

residing at
310 DEER TRACKLANE, ~~GILKEY7~~ Rutherfordton NC 28139
the person or persons signing as "Mortgagor(s)" below and hereinafter referred to as "we," "our," or "us" and MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS") a Delaware corporation, with an address of P.O. Box 2026, Flint,
MI 48501-2026, tel. (888) 679-MERS. MERS is the "Mortgagee" under this Mortgage and is acting solely as nominee for
Countrywide Bank, FSB.
("Lender" or "you") and its successors and assigns.

MORTGAGED PREMISES: In consideration of the loan hereinafter described, we hereby mortgage, grant and convey
to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the
premises located at:          422 PELICAN FLIGHT DRIVE, DEWEES ISLAND
                                               Street, Municipality
          CHARLESTON                    South Carolina    29451      (the "Premises").
                County                                      ZIP
and further described as:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

The Premises includes all buildings and other improvements now or in the future on the Premises and all rights and interests
which derive from our ownership, use or possession of the Premises and all appurtenances thereto.

WE UNDERSTAND and agree that MERS is a separate corporation acting solely as nominee for Lender and Lender's
successors and assigns, and holds only legal title to the interests granted by us in this Mortgage, but, if necessary to comply with
law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those
interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender
including, but not limited to, releasing or canceling this Mortgage.

• MERS HELOC - SC Mortgage
2E026-SC (10/06)(d/l)                              Page 1 of 4





DOC ID #:

LOAN: This Mortgage will secure your loan to us in the principal amount of $ 206,000.00    or so much thereof as may be advanced and readvanced from time to time, including future advances as provided by S.C. Code Section 29-3-50 (1976) to
DAVID C. CAULDER
JOSHUA B. FARMER

the Borrower(s) under the Home Equity Credit Line Agreement and Disclosure Statement (the "Note") dated AUGUST 29, 2007    with a maturity date of AUGUST 15, 2032    , plus interest and costs, late charges and all other charges related to the loan, all of which sums are repayable according to the Note. This Mortgage will also secure the performance of all of the promises and agreements made by us and each Borrower and Co-Signer in the Note, all of our promises and agreements in this Mortgage, any extensions, renewals, amendments, supplements and other modifications of the Note, and any amounts advanced by you under the terms of this Mortgage entitled "Our Authority To You." Loans under the Note may be made, repaid and remade from time to time in accordance with the terms of the Note and subject to the Credit Limit set forth in the Note. The maximum amount of all indebtedness outstanding at any one time secured hereby shall not exceed one hundred fifty percent (150%) of the face amount of the Note plus interest thereon, all charges and expenses of collection incurred by the Mortgagee, including court costs, and reasonable attorneys' fees.
TO THE EXTENT PROVIDED IN THE NOTE, INTEREST OR DISCOUNT WILL BE DEFERRED, ACCRUED OR CAPITALIZED.

OWNERSHIP: We are the sole owner(s) of the Premises. We have the legal right to mortgage the Premises to you.

OUR OBLIGATIONS:

(a) TAXES: We will pay all real estate taxes, assessments, water charges and sewer rents relating to the Premises when they become due. We will not claim any credit on, or make deduction from, the loan under the Note because we pay these taxes and charges. We will provide you with proof of payment upon request.

(b) MAINTENANCE: We will maintain the building(s) on the Premises in good condition. We will not make major changes in the building(s) except for normal repairs. We will not tear down any of the building(s) on the Premises without first getting your consent. We will not use the Premises illegally. If this Mortgage is on a unit in a condominium or a planned unit development, we shall perform all of our obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development and constituent documents.

(c) INSURANCE: We will keep the building(s) on the Premises insured at all times against loss by fire, flood and any other hazards you may specify. We may choose the insurance company, but our choice is subject to your reasonable approval. The policies must be for at least the amounts and the time periods that you specify. We will deliver to you upon your request the policies or other proof of the insurance. The policies must name you as "mortgagee" and "loss-payee" so that you will receive payment on all insurance claims, to the extent of your interest under this Mortgage, before we do. The insurance policies must also provide that you be given not less than 10 days prior written notice of any cancellation or reduction in coverage, for any reason. Upon request, we shall deliver the policies, certificates or other evidence of insurance to you. In the event of loss or damage to the Premises, we will immediately notify you in writing and file a proof of loss with the insurer. You may file a proof of loss on our behalf if we fail or refuse to do so. You may also sign our name to any check, draft or other order for the payment of insurance proceeds in the event of loss or damage to the Premises. If you receive payment of a claim, you will have the right to choose to use the money either to repair the Premises or to reduce the amount owing on the Note.

(d) CONDEMNATION: We assign to you the proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Premises, or part thereof, or for conveyance in lieu of condemnation, all of which shall be paid to you, subject to the terms of any Prior Mortgage.

(e) SECURITY INTEREST: We will join with you in signing and filing documents and, at our expense, in doing whatever you believe is necessary to perfect and continue the perfection of your lien and security interest in the Premises. It is agreed that the Lender shall be subrogated to the claims and liens of all parties whose claims or liens are discharged or paid with the proceeds of the Agreement secured hereby.

(f) OUR AUTHORITY TO YOU: If we fail to perform our obligations under this Mortgage, you may, if you choose, perform our obligations and pay such costs and expenses. You will add the amounts you advance to the sums owing on the Note, on which you will charge interest at the interest rate set forth in the Note. If, for example, we fail to honor our promises to maintain insurance in effect, or to pay filing fees, taxes or the costs necessary to keep the Premises in good condition and repair or to perform any of our other agreements with you, you may, if you choose, advance any sums to satisfy any of our agreements with you and charge us interest on such advances at the interest rate set forth in the Note. This Mortgage secures all such advances. Your payments on our behalf will not cure our failure to perform our promises in this Mortgage. Any replacement insurance that you obtain to cover loss or damages to the Premises may be limited to the amount owing on the Note plus the amount of any Prior Mortgages.

(g) PRIOR MORTGAGE: If the provisions of this paragraph are completed, this Mortgage is subject and subordinate to a prior mortgage dated    and given by us to

as mortgagee, in the original amount of $ 0.00    (the "Prior Mortgage"). We shall not increase, amend or modify the Prior Mortgage without your prior written consent and shall upon receipt of any written notice from the holder of the Prior Mortgage promptly deliver a copy of such notice to you. We shall pay and perform all of our obligations under the Prior Mortgage as and when required under the Prior Mortgage.

DOC ID #

(h) HAZARDOUS SUBSTANCES: We shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Premises. We shall not do, nor allow anyone else to do, anything affecting the Premises that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Premises of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Premises. As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Premises are located that relate to health, safety or environmental protection.

(i) SALE OF PREMISES: We will not sell, transfer ownership of, mortgage or otherwise dispose of our interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises without your prior written consent.

(j) INSPECTION: We will permit you to inspect the Premises at any reasonable time.

NO LOSS OF RIGHTS: The Note and this Mortgage may be negotiated or assigned by you without releasing us or the Premises. You may add or release any person or property obligated under the Note and this Mortgage without losing your rights in the Premises.

DEFAULT: Except as may be prohibited by applicable law, and subject to any advance notice and cure period if required by applicable law, if any event or condition of default as described in the Note occurs, you may foreclose upon this Mortgage. This means that you may arrange for the Premises to be sold, as provided by law, in order to pay off what we owe on the Note and under this Mortgage. If the money you receive from the sale is not enough to pay off what we owe you, we will still owe you the difference which you may seek to collect from us in accordance with applicable law. In addition, you may, in accordance with applicable law, (i) enter on and take possession of the Premises; (ii) collect the rental payments, including over-due rental payments, directly from tenants; (iii) manage the Premises; and (iv) sign, cancel and change leases. We agree that the interest rate set forth in the Note will continue before and after a default, entry of a judgment and foreclosure. In addition, you shall be entitled to collect all reasonable fees and costs actually incurred by you in proceeding to foreclosure, including, but not limited to, reasonable attorneys fees and costs of documentary evidence, abstracts and title reports.

ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER: As additional security, we assign to you the rents of the Premises. You or a receiver appointed by the courts shall be entitled to enter upon, take possession of and manage the Premises and collect the rents of the Premises including those past due.

WAIVERS: To the extent permitted by applicable law, we waive and release any error or defects in proceedings to enforce this Mortgage and hereby waive the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale and homestead exemption.

BINDING EFFECT: Each of us shall be fully responsible for all of the promises and agreements in this Mortgage. Until the Note has been paid in full and your obligation to make further advances under the Note has been terminated, the provisions of this Mortgage will be binding on us, our legal representatives, our heirs and all future owners of the Premises. This Mortgage is for your benefit and for the benefit of anyone to whom you may assign it. Upon payment in full of all amounts owing to you under the Note and this Mortgage, and provided any obligation to make further advances under the Note has terminated, this Mortgage and your rights in the Premises shall end.

NOTICE: Except for any notice required under applicable law to be given in another manner, (a) any notice to us provided for in this Mortgage shall be given by delivering it or by mailing such notice by regular first class mail addressed to us at the last address appearing in your records or at such other address as we may designate by notice to you as provided herein, and (b) any notice to you shall be given by certified mail, return receipt requested, to your address at
For MERS:
P.O. Box 2026, Flint, MI 48501-2026
For Lender:
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
or to such other address as you may designate by notice to us. Any notice provided for in this Mortgage shall be deemed to have been given to us or you when given in the manner designated herein.

RELEASE: Upon payment of all sums secured by this Mortgage and provided your obligation to make further advances under the Note has terminated, you shall discharge this Mortgage without charge to us, except that we shall pay any fees for recording of a satisfaction of this Mortgage.

DOC ID #:

**GENERAL:** You can waive or delay enforcing any of your rights under this Mortgage without losing them. Any waiver by you of any provisions of this Mortgage will not be a waiver of that or any other provision on any other occasion.

**THIS MORTGAGE** has been signed by each of us under seal on the date first above written.

WITNESS:

_Mary B___

_____
Mortgagor: DAVID C. CAULDER

_____
Mortgagor: JOSHUA B. FARMER

_Jayne K Caulder_
Mortgagor:

_Andrea G Farmer_
Mortgagor: Andrea G. Farmer

STATE OF SOUTH CAROLINA,                                    County ss.
I, _Mary B Olejnik_                                    do hereby certify that
_David C. Farmer, Joshua B. Farmer, Jayne K Caulder and
Andrea G. Farmer_

personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this ___29___ day of _August, 2007_

_Mary B Olejnik_
Notary Public for South Carolina

My Commission Expires:

MARY B. OLEJNIK
Notary Public of South Carolina
My Commission Expires:
May 4, 2009

Prepared by: MELISSA D. BENTON

## Countrywide Bank, FSB.

Branch #: 0000287
13860 BALLANTYNE CORP PL #150
CHARLOTTE, NC 28277
Phone: (704)752-1340
Br Fax No.: (704)752-1691

DATE:        08/29/2007
CASE #:
DOC ID #:    ~~~~~~~~~~~~~~~~~~
BORROWER: DAVID C. CAULDER
PROPERTY ADDRESS: 422 PELICAN FLIGHT DRIVE
                  DEWEES ISLAND, SC 29451-_____

### LEGAL DESCRIPTION EXHIBIT A

All that certain lot, piece or parcel of land, situate, lying and being in the County of Charleston, State of South Carolina, being known and designated as Lot 48 on a plat entitled "Dewees Island Charleston County, South Carolina" by E.M. Seabrook, Jr., Surveyor, dated June 11, 1993, and recorded in the Office of the Register of Deeds for Charleston County to which plat reference is hereby made for a more complete and perfect description.

This being the same property conveyed to Mortgagor by deed of Charleston County Master in Equity by deed recorded in Deed Book B 632 at page 411 on 9-5-07.

FHA/VA/CONV
Legal Description Exhibit A
2C404-XX (04/03)(d)



*23991*

026

# SECOND HOME RIDER

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
MELISSA D. BENTON

THIS SECOND HOME RIDER is made this TWENTY-NINTH           day of
AUGUST, 2007       , and is incorporated into and shall be deemed to amend and supplement the Mortgage,
Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower" whether there are one or more persons undersigned) to secure Borrower's Note to
Countrywide Bank, FSB.

(the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"),
which is located at:

422 PELICAN FLIGHT DRIVE
DEWEES ISLAND, SC 29451-_____
[Property Address]

    In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further
covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:
    6.    **Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home.
    Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times,
    and shall not subject the Property to any timesharing or other shared ownership arrangement or to any
    rental pool or agreement that requires Borrower either to rent the Property or give a management firm
    or any other person any control over the occupancy or use of the Property.

MULTISTATE SECOND HOME RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
• CONV/VA Second Home Rider
2365R-XX (02/07)(d/i)                      Page 1 of 2                      Form 3890 1/01





DOC ID #:

**8.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Second Home Rider.

_____ (Seal)
DAVID C. CAULDER                        — Borrower

_____ (Seal)
JOSHUA B. FARMER                        — Borrower

_____ (Seal)
Jayne K. Caulder                        — Borrower

_____ (Seal)
Andrea G. Farmer                        — Borrower

• CONV/VA Second Home Rider
2365R-XX (02/07)                 Page 2 of 2                 Form 3890 1/01

BK    W637PG559

DOC ID #: ~~~17045391508007

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this TWENTY-NINTH    day of
AUGUST, 2007    , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by
the undersigned (the "Borrower") to secure Borrower's Note to
Countrywide Bank, FSB.

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at:
    422 PELICAN FLIGHT DRIVE, DEWEES ISLAND, SC 29451-_____

[Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with
other such parcels and certain common areas and facilities, as described in
THE COVENANTS, CONDITIONS, AND RESTRICTIONS FILED OF RECORD
THAT AFFECT THE PROPERTY

**MULTISTATE PUD RIDER** - Single Family/Second Mortgage
Page 1 of 3
 -207R (0411)   CHL (12/05)(d)
VMP Mortgage Solutions, Inc.                                    3/99



* 2 3 9 9 1 *                                        2 0 7 R *

BK   H637PG560

DOC ID #: ~~~~~~~~~~~~~~~

(the "Declaration"). The Property is a part of a planned unit development

DEWEE ISLAND

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and (ii) Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan. Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 9.

BK    W637PG561

DOC ID #:

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
DAVID C. CAULDER    - Borrower

_____ (Seal)
JOSHUA B. FARMER    - Borrower

_____ (Seal)
Jayne K. Caulder    - Borrower

_____ (Seal)
Andrea G. Farmer    - Borrower

BK    W637PG562

# RECORDER'S PAGE

*NOTE*: This page MUST remain
with the original document

**Filed By:**

JOHNSON SMITH HIBBARD & WILDMAN
PO BOX 5587
SPARTANBURG SC   29304-5587

**FILED**

September 6, 2007

10:48:36 AM

BK    W637PG552

**Charlie Lybrand, Register**
**Charleston County, SC**

**Number of Pages:**

11

| DESCRIPTION | AMOUNT |
|---|---|
|  | $      16.00 |
|  |  |
|  |  |
|  |  |
| Postage |  |

| TOTAL | $      16.00 |
|---|---|

DRAWER:

| ③ | A - BJA |
|---|---|

---

DO NOT STAMP BELOW THIS LINE

843-958-4800    101 MEETING STREET    CHARLESTON, SC 29401    www.charlestoncounty.org



**Comptroller of the Currency**
**Administrator of National Banks**

Large Bank Licensing
Mail Stop 7-13
250 E Street, SW
Washington, DC 20219

April 27, 2009

Ms. Radhi Thayu
Assistant General Counsel
Bank of America Corporation
NY 1-100-18-07
One Bryant Park
New York, NY 10036

Re:   Application by Countrywide Bank, FSB, Centennial, Colorado to convert to a
national bank and application to merger Countrywide Bank, National Association
with and into Bank of America, National Association, Charlotte, North Carolina.
Application Control Numbers: 2009-ML-01-0003; 2009-ML-02-0003

Dear Ms. Thayu:

This letter is the official certification of the Comptroller of the Currency (OCC) of the
conversion of Countrywide Bank, FSB, Centennial, Colorado to a national bank with the name
Countrywide Bank, National Association, effective April 27, 2009.  This is also the certification
to merge Countrywide Bank, National Association with and into Bank of America, National
Association, Charlotte, North Carolina, effective April 27, 2009.

This letter is also the official authorization for Bank of America, National Association to operate
the former main office of Countrywide Bank, National Association as a branch of Bank of
America, National Association as detailed below:

Popular Name:      Colorado Branch
Address:           6465 South Greenwood Plaza, Suite 200
                   Centennial, Colorado
Branch Number:     146797A

If you have questions regarding this letter, please contact me at (202) 874-5294 or by email at:
Stephen.Lybarger@occ.treas.gov .  Please reference the application control number or numbers
in any correspondence.

Sincerely,

*Stephen A. Lybarger*

Stephen A. Lybarger
Large Bank Licensing Lead Expert

## CERTIFICATE OF ASSISTANT SECRETARY
### OF
### BANK OF AMERICA, NATIONAL ASSOCIATION
#### a national banking association

March 19, 2010

The undersigned, a duly qualified and acting Assistant Secretary of Bank of America, National Association, a national banking association (the "Bank"), does hereby certify as follows:

1.    That BAC GP, LLC, a Nevada limited liability company is the General Partner of BAC Home Loans Servicing, LP, a Texas limited partnership (the "Partnership"), and owns 0.1% of the Partnership;

2.    That BANA LP, LLC, a Nevada limited liability company is the Limited Partner of the Partnership, and owns 99.9% of the Partnership;

3.    That the Bank owns 100% of each of BAC GP, LLC and BANA LP, LLC; and

4.    That the Partnership is an indirect subsidiary of the Bank.

IN WITNESS WHEREOF, the undersigned has signed this Certificate of Assistant Secretary on behalf of the Bank as of the date first written above.

By: _Devra Lindgren_
Devra Lindgren
Assistant Secretary