IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Joshua and Andrea Farmer** | ) | Chapter 11 |
| | ) | Case No. 10-40270 |
| Debtors. | ) | |
| In re: | ) | |
| | ) | |
| **Raymond and Diane Farmer** | ) | Chapter 11 |
| | ) | Case No. 10-40269 |
| Debtors. | ) | |

**SECOND AMENDED JOINT DISCLOSURE STATEMENT OF JOSHUA AND
ANDREA FARMER AND RAYMOND AND DIANE FARMER RELATING
TO SECOND AMENDED JOINT PLAN OF REORGANIZATION
<u>PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE</u>**


Dated: Charlotte, North Carolina
     March 18, 2011

Hamilton Moon Stephens Steele & Martin, PLLC
Travis W. Moon (Bar No. 3067)
Richard S. Wright (Bar No. 24622)
Andrew T. Houston (Bar No. 36208)
201 South College Street, Suite 2020
Charlotte, NC 28244

*Counsel for the Debtors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Joshua and Andrea Farmer** | ) | Chapter 11 |
| | ) | Case No. 10-40270 |
| Debtors. | ) | |
| In re: | ) | |
| | ) | |
| **Raymond and Diane Farmer** | ) | Chapter 11 |
| | ) | Case No. 10-40269 |
| Debtors. | ) | |

**SECOND AMENDED JOINT DISCLOSURE STATEMENT OF JOSHUA AND
ANDREA FARMER AND RAYMOND AND DIANE FARMER RELATING TO
SECOND AMENDED JOINT PLAN OF REORGANIZATION
PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

ARTICLE I
INTRODUCTION AND OVERVIEW

**NO REPRESENTATIONS CONCERNING THE DEBTORS, THE
ENTITIES, THEIR BUSINESS, OR FUTURE OPERATIONS, OTHER THAN
THOSE SPECIFICALLY SET FORTH HEREIN, HAVE BEEN AUTHORIZED BY
THE DEBTORS.**

**A.      GENERAL**

On April 5, 2010, Raymond B. Farmer and Diane P. Farmer filed a voluntary
petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101
et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Western
District of North Carolina (the "Bankruptcy Court"). Joshua B. Farmer and Andrea G.
Farmer also filed a voluntary petition for relief under Chapter 11 of Title 11 of the
Bankruptcy Code in the Bankruptcy Court on April 5, 2010. The Honorable George R.
Hodges, United States Bankruptcy Judge, has presided over these chapter 11 cases at all
times since their inception.

The Bankruptcy Court directed that the cases be jointly administered in an Order
entered in each proceeding on May 10, 2010. Therefore, whenever applicable, the two
cases are referred to jointly as the "Chapter 11 Cases." Likewise, whenever applicable,
Raymond B. Farmer and Diane P. Farmer, along with Joshua B. Farmer and Andrea G.
Farmer, are referred to as the "Debtors" or the "Individual Debtors."

Contemporaneously herewith, the Debtors have filed the "Second Amended Joint Plan of Reorganization of Raymond and Diane Farmer and Joshua and Andrea Farmer, Pursuant to Section 1121(a) of the Bankruptcy Code" (the "Plan"). The Plan sets forth the proposed reorganization of the Debtors' chapter 11 estates and those of the Entities (collectively, the "Estates") and the distribution of recoveries to creditors (collectively, the "Creditors") of the Estates. A copy of the Plan is attached as <u>Exhibit A</u> to this disclosure statement (the "Disclosure Statement").

Pursuant to § 1126 of the Bankruptcy Code, the Debtors are soliciting acceptances of the Plan from the classes of Claims entitled to vote on the Plan. This Disclosure Statement is submitted pursuant to § 1125 of the Bankruptcy Code in order to provide information of the kind necessary to enable a hypothetical reasonable investor to make an informed judgment in the exercise of his/her/its right to vote on the Plan.

**B.    PURPOSE OF DISCLOSURE STATEMENT**

This Disclosure Statement is presented to all Creditors in order to satisfy the requirements of § 1125 of the Bankruptcy Code. Section 1125 requires a disclosure statement to provide information sufficient to enable a hypothetical and reasonable investor, typical of the Creditors, to make an informed judgment whether to accept or reject the Plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED. UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN SHALL HAVE THE MEANING SET FORTH IN ARTICLE I OF THE ATTACHED PLAN.**

**NO REPRESENTATIONS CONCERNING THE DEBTORS (PARTICULARLY AS TO THE VALUE OF THEIR PROPERTY) ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO SHALL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION CONTAINED IN THE EXHIBITS ATTACHED HERETO, HAVE NOT BEEN SUBJECT TO AN AUDIT**

OR INDEPENDENT REVIEW.  ACCORDINGLY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE DEBTORS OR THEIR FINANCIAL CONDITION IS ACCURATE OR COMPLETE.   ANY PROJECTED INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY, AND BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED, THE DEBTORS' ACTUAL RESULTS MAY NOT BE AS PROJECTED.

ALTHOUGH AN EFFORT HAS BEEN MADE TO BE AS ACCURATE AS POSSIBLE UNDER THE CIRCUMSTANCES, THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT.   THE DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.   EACH CREDITOR WHO IS ENTITLED TO VOTE ON THE PLAN IS URGED TO REVIEW THE PLAN PRIOR TO CASTING ITS VOTE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED.   THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH SINCE THE DATE OF THE DISCLOSURE STATEMENT.

SCHEDULES OF THE ASSETS AND LIABILITIES OF THE DEBTORS AND ENTITIES AS OF THE PETITION DATE (COLLECTIVELY, AS MAY BE AMENDED FROM TIME TO TIME, THE "SCHEDULES") ARE ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT AND MAY BE INSPECTED BY INTERESTED PARTIES DURING REGULAR BUSINESS HOURS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH § 1125 OF THE BANKRUPTCY CODE AND **NOT** IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW.  ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN, OR SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

The Honorable George R. Hodges will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") in the United States Bankruptcy Court, Charles Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina, on [_____]. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the Creditors, and will review the ballot reports concerning votes cast for acceptance and rejection of the Plan.

## C.   BRIEF OVERVIEW OF THE DEBTORS AND THE PLAN

### 1.   History of the Individual Debtors and the Entities

Joshua Farmer and Andrea Farmer are both practicing attorneys, and are partners in the law firm of Tomblin, Farmer & Morris, PLLC. Raymond Farmer is one of the principals of Carlson-Farmer, Inc. a North Carolina corporation that was incorporated in 1998. Carlson-Farmer is a construction company located in Rutherfordton, North Carolina. Diane Farmer has taught elementary school for over twenty years.

Prior to March 31, 2010, Joshua Farmer and Raymond Farmer each owned one-half of the membership interests in the following limited liability companies: (i) Wildewood Apartments of Spartanburg, LLC, a South Carolina limited liability company; (ii) Meadow Green Apartments, LLC, a South Carolina limited liability company; (iii) East Ridge Apartments, LLC, a South Carolina limited liability company; (iv) Timbercreek Apartments, LLC, a South Carolina limited liability company; (v) Groves Apartments, LLC, a South Carolina limited liability company; (vi) Georgetown Village Apartments, LLC, a South Carolina limited liability company; (vii) Gaffney Apartments, LLC, a South Carolina limited liability company; and (viii) Two Mile Properties, LLC, a North Carolina limited liability company (each an "Entity" and collectively, the "Entities"). Each Entity owned certain real property and improvements, which were and are operated as apartment complexes and other rental properties (the "Properties"). The Entities derived substantially all of their revenues from rents related to the Properties. A more detailed description of the Properties and the values of the Properties is set forth in Section I.C.2. below.

Joshua Farmer and Raymond Farmer also each owned one-half of the membership interests in a separate, North Carolina limited liability company, Two Mile Enterprises, LLC, which managed the various Properties pursuant to contracts with the Entities.

On or about March 30, 2010, each Entity executed the following documents:

(a) Minutes of the Meeting of the Members, whereby it was resolved that "all assets of the company, including all real and personal property and all tangible and intangible assets, be transferred to [Raymond Farmer and Joshua Farmer] in a ratio equal to each member's proportional membership interest in the company in consideration of the member's assuming liabilities of the company per the company's accounting

records";

(b)    a Consent Resolution authorizing each Entity to transfer to the Farmers "all of the Company's assets, subject to all liens and encumbrances";

(c)    a Bill of Sale, transferring to the Farmers all of the Entities interest in "furniture, fixtures, equipment and other tangible personal property that is now affixed to and/or located at the Real Property . . . and used in connection with the management, operation or repair of the Real Property"; and

(d)    a quit-claim deed or non-warranty deed transferring the real property owned by the Entities to the Farmers.

Between April 1 and April 5, 2010, each Entity also filed either Articles of Dissolution (in North Carolina) or Articles of Termination (in South Carolina). As a result of these transfers, each of the Properties is now owned by Joshua Farmer and Raymond Farmer jointly, subject to the liens and encumbrances of each Entity's creditors.

## 2.    Description of the Properties and Assets of the Estate

The following is a brief description of the Properties and the other Assets of the Estates that will provide a key source of funding for the Plan.

### Assets Owned by the Individual Debtors:

The Assets owned by the Individual Debtors and the values of those Assets are set forth in **Exhibit B** and **Exhibit C** to this Disclosure Statement. **Exhibit B** illustrates the Assets owned by Joshua and Andrea Farmer and **Exhibit C** illustrates the Assets owned by Raymond and Diane Farmer.

### Properties Formerly Owned by Gaffney Apartments, LLC:

*Creekside Apartments.* Creekside Apartments is a 92-unit apartment community located on the west side of Gaffney, South Carolina on Overbrook Drive. It consists of 6 buildings of townhome style apartments, with 6 units per building, and two four-story buildings of garden style apartments, with 28 units per building. The breakdown of units is 14 one bedroom/one-bathroom garden units, 4 one bedroom/one-bathroom townhome units, 42 two-bedroom/two-bathrooms garden units, 24 two-bedroom/1.5 bathrooms townhome units, and 8 three-bedroom/1.5 bathrooms townhome units. There is a playground, swimming pool, laundry facility, and fitness center located on site. The Debtors retained Integra Realty Resources ("Integra") to perform appraisals of many of the Properties. Integra appraised the Creekside Apartments at $2,350,000 as of September 15, 2010.

*Magnolia Ridge Apartments.*  Magnolia Ridge Apartments is an 84-unit apartment community located on the east side of Gaffney, South Carolina on Goldmine Springs Road. It consists of 12 buildings of garden style apartments. There are four buildings with four units each, and eight buildings with eight units each. The breakdown of units is 12 efficiency, 16 one-bedroom/one-bathroom, 32 two-bedroom/one-bathroom, 20 three-bedroom/one-bathroom, and 4 four-bedroom/two-bathrooms.  There is a playground, and laundry facility located on site.  Integra appraised the Magnolia Ridge Apartments at $1,010,000 as of September 15, 2010.

### Properties and Assets Formerly Owned by Two Mile Properties, LLC:

*Addison Townhomes.*   Addison Townhomes is a 54 unit apartment community located in Taylors, South Carolina on Watson Road.  It consists of four buildings of townhome style apartments.  The breakdown of units is 13 one-bedroom/one bathroom, 25 two-bedroom/1.5 bathrooms, and 6 three-bedroom/1.5 bathrooms.  Internet service is provided without charge to the residents.  Integra appraised the Addison Townhomes at $1,330,000 as of September 7, 2010.

*Creekside Mini-Storage.*  Creekside Mini-Storage is an 81-unit mini-storage facility located on the west side of Gaffney, South Carolina on Overbrook Drive.  The Debtors scheduled the value of the Creekside Mini-Storage at $220,000.

*Mayse Road Houses.*  The Mayse Road Houses are fifteen houses located on Mayse Road, Forest City, North Carolina.  They are located on one street consisting of twelve three bedroom/one bath, and three two bedroom/one bath houses.  The three bedroom houses are approximately 1000 sq ft each and the two bedroom houses are approximately 800 sq ft each.  The combined value of the Mayse Road Houses is $415,000.

*Winchester Drive Houses.*  The Winchester Drive Houses are five houses located on Winchester Drive in Ellenboro, North Carolina.  They are located on one street consisting, and each house includes three bedrooms and one bathroom.  All five houses are master-leased to Hansen Industrial Controls, Inc.  Additionally, Hansen Industrial Controls, Inc. has an option to purchase the houses individually.  The combined value of the Winchester Drive Houses is $140,000.

*Personal Property.*  The personal property associated with the former Two Mile Properties entity and corresponding values are set forth in **Exhibit D** to this Disclosure Statement.

### Others:

*Wildewood Apartments.*   Wildewood Apartments is a 369-unit apartment community located on the north side of Spartanburg, South Carolina on Bryant Road. It consists of 23 buildings with 16 garden style units each.  The breakdown of units is 112

one-bedroom/one-bathroom,   128   two-bedrooms/two-bathroom,   and   129   three-bedroom/two-bathroom units.   There are two swimming pools, two tennis courts, a playground, fitness center, and a picnic area located at the property.  Wi-Fi is also provided at the clubhouse.  Integra's appraised value of the Wildewood Apartments is $6,050,000 as of September 7, 2010.

*East Ridge Apartments.*  East Ridge Apartments is a 144-unit apartment community located on the east side of Spartanburg, South Carolina on Regency Road.  It consists of 18 buildings with eight garden style units each.    The breakdown of units is 55 one-bedroom/one-bathroom,   73   two-bedroom/one bathroom,   and   16   three-bedroom/two bathroom. There is a swimming pool and laundry facility located on the property.  Internet services are provided without charge to the residents.  Integra's appraised value of the East Ridge Apartments is $3,160,000 as of September 7, 2010.

*Meadow Green Apartments.*  Meadow Green Apartments is a 116-unit apartment community located on the east side of Spartanburg, South Carolina on Fernwood-Glendale road.  It consists of 8 buildings with garden style apartment homes.  The breakdown of units is 28 one-bedroom/one-bathroom, 72 two-bedroom/1.5 bathroom, and 16 three-bedroom/two-bathroom units. There is a swimming pool and laundry facility located on the property.  Integra's appraised value of the Meadow Green Apartments is $2,050,000 as of September 7, 2010.

*Timbercreek Apartments.*   Timbercreek Apartments is a 116-unit apartment community located on the west side of Spartanburg, South Carolina on Camelot Drive.  It consists of 11 buildings of garden-style apartments.  The breakdown of units is 32 one-bedroom/one-bathroom,   64   two-bedroom/1.5 bathroom, and   20   three-bedroom/two-bathroom units. There is a swimming pool and playground located on the property.  Internet services are provided without charge to the residents.  Integra's appraised value of the Timbercreek Apartments is $2,990,000 as of September 7, 2010.

*Georgetown Village Townhomes.*  Georgetown Village Townhomes is a 74-unit apartment community located on the west side of Spartanburg, South Carolina on John B. White Sr. Blvd. It consists of 8 buildings with townhome-style apartments.    The breakdown of units is seven one-bedroom/1.5 bathroom, 60 two-bedroom/1.5 bathroom, and seven three-bedroom/1.5 bathroom units.  There is a swimming pool, playground and laundry facility located on the property.  Integra's appraised value of the Georgetown Village Townhomes is $1,200,000 as of September 7, 2010.

*Groves Apartments.*  Groves Apartments is a gated 132-unit apartment community located on the north side of North Augusta, South Carolina on Groves Blvd.  It consists of 18 buildings of garden and townhome style apartments.  The breakdown of units is 33 one-bedroom/one-bathroom garden style, 75 two-bedroom/1.5 bathroom, and 24 three-bedroom/1.5 bathroom units.  There is a swimming pool, playground, and laundry facility on the property.  Integra's appraised value of the Groves Apartments is $3,560,000.

3.       **Reasons for the Chapter 11 Filing(s)**

The Properties experienced a significant reduction in overall net operating income during 2008 and 2009 as a result of the lagging United States economy.  Simply put, fewer jobs in the geographic region in which the Debtor operates meant fewer tenants who could afford to pay their rent.  The Entities' reduced income left them unable to pay its monthly operating expenses as well as its ongoing debt service and property tax obligations.

The Debtors entered into the property transfers described above and filed for protection under Chapter 11 in order to prevent foreclosure of the Properties and to streamline the reorganization of its business interests.  It is the Debtors' belief that their chosen course of action has reduced the administrative costs of their reorganization efforts, reduced the procedural hurdles attendant upon a large number of corporate filings, and increased the pool of assets available to satisfy its creditors generally.

4.       **The Proposed Reorganization of**
         **The Individual Debtors and Entities Pursuant to the Plan**

The Individual Debtors intend to restructure their existing secured debt based upon the value of the collateral securing each loan.  The restructured obligations will be paid over a term of years at the interest rates set forth specifically in Article 3 of the Plan.  In addition, the Individual Debtors intend to commit the value of their projected disposable income for a period of five (5) years as required by § 1129(a)(15) of the Bankruptcy Code to fund distributions to unsecured creditors.

With respect to Two Mile Properties, the company's assets will re-vest in Two Mile Properties Newco or as otherwise designated in Article 3 of the Plan.  Any secured debts will be restructured based upon the value of the collateral securing each loan or as otherwise designated in the Plan.  The Debtors intend to fund distributions to the unsecured creditors of Two Mile Properties by committing (i) the net cash flow of Two Mile Properties Newco for a period of three (3) years from the Effective Date of the Plan; (ii) from the net proceeds of the sale of the Two Mile Properties Liquidated Assets; and (iii) with a contribution of new value supplied by a relative of the Individual Debtors.

Pursuant to stipulated agreements with the former Entities' largest secured creditors, the properties formerly owned by the Entities are to be tendered to the respective lienholders or sold by auction pursuant to § 363 of the Bankruptcy Code.  The auction, which will be supervised by the Bankruptcy Court, will include a competitive, open bidding process.   The sale proceeds will be distributed according to the priorities established under the Bankruptcy Code and applicable state law.

5.       **Description of the Plan's Terms Contained in Disclosure Statement**

The reorganization of the Individual Debtors' Estates and the Entities' Estates under the Plan and each Sub-Plan, and the operation of Two Mile Properties Newco will

ensure at least an equivalent return to creditors of the respective Estates compared with what they would receive if the separate Estates were liquidated under chapter 7 of the Bankruptcy Code. An explanation of the Plan's terms is contained in Articles III and IV below.

**ARTICLES III AND IV OF THIS DISCLOSURE STATEMENT, AND THE ATTACHED EXHIBITS, CONTAIN A SUMMARY OF THE PLAN'S CLASSIFICATION AND TREATMENT OF CLAIMS, AS WELL AS OTHER KEY PROVISIONS OF THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH HEREIN CONSTITUTES A SUMMARY ONLY. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THIS DISCLOSURE STATEMENT ALONG WITH THE PLAN ITSELF. A COPY OF THE PLAN IS ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT.**

**TO THE EXTENT THAT ANY PROVISIONS OF THIS DISCLOSURE STATEMENT ARE INCONSISTENT WITH THE PROVISIONS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL; <u>PROVIDED, HOWEVER,</u> THAT THE CONFIRMATION ORDER SHALL CONTROL TO THE EXTENT THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE CONFIRMATION ORDER.**

## E.    <u>CREDITORS ENTITLED TO VOTE ON THE PLAN</u>

Pursuant to the Bankruptcy Court's SARE Order, the Debtors are required to separately administer the assets and liabilities of the Individual Debtors and the Entities. The Claims against the Individual Debtors and the Entities are grouped into Sub-Plans to carry out the Bankruptcy Court's requirement of separate administration of assets and liabilities. The Bankruptcy Court also required separate voting on this Plan. Thus, a holder of a claim against one of the Entities or the Individual Debtors should look to the Sub-Plan related to that Entity or Individual Debtor in order to determine the treatment of its claim. Within each Sub-Plan below, holders of Claims in Classes are or may be impaired by the Sub-Plan and, as such, the Debtors are soliciting votes from holders of Allowed Claims in these classes as set forth in Article 3 of the Plan. An explanation of the voting powers and requirements is contained in Part F.1 below.

## F.    **INSTRUCTIONS REGARDING VOTING, CONFIRMATION, AND OBJECTIONS TO CONFIRMATION**

### 1.    <u>Voting Instructions</u>

**BEFORE VOTING, YOU SHOULD READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, INCLUDING THE PLAN AND ITS EXHIBITS, IN THEIR ENTIRETY. BALLOTS MUST BE RECEIVED BY NO LATER THAN [_____].** You may vote on the relevant Sub-Plan by completing and mailing the enclosed Ballots to the Debtors' counsel at:

Hamilton Moon Stephens Steele & Martin, PLLC
Attention: Andrew T. Houston, Esq.
201 South College Street, Suite 2020
Charlotte, North Carolina 28244

You should use the ballots sent to you with this Disclosure Statement to cast your votes for or against the relevant Sub-Plan. You may <u>NOT</u> cast ballots or votes orally. In order for your ballot to be considered by the Bankruptcy Court, it must be received at the above address no later than the time designated in the notice accompanying this Disclosure Statement. **Any ballot executed by the holder of an Allowed Claim that does not indicate acceptance or rejection of the Sub-Plan shall be considered a vote to accept that Sub-Plan.**

If you are a holder of a Claim entitled to vote on a Sub-Plan and did not receive a ballot with this Disclosure Statement, you may obtain a ballot by contacting Debtors' counsel at the address shown above.

Only holders of Allowed Claims in impaired Classes are entitled to vote on each Sub-Plan. In addition, the record date of all Claims against the Debtor for voting purposes is August 19, 2010. Persons holding Claims transferred after such date will <u>not</u> be permitted to vote on the relevant Sub-Plan. An impaired Class of Claims accepts a Sub-Plan if at least two-thirds (2/3) in amount, and more than one-half (1/2) in number, of the Allowed Claims in the Class that are <u>actually</u> <u>voted</u> are cast in favor of the Sub-Plan. Subject to the terms of the Sub-Plan, Claimants who do not submit ballots are not counted as having voted either for or against the Sub-Plan. Pursuant to the provisions of Section 1126 of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Sub-Plan if such vote is not cast in good faith.

**A Creditor's failure to vote on a Sub-Plan will not affect such Creditor's right to a Distribution under the Sub-Plan.**

If the voting members of an impaired Class do not vote unanimously for a Sub-Plan but, nonetheless, vote for that Sub-Plan by at least the requisite two-thirds (2/3) in amount of Allowed Claims in that Class and one-half (1/2) in number of Allowed Claims actually voted in that Class, the Sub-Plan, at a minimum, must provide that each member of such Class will receive property of a value, as of the Effective Date, that is not less than the amount such Class members would receive or retain if the relevant Estate was liquidated under chapter 7 of the Bankruptcy Code.

The Debtors may dispute proofs of Claim that have been filed or that the Debtors listed as disputed in its Schedules filed with the Bankruptcy Court. Persons whose Claims are disputed may vote on, or otherwise participate in, Distributions under the Plan <u>ONLY</u> to the extent that the Bankruptcy Court allows their Claims. The Bankruptcy Court may temporarily allow a Claim for voting purposes only. The Schedules, which list the Claims and whether such Claims are disputed, can be inspected at the Office of the Clerk of the

United States Bankruptcy Court for the Western District of North Carolina, Charles Jonas Federal Building, 401 West Trade Street, Room 111, Charlotte, North Carolina.

Whether or not a Claimant votes on a Sub-Plan, such Persons will be bound by that Sub-Plan, including the terms and treatment of Claims set forth therein, if that Sub-Plan is accepted by the requisite majorities of the Classes or is "crammed-down" and confirmed by the Bankruptcy Court. Allowance or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for purposes of Distribution under the Plan.

## 2.    Confirmation of the Plan

Once it is determined which impaired Classes, if any, have or have not accepted each Sub-Plan, the Bankruptcy Court will determine whether each Sub-Plan may be confirmed. If all impaired Classes accept a given Sub-Plan, that Sub-Plan will be confirmed provided that the Bankruptcy Court finds the other conditions set forth in § 1129(a) of the Bankruptcy Code satisfied.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. IF YOU DO NOT UNDERSTAND ANY OF THESE PROVISIONS, PLEASE CONSULT WITH AN ATTORNEY. IF ALL CLASSES DO NOT ACCEPT THE PLAN, THE DEBTOR INTENDS TO RELY UPON THE "CRAM DOWN" PROVISION OF § 1129(b) OF THE BANKRUPTCY CODE.**

The Bankruptcy Court may confirm a Sub-Plan, even if all of the impaired Classes do not accept the Sub-Plan, if the Bankruptcy Court finds that certain additional conditions are met. Accordingly, if a Sub-Plan is not accepted by the requisite amount of Claims in their respective impaired Classes, the Debtors will seek confirmation of the Sub-Plan as to such non-accepting Classes pursuant to § 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code is generally referred to as the "cram down" provision. The Bankruptcy Court may confirm a Sub-Plan over the objection of a non-accepting Class if the Sub-Plan satisfies one of the alternative requirements of § 1129(b)(2)(A) of the Bankruptcy Code. The Bankruptcy Court may confirm a Sub-Plan over the objection of a non-accepting Class if one impaired Class within that Sub-Plan votes to accept the Sub-Plan.

## 3.    Objections to Confirmation

Any objections to confirmation of the Plan or any Sub-Plan must be filed with the Clerk of the Bankruptcy Court and served upon (a) Andrew T. Houston, Esq., Hamilton Moon Stephens Steele & Martin, PLLC, 201 South College Street, Suite 2020, Charlotte, North Carolina 28244; and (b) Linda Simpson, Office of the United States Bankruptcy Administrator, 402 West Trade Street, Charlotte, North Carolina 28202, in such a manner as will cause such objections to be filed with the Bankruptcy Court and received by the

aforementioned parties **no later than [_____].**

### 4.      Confirmation Hearing

A hearing on confirmation of the Plan is scheduled before the Honorable George R. Hodges, United States Bankruptcy Judge, United States Bankruptcy Court for the Western District of North Carolina, Charles Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina, on [_____]. Announcement of the adjournment or continuance of such hearing, if any, may be made in writing or in open court. No further written notice is required to be sent to claimants, interest holders, or other parties in interest.

## ARTICLE II
## BACKGROUND INFORMATION REGARDING THE DEBTOR

### A.      COMMENCEMENT OF THE CHAPTER 11 CASE

### 1.      Filing of the Petition

On April 5, 2010, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

### 2.      No Appointment of Unsecured Creditors Committee or Trustee

An Official Committee of Unsecured Creditors was not appointed in this Chapter 11 Case due to a lack of interest. Neither a trustee nor an examiner has been appointed in the Chapter 11 Case.

### 3.      Continuation of Business After Filing

The Debtors have continued to manage their business and affairs as debtors in possession, subject to the oversight of the Bankruptcy Administrator and the Bankruptcy Court. Consequently, certain actions of the Debtors during the pendency of the Chapter 11 Case, including all transactions outside of the ordinary course of business, if any, were taken only after first requesting and receiving authorization from the Bankruptcy Court.

Upon the filing of the chapter 11 petition, substantially all claims against the Debtors and the Entities that existed prior to the Petition Dates became subject to the automatic stay provisions under § 362 of the Bankruptcy Code while the Debtors continued operation of their business and affairs as debtors in possession. These pre-petition claims may arise from the determination by the Bankruptcy Court of allowed claims for contingent liabilities and other disputed amounts.

**B.**    **SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE**

1.    **Filing of Schedules**

The Debtor filed its Schedules of Assets and Liabilities, and its Statement of Financial Affairs on April 28, 2010 (collectively, the "Schedules").    The Debtor subsequently filed amendments to the Schedules on June 11, 2010.

2.    **Retention of Professionals by the Debtor**

The Debtor is represented by Travis W. Moon, Esq., Andrew T. Houston, Esq., and Richard S. Wright, Esq. as bankruptcy counsel for the Debtor in connection with its Chapter 11 Case.    Messrs. Moon, Houston, and Wright are attorneys with the firm of Hamilton Moon Stephens Steele & Martin, PLLC.    O. Max Gardner, III, was retained as special counsel to the Debtors to pursue litigation against certain parties in these Chapter 11 Cases.    The Debtors also retained the accounting firm of Swaim Brown, P.A. as accountants for the Debtors.

3.    **Critical Motions and Related Orders**

a.    **Administrative Matters**

Upon the filing of the Chapter 11 Case, the Debtors sought authority to use rental income from the Properties that may be subject to security interests of the Debtors' secured lenders on an interim basis.    The Court granted the Debtors' motion in an Order entered on April 23, 2010 (the "Interim Cash Collateral Order").    The Interim Cash Collateral Order required that the Debtor conform to certain budgets for the operation of each Property, which budgets were attached as an exhibit to the Interim Cash Collateral Order.    The Order also set a final hearing on the Debtor's continued use of cash collateral for April 28, 2010.

Following the April 28, 2010 hearing, the Court entered an Order on May 10, 2010 approving the Debtor's continued use of cash collateral to funds its operations on an ongoing basis (the "Final Cash Collateral Order").    The Court specifically found in the Final Cash Collateral Order that the above-referenced transfers of property from the Entities to the Debtor "were documented and were undertaken in a transparent fashion, which does not impugn the integrity of Raymond Farmer and Joshua Farmer in the operation and management of the Properties."    The Court further found that "Joshua Farmer and Raymond Farmer are competent and able to operate and manage the Properties and there is no evidence of mismanagement on the part of Joshua Farmer or Raymond Farmer."

The Final Cash Collateral Order incorporated the above-referenced budgets for each Property; authorized the continued operation and management of the Properties by the Debtor in return for a 4.5% management fee; provided that Joshua B. Farmer would receive an annual salary of $75,000 and a vehicle allowance in return for his management

services, to be paid from the management fee; and provided that Raymond B. Farmer would receive a salary of $50,000 in return for his management services, also to be paid from the management fee.

### b. The Bankruptcy Court's SARE Order.

Certain of the Properties would qualify as "single asset real estate" as defined in the Bankruptcy Code, had the Entities filed corporate bankruptcies rather than transferring their assets to the Debtors.  Pursuant to § 101(51B) of the Bankruptcy Code, "single asset real estate" refers to real property constituting a single property or project, other than residential real property with fewer than four residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.  The Bankruptcy Code imposes procedural requirements in "single asset real estate" cases that do not apply in other bankruptcy proceedings.

At the final cash collateral hearing on April 28, 2010, the Bankruptcy Court stated that it would hear from interested parties regarding the application of the single asset real estate rules in the Chapter 11 Case.  Thereafter, Creditor Palmetto Bank also filed a motion requesting that the Court consider whether the absolute priority rule of § 1129(b)(2), which applies to corporate debtors in bankruptcy, should apply in the Chapter 11 Case in light of the transfer of the Properties to the Debtor shortly before its bankruptcy filing.

In an Order entered May 28, 2010, the Bankruptcy Court concluded that the rules applicable to single asset real estate cases should apply in the Chapter 11 Case and directed the Debtor to file amended Schedules separately listing the assets and liabilities of each Entity (the "SARE Order").  The Bankruptcy Court also required the Debtors to separately administer the assets and liabilities of the Individual Debtors and the Entities.  The Bankruptcy Court further required separate voting on a Plan of Reorganization.  However, the Bankruptcy Court reserved ruling on whether the absolute priority rule applies in the Chapter 11 Case.  As directed, the Debtor filed its amended Schedules on June 11, 2010.

### c. Previous Disclosure Statements.

On July 6, 2010, the Debtors filed the Joint Plan of Reorganization of Raymond and Diane Farmer and Joshua and Andrea Farmer, Pursuant to Section 1121(a) of the Bankruptcy Code.  The Debtors also filed a joint disclosure statement on July 6, 2010.  The Debtors ultimately withdrew their initial plan and disclosure statement and sought leave to file an amended plan and disclosure statement.

The Bankruptcy Court granted leave to amend and the Debtors filed the Amended Disclosure Statement of November 15, 2010 (the "Amended Disclosure Statement") Contemporaneously therewith, the Debtors filed the First Amended Joint Plan of Reorganization of Raymond and Diane Farmer and Joshua and Andrea Farmer, Pursuant to

Section 1121(a) of the Bankruptcy Code (the "Amended Plan").

After a hearing on the Amended Disclosure Statement held on December 15, 2010, the Bankruptcy Court denied approval of the Amended Disclosure Statement and entered its Order Denying Approval of the Debtors' First Amended Joint Disclosure Statement on January 6, 2011 (the "Disclosure Statement Order"). The Disclosure Statement Order denied approval of the Amended Disclosure Statement because, among other reasons, it failed to provide for separate voting and separate administration of the assets and liabilities of the Entities and Individual Debtors. The Bankruptcy Court also ruled that the absolute priority rule would apply to the Entities in these Chapter 11 Cases. The Bankruptcy Court ordered the Debtors to file an amended disclosure statement and plan on or before January 26, 2011.

### d. The Debtors' Appeal of the Disclosure Statement Order.

The Debtors filed a Notice of Appeal with the Bankruptcy Court on January 20, 2011, indicating their intention to appeal the SARE Order and the Disclosure Statement Order to the United States District Court for the Western District of North Carolina. The appeal was assigned to the Honorable Graham C. Mullen, United States District Court Judge for the United States District Court for the Western District of North Carolina. The Debtors filed a motion for a stay of the Disclosure Statement Order pending appeal. The motion was initially granted but the District Court dissolved the preliminary stay of enforcement of the Disclosure Statement after a final hearing on the merits. After the stay hearing, the Debtors reached a series of consent resolutions of various stay relief motions and a motion to terminate cash collateral use that led to a consensual dismissal of the appeal.

### e. Stay Relief Motions.

Throughout the course of these Chapter 11 Cases, various secured creditors including, without limitation, Inland, Palmetto, NAFH, the Timbercreek Noteholders, and the Gaffney Noteholders filed motions for relief from stay seeking to foreclose on their respective collateral in state law proceedings. As a result of the stay relief motions, the Debtors reached a series of consent orders that addressed not only relief from stay, but also the resolution of the claims of each of these creditors. The terms of these consent orders and resolution of claims are incorporated into the Plan which is attached as **Exhibit A** to this Disclosure Statement.

### 4.    Pending and Potential Adversary Proceedings

The Debtors filed an adversary proceeding on September 14, 2010, captioned *Raymond B. Farmer et al. v. LB-UBS Commercial Mortgage Trust 2006 C-7, et al.*, Adversary Proceeding No. 10-03245, which is currently pending before the Bankruptcy Court (the "Gaffney Action"). The Action relates to a securitized loan made to Gaffney. Gaffney was the owner of the Magnolia Ridge Apartments and the Creekside Apartments.

In the Gaffney Action, the Debtors seek declaratory, injunctive and equitable relief and seek a determinations that the Defendants: (i) are not the real party/parties in interest, (ii) are estopped from asserting claims or, alternatively, are unsecured creditors, and (iii) have violated the automatic stay.

The Debtors filed the following similar actions in the Bankruptcy Court with respect to securitized loans: (i) *Farmer et al. v. Homebanc Mortgage Trust 2005-4, et al.*, case no. 10-3305 (the "Honeysuckle House Action"); (ii) *Farmer et al. v. Structured Asset Mortgage Investments II, Inc. et al.*, case no. 10-3306 (the "234 Edwards Street Action"), (ii), and (iii) *Farmer et al. v. ML-CFC Commercial Mortgage Trust 2007-8 et al.*, case no. 10-3304 (the "Timbercreek Action").

In connection with the settlements discussed above, the Debtors have agreed to dismiss the Gaffney Action and the Timbercreek Action.

### 5.    Bar Date for Filing of Claims

The Bankruptcy Court established August 19, 2010 (the "Claims Bar Date") as the deadline by which all proofs of Claim must be filed in this Chapter 11 Case. The Clerk of the Bankruptcy Court transmitted notices of the Bar Date to all known actual or potential claimants and informed them of their need to file a proof of Claim with the Bankruptcy Court on or before the Claims Bar Date.

**ARTICLE III**
**THE DEBTOR'S PLAN OF REORGANIZATION**

**THE FOLLOWING IS A SUMMARY OF THE PROVISIONS OF THE PLAN AND, ACCORDINGLY, IS NOT AS COMPLETE AS THE FULL TEXT OF THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT. THE PLAN ITSELF, ATTACHED AS EXHIBIT A HERETO, SHOULD BE READ IN ITS ENTIRETY.**

### A.    SUMMARY OF PAYMENT PROVISIONS CONTAINED IN THE PLAN

### 1.    Impairment of Claims

Under the Bankruptcy Code, a class of claims or interests is deemed "impaired" under a chapter 11 plan unless, in general, the rights of the holders of the claims or interests of such class are not altered or, with respect to interests, the holders receive cash equal to the greater of (a) any liquidation preference or (b) the redemption price, if either is applicable. Any class that is deemed impaired must accept the Sub-Plan by the requisite majority before the Sub-Plan can be confirmed, unless the Bankruptcy Court finds, pursuant to § 1129(b) of the Bankruptcy Code, that the Sub-Plan is fair and equitable and does not discriminate unfairly with respect to each class that is impaired and has not accepted the plan.

### 2.    Treatment of Claims

The treatment of and consideration to be received by holders of Allowed Claims pursuant to the Plan and each Sub-Plan will be in full settlement, release, and discharge of their respective Allowed Claims relating to the Debtors, the Entities and other Persons, as applicable, as specified in the Plan.

### B.    SUMMARY OF CLASSIFIED CLAIMS UNDER THE PLAN

Pursuant to the Bankruptcy Court's SARE Order, the Debtors are required to separately administer the assets and liabilities of the Individual Debtors and the Entities. The Claims against the Individual Debtors and the Entities are grouped into Sub-Plans to carry out the Bankruptcy Court's requirement of separate administration of assets and liabilities.  Thus, a holder of a claim against one of the Entities or the Individual Debtors should look to the Sub-Plan related to that Entity or Individual Debtor in order to determine the treatment of its claim.  Within each Sub-Plan, a Claim is included in a particular class or designation only to the extent that such Claim qualifies within the description of that class or designation, and is in a different class or designation to the extent that the remainder of such Claim qualifies within the description of such different class or designation.  Allowed Administrative Claims and Allowed Priority Tax Claims are not designated as classes of Claims for purposes of the Plan or Sub-Plan and pursuant to §§ 1123, 1124, 1126 and 1129 of the Bankruptcy Code.  A description of the general Classes and designations of claims against the Debtors and the Former Entities and the corresponding treatment thereof under the Plan is contained below.  This summary is qualified in its entirety by reference to the relevant provisions of the Plan.

In the Plan and the Sub-Plans, the treatment of claims are classified and treated as set forth on the attached **Exhibit E**.

ALL AMOUNTS LISTED ON THE ATTACHED **EXHIBIT E** FOR EACH CLASS OF CLAIM ARE MERELY ESTIMATES BASED ON INFORMATION AVAILABLE AS OF THE FILING OF THIS DISCLOSURE STATEMENT.  THE AMOUNTS SHOWN ARE SUBJECT TO CHANGE THROUGH THE DEBTOR'S CLAIMS REVIEW AND OBJECTION PROCESS OR OTHERWISE.  THE ACTUAL AMOUNTS COULD BE SUBSTANTIALLY DIFFERENT, CAUSING THE ULTIMATE DISTRIBUTIONS TO CREDITORS TO BE SIGNIFICANTLY HIGHER OR LOWER THAN ESTIMATED.

### ARTICLE IV
### OTHER PROVISIONS OF THE PLAN

### A.    ADMINISTRATIVE BAR DATE

In accordance with § 2.2 of the Plan, and except as otherwise ordered by the Bankruptcy Court (including any order providing for an earlier date), requests for payment

of Administrative Claims, including all applications for final allowance of compensation and reimbursement of expenses of Professionals incurred before the Confirmation Date, must be filed and served on the Reorganized Debtor, and the Bankruptcy Administrator no later than thirty (30) days after the Effective Date.  Any Person required to file and serve a request for payment of an Administrative Claim and who fails to timely file and serve such request, shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof.  The Administrative Claims Bar Date shall not apply to fees and expenses of Professionals incurred after the Effective Date.

## B.      EXECUTORY CONTRACTS

In accordance with § 5.1 of the Plan, as of the Effective Date, all executory contracts and unexpired leases of the Debtors that (a) have not previously been assumed by the Debtors by Order of the Bankruptcy Court, or (b) are not the subject of a motion to assume/reject pending on the Effective Date, shall be deemed REJECTED by the Debtors. It is anticipated that all Tenant leases will be assumed and assigned to the winning bidder at the Sale(s) contemplated in the Plan.  The Debtors do not believe that there are any cure payments owed as of the Effective Date for the assumption of these obligations.  This zero cure amount will be binding on the counterpart to such Assumed Agreement unless timely objected to by parties to the executory contracts and unexpired leases.

If not otherwise resolved by the parties, the Bankruptcy Court shall determine any dispute pertaining to the assumption and assignment of any Assumed Agreement, and any required disputed cure payment shall be paid promptly following the entry of a Final Order resolving such dispute.

In accordance with § 5.3 of the Plan and except to the extent a prior order of the Bankruptcy Court provided for an earlier date, in which case such earlier date shall control, all proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases shall be filed with the Bankruptcy Court within thirty (30) days after the earlier of (1) the date of service of notice of entry of an order of the Bankruptcy Court approving such rejection, or (2) the date of service of notice of the Confirmation Date, if such executory contract or unexpired lease has been rejected pursuant to the Plan.  Any Claims not filed within such time shall be released and discharged and forever barred from assertion against the Debtor, the Estate and the Reorganized Debtor.

## C.      AVOIDANCE ACTIONS

The Debtors have investigated the existence of, and potential recovery in, Avoidance Actions.  However, the Debtors are familiar with the assets and liabilities of any potential transferees and have concluded that they are judgment proof.  Therefore, the pursuit of such claims would be a waste of estate resources.  Regardless, and as set forth in § 7.7 of the Plan, after the Effective Date the Reorganized Debtors shall have the sole right, in the name of the Debtors, the Entities, and the Estates, to commence, continue, or settle any Avoidance Action, including any Avoidance Action brought by the Debtors prior to

the Effective Date and which remains unsettled as of the Effective Date, if any.

## D.   DISTRIBUTIONS

All Distributions made under the Plan will be made as set forth specifically in Articles 2, 3, and 8 of the Plan.

## E.   OBJECTIONS TO CLAIMS

Following the Effective Date, the Reorganized Debtor shall be authorized to object to, or to succeed or otherwise join any objection filed by the Debtor prior to the Effective Date, Claims so as to have the Bankruptcy Court determine the amounts to be allowed, if any, of such Claims and thus paid pursuant to the Plan.  Objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of such Claims no later than one hundred and twenty (120) days after the Effective Date; provided, however, that this deadline may be extended by the Bankruptcy Court upon the entry of an order by the Bankruptcy Court extending such deadline.  An objection to the allowance of a Claim by the Reorganized Debtor must be filed with the Bankruptcy Court and served upon the holder of the Claim and all parties who have requested notice.

Notwithstanding the foregoing, unless an order of the Bankruptcy Court specifically provides for a later date, any proof of claim for pre-petition debts of the Debtor filed after the Confirmation Date shall be automatically disallowed as a late-filed claim, without any action by the Reorganized Debtor, unless and until the party filing such Claim obtains (i) the written consent of the Reorganized Debtor to file such Claim late, or (ii) approval from the Bankruptcy Court upon notice to the Reorganized Debtor that permits the late filing of the Claim, in which event, the Reorganized Debtor shall have 120 days from the date of such written consent or order to object to such Claim, which deadline may be extended by the Bankruptcy Court upon motion of the Reorganized Debtor.

Prior to the Effective Date, the Debtor shall litigate to judgment, propose settlements of, or withdraw objections to such Disputed Claims asserted against it as the Debtor may choose.  From and after the Effective Date, the Reorganized Debtor shall litigate to judgment, propose settlements of, or withdraw objections to all Disputed Claims. Prior to the expiration of thirty (30) days from the date of service of the objection, the Claimant whose Claim was the subject of the objection must file a response to the objection with the Bankruptcy Court and serve the response upon the objecting party and the Reorganized Debtor.  If the Claimant whose Claim was the subject of the objection fails to file and serve its response to the objection within the 30-day response deadline, the Bankruptcy Court may grant the relief requested in the objection against the non-responding Claimant without further notice or hearing.  All proposed settlements of Disputed Claims shall be subject to the approval of the Bankruptcy Court after notice and opportunity for a hearing (as that term is used in § 102(1) of the Bankruptcy Code).

## F.     MISCELLANEOUS

### (a)     Consummation – Retention of Jurisdiction

Consummation of the Plan consists of satisfaction of any and all conditions to the effectiveness of the Plan.  Pursuant to Article 11 of the Plan, the Bankruptcy Court will continue to retain jurisdiction after Confirmation of the Plan to resolve all outstanding matters in the Chapter 11 Cases and with respect to the fulfillment of the obligations of the Reorganized Debtors under the Plan.

### (b)     Discharge of Individual Debtors

The consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, discharge, release, and termination of all Claims of any nature whatsoever against the Estates or the Individual Debtors.  Pursuant to § 1141 of the Bankruptcy Code, and except as otherwise stated in the Plan, the Individual Debtors shall be entitled to move for entry of a discharge upon completion of all payments under the Plan.  A complete description of the scope and effect of the Individual Debtors' discharge is contained in Section 9.1 of the Plan.

### (c)     Discharge of Entities

Except as otherwise specifically provided in this Plan or in the Confirmation Order, the rights afforded in this Plan or in any Sub-Plan, and the treatment of the Claims and Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims against and Interests in the Entities, Two Mile Properties Newco or the Assets, properties, or Interests in, or property of the Entities or Two Mile Properties Newco of any nature whatsoever, including any interest accrued on any Claim from and after the Petition Date. Except as expressly otherwise provided herein or in the Confirmation Order, on the Effective Date, all Claims arising before the Effective Date (including those arising under Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code) against the Entities and Two Mile Properties Newco (including any based on acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of any of the Debtor, or any conduct for which any of the Debtor may be deemed to have strict liability under any applicable law), and all Interests shall be irrevocably satisfied, discharged, cancelled and released in full.   A complete description of the scope and effect of the Entities' discharge is contained in Section 9.2 of the Plan.

### (d)     Release of Certain Claims and Actions

As of and upon entry of the Discharge Order, all Persons or Entities who have held, hold, or may hold Claims against the Debtor and/or the Estate shall be deemed to have waived, released, and discharged all rights or claims, whether based upon tort, contract or otherwise, which they possessed or may possess prior to entry of the Discharge Order

against the Debtor and/or the Estate, except as otherwise provided for in the Plan (including the documents filed as Schedules to the Plan) or the Confirmation Order; provided, however, that the foregoing release shall not apply to performance or nonperformance under the Plan or related instruments, securities, agreements or documents, or to any action or omission that constitutes actual fraud or criminal behavior. The Discharge Order shall contain a permanent injunction to effectuate these releases.

### (e)  Exculpation

To the fullest extent permitted by § 1125(e) of the Bankruptcy Code, the Debtor, the Reorganized Debtor, and its respective members, officers, directors, employees, representatives, counsel, or agents shall be deemed released by each of them against the other and by the holders of Claims of and from any and all claims, obligations, rights, causes of action, and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case, including, without limiting the generality of the foregoing, the Disclosure Statement, the pursuit and approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for Avoidance Actions, willful misconduct or gross negligence, and all such persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan and under the Bankruptcy Code.

### (f)  Conditions Precedent to Confirmation

The Plan shall not be confirmed unless and until the Bankruptcy Court has entered the Confirmation Order in a form and substance satisfactory to the Debtor.

### (g)  Conditions Precedent to the Effective Date

The Plan shall not become effective and operative unless and until the Effective Date occurs. The Effective Date shall occur: (i) after the Confirmation Order has been entered, has not been modified or altered in any way, and no stay of the Confirmation Order shall be in effect, and (ii) the other conditions set forth in Section 10.2 of the Plan are satisfied.

### (h)  Rounding

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as unclaimed property under the Plan.

## ARTICLE V
## CONFIRMATION OF THE PLAN

### A.   FEASIBILITY

Section 1129(a) of the Bankruptcy Code requires a judicial determination that confirmation of the Plan will not likely be followed by liquidation or the need for further financial reorganization of the Debtor unless liquidation is contemplated under the Plan. Analyses of the Individual Debtors' sources of income and expenses are set forth in **Exhibits F and G** of the Disclosure Statement.  In addition, **Exhibit H** illustrates the projected cash flow for Two Mile Properties Newco.

Based on the foregoing, the Debtors submit that there will be sufficient funds on hand to satisfy the minimum distributions required under § 1129(a)(9) of the Bankruptcy Code and the obligations of the Reorganized Debtors under the Plan or Sub-Plans from the continued operation of the Reorganized Debtors.

### B.   ACCEPTANCE

As a condition to Confirmation of each Sub-Plan, the SARE Order and § 1129(a) of the Bankruptcy Code, with certain exceptions, requires that each impaired Class accept the Sub-Plan.  In general, a class is "impaired" if the legal, equitable, or contractual rights attaching to the Claims of that class are modified, other than by curing defaults and reinstating maturities or by payment in full in cash.

The Bankruptcy Code defines acceptance of a plan (a) by a class of creditors entitled to vote thereon as acceptance by holders of two-thirds in dollar amount and a majority in number of Allowed Claims in that class and (b) by a class of equity holders entitled to vote thereon by acceptance two-thirds in amount of such interests.  Each calculation, however, includes only those holders of Allowed Claims who actually vote to accept or reject the Plan or Sub-Plan in this case.

Under § 1126(f) of the Bankruptcy Code, classes of Allowed Claims that are not "impaired" under a Sub-Plan are conclusively deemed to have accepted that Sub-Plan. Under § 1126(g) of the Bankruptcy Code, classes that receive no distributions under the Sub-Plan are conclusively deemed to have rejected the Sub-Plan.  For these reasons, acceptances of the Sub-Plans are being solicited from all Classes impaired pursuant to the Sub-Plans, if any.

### C.   NON-ACCEPTANCE AND CRAM DOWN

If any Class of impaired Claims fails to accept a Sub-Plan, the Debtors will seek to effect a "cram down" on such dissenting Class and all Classes that are junior to such dissenting Class in each Sub-Plan under § 1129(b) of the Bankruptcy Code.  The Debtors expressly reserve the right to resort to the "cram down" provisions of the Bankruptcy Code in each Sub-Plan.  The Debtors also reserve the right to amend the Plan  or Sub-Plans and

request the Bankruptcy Court to confirm the Plan or Sub-Plan as further amended.  If an amendment(s) to a Sub-Plan is material, the Debtor may have to re-solicit acceptances from any Class affected by the change(s), unless that Class can be deemed to have accepted or rejected the Sub-Plan.

Each Sub-Plan's treatment of Classes is consistent with the foregoing. Consequently, the Debtors believes that if any of the holders in Classes that are impaired reject a Sub-Plan, each Sub-Plan may be confirmed over such opposition.  Pursuant to § 1129(b) of the Bankruptcy Code, the Debtor will seek Confirmation of the Plan or Sub-Plan, notwithstanding the possible rejection of a Sub-Plan by holders of Claims in any class.

## D.    BEST INTERESTS TEST - - LIQUIDATION ANALYSIS

### Introduction

Notwithstanding acceptance of the Plan in accordance with section 1126 of the Bankruptcy Code, the Court must find that each member of an impaired class of creditors, if any, has each accepted the applicable Sub-Plan, or will receive or retain property of a value, as of the Effective Date of the Plan or Sub-Plan, that is not less than the amount such creditor or interest holder would have received or retained if the Estates were liquidated under Chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan and Sub-Plans comply with this "best interests" test.

As discussed below, a conversion of the Chapter 11 Case to a case administered under Chapter 7 of the Bankruptcy Code, followed by liquidation under Chapter 7, would engender higher expenses and risks than the reorganization contemplated by the Plan. When coupled with the inevitable delay caused by the appointment of a Chapter 7 trustee and the retention of the trustee's professionals (including, for example, attorneys, accountants, appraisers, real estate brokers, and the like), distributions to holders of Allowed Claims that would otherwise be made on the Effective Date of the Plan necessarily will be delayed for an indefinite period.

A conversion of the Chapter 11 Case to a case administered under Chapter 7 of the Bankruptcy Code would require the appointment of a trustee(s) to conduct the liquidation of the Estate.  Such a trustee would likely have limited historical experience or knowledge of the Chapter 11 Case or of the Debtor's records, assets, or former business.  The fees charged by a Chapter 7 trustee(s) and any professionals hired by the Chapter 7 trustee(s) would impose additional administrative costs on the Estate that will not be incurred under the Plan, which would be paid ahead of Allowed Administrative, Priority Tax, and Other Priority Claims.

### Joshua Farmer and Andrea Farmer

Debtors Joshua and Andrea Farmer hold certain non-exempt assets that would be

available for liquidation by a Chapter 7 Trustee.  After payment of liquidation costs and expenses, and allowing for statutory fees to the Trustee, the Debtors estimate that the net amount available for distribution in a liquidation case  upon disposition of these assets would total approximately $58,000.00.  In contrast, the Plan provides that the Debtors will commit the value of their projected disposable income for a period of five years for payment of periodic distributions to unsecured creditors.  The Debtors estimate that the total amount available for distributions under the Plan will be at least $65,050.00.  Charts setting forth a more detailed explanation of the Debtor's liquidation analysis and projected disposable income calculations are set forth in **Exhibits B and I** attached hereto.

### Raymond Farmer and Diane Farmer

Debtors Raymond and Diane Farmer  also hold certain non-exempt assets that would be available for liquidation by a Chapter 7 Trustee.  After payment of liquidation costs and expenses, and allowing for statutory fees to the Trustee, the Debtors estimate that the net amount available for distribution in a liquidation case upon disposition of these assets would total approximately $8,234.87.  In contrast, the Plan provides that the Debtors will commit their projected disposable income for a period of five years for payment of periodic distributions to unsecured creditors.  The Debtors estimate that the total amount available for distributions under the Plan will be at least $8,450.00.  Charts setting forth a more detailed explanation of the Debtors' liquidation analysis and projected disposable income calculations are set forth in **Exhibits C and I** attached hereto.

### Two Mile Properties

Like the Individual Debtors, the former Two Mile Properties, LLC Entity held non-exempt assets that would be available for liquidation by a Chapter 7 Trustee.  After payment of liquidation costs and expenses, and allowing for statutory fees to the Trustee, the Debtors estimate that the net amount available for distribution in a liquidation case upon disposition of these assets would total approximately $47,187.50.  In contrast, the Plan provides that the Two Mile Properties Newco  will commit  its net  cash flow for a period of three (3) years for payment of periodic distributions to unsecured creditors in the amount of $39,493.00.  The Two Mile Properties Liquidated Assets will be auctioned as well, with the net proceeds of approximately $21,000.00 also committed for distributions to unsecured creditors.  Finally, a family member of the Individual Debtors will contribute $10,000.00 to increase the pool of funds distributed to unsecured creditors under this Sub-Plan.  Thus, the Debtors estimate that the total amount available for distributions under this Sub-Plan will be at least $70,493.00.  Charts setting forth a more detailed explanation of the Debtors' liquidation analysis and projected disposable income calculations are set forth in **Exhibits D and I** attached hereto.

### Apartment Properties

The Plan provides that the properties owned by the  remaining Entities, including the Wildewood Apartments, Addison Townhomes, East Ridge Apartments, Meadow Green

Apartments, Timbercreek Apartments, Georgetown Village Apartments, the Creekside Apartments, and the Magnolia Ridge Apartments, will be sold in an auction supervised by the Bankruptcy Court upon confirmation of the Plan pursuant to section 363 of the Bankruptcy Code.   The Groves Apartments are excluded from the proposed sale, as this property was previously tendered to Inland's designee in full satisfaction of Inland's secured claim by stipulation.

A table setting forth the fair market values of each of the apartment properties to be auctioned is shown below.  The indicated values are derived from appraisals completed by Integra Realty Resources dated on or about October 1, 2010.

| PROPERTY | APPRAISED VALUE |
|---|---|
| Addison Townhomes | $1,330,000 |
| Wildewood Apartments | $6,050,000 |
| East Ridge Apartments | $3,160,000 |
| Meadow Green Apartments | $2,050,000 |
| Timbercreek Apartments | $2,990,000 |
| Georgetown Village Apartments | $1,200,000 |
| Creekside Apartments | $2,350,000 |
| Magnolia Ridge Apartments | $1,010,000 |
| Total: | $20,140,000 |

It is undisputed that the aggregate amount of secured Claims encumbering the apartment properties exceeds their fair market value.  Thus, in the event of a liquidation sale, the Chapter 7 Trustee would be unable to realize any funds for distributions to unsecured creditors upon disposition of the properties at depressed, liquidation values. After deductions for sale costs, outstanding *ad valorem* taxes, and allowed commissions, such sales would not generate net proceeds sufficient to satisfy even the Allowed Secured Claims against the properties.  Unsecured creditors would receive nothing from the sale of the properties in this scenario.

Under the proposed Plan, the properties identified in the table shown above will be sold through an open auction process with competitive bidding.  The Debtors believe that selling the properties in this fashion, while they continue to operate as going concerns, will maximize their sale potential.  Through agreements reached with secured creditors holding liens against the properties, the auction sale will provide a means to satisfy the Debtors' largest Allowed Secured Claims in full.  In addition, the auction process will afford the best opportunity to realize sums over and above the amounts of the senior secured claims, potentially leaving funds available for distribution to unsecured creditors that would be impossible in a Chapter 7 liquidation.

*Conclusion*

Thus, considering the property and assets owned by the Debtors, confirmation of

the Plan and each Sub-Plan is preferable to liquidating the case under Chapter 7 of the Bankruptcy Code. Creditors will receive more under the Plan and Sub-Plans than they would receive in a Chapter 7 liquidation by preserving the going-concern value of the Debtor's assets.

Accordingly, for all the foregoing reasons, the Debtors believe that confirmation of the Plan is in the best interests of Creditors and fully complies with the statutory requirements of the Bankruptcy Code.

**ARTICLE VI**
**MATERIAL UNCERTANITIES AND RISK FACTORS**

**HOLDERS OF CLAIMS AGAINST THE DEBTOR AND THE ESTATE SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS OTHER INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN). THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND IMPLEMENTATION THEREOF.**

**A.    CERTAIN DISPUTED CLAIMS**

The feasibility of the Plan is predicated upon the levels of the Claims not being materially in excess of the amounts estimated herein and in the Plan. If such claims are substantially in excess of the estimated amounts, the Debtor's ability to satisfy its payment obligations under the Plan could be impacted.

Moreover, the stated amounts of claims in each Class listed above are merely estimates based on the amounts listed on the Debtor's Schedules and the current claims register published by the Clerk of the Bankruptcy Court. All amounts are subject to change upon the completion of the claims review and objection process by the Reorganized Debtor.

**B.    CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE**

As more fully discussed herein, if certain conditions precedent to Confirmation and the Effective Date have not been satisfied, the Plan may be withdrawn and the Confirmation Order vacated.

**C.    CERTAIN TAX MATTERS**

Implementation of the Plan may have material federal income tax consequences to the Debtor and to holders of the Claims.

## ARTICLE IX
## <u>CONCLUSION</u>

**FOR THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTOR BELIEVES THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.  THE DEBTOR THUS URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY[_____].**

Dated: Charlotte, North Carolina
       March 18, 2011


*/s/  Raymond B. Farmer*
_____
Raymond B. Farmer


*/s/ Diane P. Farmer*
_____
Diane P. Farmer


*/s/ Joshua B. Farmer*
_____
Joshua B. Farmer


*/s/ Andrea G. Farmer*
_____
Andrea G. Farmer